Volume 2

Pages 185 - 422

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )        NO. CR 14-00380-CRB
                                   )
FEDEX CORPORATION, ET AL.,         )
                                   )
            Defendants,            )
_____)

                        San Francisco, California
                        Tuesday, June 14, 2016

            **TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        **DAVID R. CALLAWAY**
                        United States Attorney
                        Acting Under Authority Conferred by
                        28 U.S.C. Section 515
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                 BY:    **KIRSTIN AULT**
                        **JOHN HEMANN**
                        **JENNY ELLICKSON**
                        **ASSISTANT UNITED STATES ATTORNEYS**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2

     For Defendants:
3                               ARGUEDAS, CASSMAN & HEADLEY, LLP
                                803 Hearst Avenue
4                               Berkeley, CA  94710
                          BY:  **CRISTINA C. ARGUEDAS, ATTORNEY AT LAW**
5                               **TED W. CASSMAN, ATTORNEY AT LAW**
                                **RAPHAEL M. GOLDMAN, ATTORNEY AT LAW**
6

7                               SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
                                LLP
8                               525 University Avenue
                                Palo Alto, CA  94301
9                         BY:  **ALLEN RUBY, ATTORNEY AT LAW**

10                              FEDEX EXPRESS LITIGATION
                                3620 Hacks Cross Road
11                              Memphis, TN  38125
                          BY:   **PETER D. BLUMBERG, ATTORNEY AT LAW**
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    Tuesday, June 14, 2016 - Volume 2

3    GOVERNMENT'S WITNESSES                    PAGE   VOL.

4    CHIN, JASON
     (SWORN)                                   203     2
5    Direct Examination by Ms. Ault           210     2

6    FOSTER, SUSAN
     (SWORN)                                   302     2
7    Direct Examination by Mr. Hemann         302     2
     Cross-Examination by Ms. Arguedas        319     2
8
     CHIN, JASON (RECALLED)
9    (PREVIOUSLY SWORN)                        333     2
     Direct Examination resumed by Ms. Ault   333     2
10   Cross-Examination by Mr. Ruby            401     2

11                       E X H I B I T S

12   TRIAL EXHIBITS                    IDEN   EVID   VOL.

13     001-1                                   212     2

14     001-6                                   244     2

15     015-25                                  209     2

16     015-26                                  209     2

17     016-6                                   209     2

18     016-17                                  209     2

19     016-23                                  209     2

20     016-34                                  209     2

21     016-61                                  209     2

22     016-73                                  209     2

23     016-89                                  209     2

24     016-80                                  209     2

25
```

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 016-118 | | 209 | 2 |
| 016-8 | | 209 | 2 |
| 025-2 | | 209 | 2 |
| 026-10 | | 209 | 2 |
| 026-37 | | 209 | 2 |
| 026-43 | | 209 | 2 |
| 026-44 | | 209 | 2 |
| 026-75 | | 209 | 2 |
| 026-76 | | 209 | 2 |
| 026-81 | | 209 | 2 |
| 026-96 | | 209 | 2 |
| 026-1 | | 209 | 2 |
| 026-27 | | 209 | 2 |
| 026-14 | | 209 | 2 |
| 026-3 | | 209 | 2 |
| 026-13 | | 209 | 2 |
| 026-15 | | 209 | 2 |
| 026-25 | | 209 | 2 |
| 026-33 | | 209 | 2 |
| 026-45 | | 209 | 2 |
| 026-46 | | 209 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 026-52 | | 209 | 2 |
| 026-50 | | 209 | 2 |
| 026-54 | | 209 | 2 |
| 026-42 | | 209 | 2 |
| 026-57 | | 209 | 2 |
| 026-88 | | 209 | 2 |
| 030-3 | | 209 | 2 |
| 030-4 | | 209 | 2 |
| 030-8 | | 209 | 2 |
| 030-12 | | 209 | 2 |
| 030-14 | | 209 | 2 |
| 030-16 | | 209 | 2 |
| 030-19 | | 209 | 2 |
| 030-37 | | 209 | 2 |
| 030-42 | | 209 | 2 |
| 030-72 | | 209 | 2 |
| 030-66 | | 209 | 2 |
| 030-30 | | 209 | 2 |
| 030-40 | | 209 | 2 |
| 030-48 | | 209 | 2 |
| 030-103 | | 209 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 030-111 | | 209 | 2 |
| 030-34 | | 209 | 2 |
| 032-1 | | 209 | 2 |
| 032-2 | | 209 | 2 |
| 032-8 | | 209 | 2 |
| 040-32 | | 209 | 2 |
| 040-39 | | 209 | 2 |
| 040-30 | | 209 | 2 |
| 040-90 | | 209 | 2 |
| 040-81 | | 209 | 2 |
| 040-131 | | 209 | 2 |
| 040-37 | | 209 | 2 |
| 040-42 | | 209 | 2 |
| 040-43 | | 209 | 2 |
| 040-96 | | 209 | 2 |
| 40-85 | | 400 | 2 |
| 041-9 | | 209 | 2 |
| 041-12 | | 209 | 2 |
| 050-20 | | 209 | 2 |
| 058-119 | | 209 | 2 |
| 058-120 | | 209 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 058-121 | | 209 | 2 |
| 060-9 | | 209 | 2 |
| 060-17 | | 209 | 2 |
| 060-19 | | 209 | 2 |
| 060-22 | | 209 | 2 |
| 060-015 | | 307 | 2 |
| 060-023 | | 309 | 2 |
| 060-016 | | 309 | 2 |
| 060-20 | | 335 | 2 |
| 060-21 | | 335 | 2 |

| | |
|---|---|
| 1 | **<u>Tuesday - June 14, 2016</u>**                                **<u>9:01 a.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---oOo--- |
| 4 | **THE COURT:**  Good morning. |
| 5 | Mr. Hemann, you may proceed. |
| 6 | **MR. HEMANN:**  Good morning, Your Honor.  John Hemann, |
| 7 | Kirstin Ault, and Jenny Ellickson, who's back there, for the |
| 8 | United States. |
| 9 | **THE COURT:**  All right.  Everybody's here.  Okay. |
| 10 | **MR. HEMANN:**  So before we start with the witnesses, |
| 11 | Your Honor, we wanted to take up an issue with regard to |
| 12 | scheduling that flows from the Court's observations at the |
| 13 | close of openings -- |
| 14 | **MS. ARGUEDAS:**  Could you go to the mic? |
| 15 | **MR. HEMANN:**  Oh.  Yeah.  Surely. |
| 16 | -- that goes to the Court's observations at the close of |
| 17 | openings yesterday, specifically the Court's request to hear a |
| 18 | fulsome presentation of the evidence with regard to the |
| 19 | meetings that took place between the DEA and representatives of |
| 20 | FedEx and other carriers in sort of the 2002 to 2007 time |
| 21 | frame.  There were some six, seven number of meetings. |
| 22 | We are going to do that.  We are going to call as many of |
| 23 | the witnesses who were at those meetings as are available and |
| 24 | we can find them and get them here to include the two witnesses |
| 25 | that Ms. Arguedas focused on yesterday, Ms. Willis and |

 1   Mr. Murphy.

 2        Before we do so, we feel the need to have a further

 3   conversation with both of those witnesses, and we're -- and

 4   make logistical arrangements to get them out here.  We have

 5   several other witnesses who are already on the Government's

 6   shortened witness list who we had intended to bring next week

 7   starting on Monday, and they've got a variety of family

 8   obligations that make Monday the day that works for them, and

 9   there are three of them.  There may be even a couple more.

10        So here's our proposal, Your Honor:  Number one, we don't

11   want to waste the Court's time or anybody else's time.

12        Number two, this is an issue that, given where we are and

13   given the way the Court has expressed its thoughts, is probably

14   an issue that should be dealt with directly and soon.  To that

15   end, what we would like to do is get through some number of

16   witnesses today and potentially tomorrow, go dark on Thursday

17   and Friday, and then present to the Court on Monday and Tuesday

18   these witnesses and devote time to doing that.  I can tell the

19   Court I need the time.

20        **THE COURT:**  Well, I think that's fine.  Well, I'll

21   hear from Ms. Arguedas.  You know, tomorrow afternoon I'm

22   otherwise occupied with your office.

23        **MR. HEMANN:**  Yes, Your Honor.

24        **THE COURT:**  So it's not like I'm going to a baseball

25   game having given away my tickets to the baseball game tomorrow

1   afternoon.

2          But putting that aside, yes, Ms. Arguedas?  This is --

3          **MS. ARGUEDAS:**  A good development, is that --

4          **THE COURT:**  Well, I mean, I think, you know, I sort of

5   came out on the bench thinking, you know, this is in front of

6   me.  I have these questions.  I don't -- I don't know -- I

7   don't know what the Government's response is; in other words,

8   whether they accept as accurate the characterizations of what

9   was basically a large percentage of your presentation

10  yesterday.

11         I think Ms. Ault's comment yesterday was important; that

12  is, keep an open mind.  But the question is:  An open mind on

13  what?  I mean, an open mind?  I mean, what does that mean?

14         It means that where there are contested issues of fact, I

15  ought to be very careful not to conclude one set of facts is

16  accurate, and if, in fact, it's contested before I hear

17  everything.  I think that's what lawyers want or expect -- or

18  parties expect a trier of fact to do, keep an open mind on

19  contested issues of fact.  And I'm certainly willing to do

20  that, and I think I have to do that.  I think that's important

21  to do.  I tell jurors it's important to do, and I think it's

22  equally important for judges where there's a contest.

23         But because of being a judge and 19 years on the bench, I

24  can come to certain -- and having heard two cases, I can come

25  to certain conclusions as to what is the factual landscape of

1     the case and perhaps what is somewhat the legal landscape of

2     the case.  I can come to certain conclusions, though those

3     conclusions have to be grounded in a -- or tested against the

4     reality of what the evidence is.  So I appreciate that.

5          So I think it's a good development that we're going to try

6     to get to these issues relatively soon.  I appreciate it.  I

7     asked the Government to do it.  I think that they've been very

8     thoughtful, and I'm appreciative of that effort.

9          After having said all that, I address my attention to you.

10          **MS. ARGUEDAS:**  Thank you, Your Honor.

11          First of all, I want to say that I also think this is a

12     welcomed development, and I have both compassion and empathy

13     for Mr. Hemann when he says, "I need this time."  However, from

14     FedEx's point of view, we do not want any dark days.  We want

15     our trial every day, and let me just make a couple points that

16     I think will explain our position.

17          Willis and Murphy have always been available to the

18     Government.  They have been interviewed by the Government years

19     ago and two months ago.  And I keep coming back to this because

20     Ms. Ault interviewed both Willis and Murphy I'm going to say

21     six weeks ago.  She did it with two agents on the phone, and

22     what we have heard from Ms. Ault in writing is that no one took

23     any notes of those interviews of these obviously critical

24     witnesses and witnesses that have strongly exculpatory

25     evidence.

1     So having said that, I also want to say that while I

2  appreciate that the Government has a lot to do, there was last

3  night and there was this morning to talk to both Willis and

4  Murphy.  Both were available.  I talked to them.  And I

5  e-mailed the Government last night and I said, "Murphy can be

6  here on Friday to testify"; and Willis, I didn't have a date,

7  but I said, "There's no impediment to her coming here

8  immediately."

9     So that is the context in which I say -- we said from the

10 beginning we want our trial every single day, and they either

11 because of the two months' ago interview or the presence of

12 last night and this morning, they should have it done.

13     THE COURT:  Yeah, but you would recognize that we have

14 an addition to the Prosecution team somebody who is not as

15 intimately familiar with the facts.

16     MS. ARGUEDAS:  That's why I started with empathy and

17 compassion.

18     THE COURT:  Well, but I think -- I think that -- and I

19 appreciate your position, but I have a slightly different

20 position because I'm not engaged in the fray sadly.

21          (Laughter)

22     THE COURT:  Okay.  Let me ask you this:  If we were to

23 go dark on Thursday, all day Thursday, could you be ready to

24 proceed on Friday?  You would then have Wednesday afternoon and

25 all day Thursday.

1          **MR. HEMANN:**  I have -- yes, but I don't think it's a

2    good idea, and I don't think it's a good idea for the following

3    reasons:

4          Reason number one is, even today and tomorrow we are going

5    to be presenting to the Court things that the Court does not

6    want to hear first first.

7          **MS. ARGUEDAS:**  Always a good idea.

8                    (Laughter)

9          **MR. HEMANN:**  First.

10   Yeah.  And so -- and, listen, when the Court said, "I want

11   you to prioritize the issue of FedEx's knowledge and intent,"

12   we went through a process of determining what that evidence is.

13   Much of it includes words from the mouths of FedEx witnesses,

14   which are going to talk a lot about the e-mails that have been

15   shown.  Those witnesses are mostly this week primarily because

16   of the scheduling difficulties with these other meeting

17   witnesses that were going to come next week.

18         And so my concern -- my number one concern is that we're

19   going to spend some of today, tomorrow, and any other days that

20   we go this week talking about things that the Court has decided

21   are the cart and not the horse.  And it's time in this case we

22   see because whether the Court -- whether it's a jury or a

23   judge, we need to look at the audience.  We can see the

24   audience.  We can see the faces of the jurors.  We can hear the

25   words of the Court.  We know that what we need to do now is put

1  the horse on first.  This is our horse, this is Your Honor's

2  horse, and we need to do it.

3      So that's what we should do.  We can put on these two

4  witnesses presumably, assuming they're available, on Friday.

5  We obviously -- I'm assuming, based on Ms. Arguedas'

6  representations, that we can read the reports, look at all the

7  notes, talk to them, get them out here, put them on the stand,

8  but they are not the only two witnesses at these meetings.

9  There are other witnesses who cannot come until next week.  I

10 don't think that these two witnesses will take all day on

11 Friday, so I just think that scheduling-wise --

12      **THE COURT:**  Well, what if we do this, though:  I mean,

13 you put on the two witnesses on Friday -- I guess you've

14 identified them -- and when they're complete, we recess.

15      I just think it's important -- I can't ask the Government

16 to do something and then turn around and say, "I'm not going to

17 give you time to do it."

18      **MS. ARGUEDAS:**  I understand.

19      **THE COURT:**  I just can't do that.  They'll never agree

20 to anything again, and I wouldn't if I were the Government.

21      **MS. ARGUEDAS:**  I understand.

22      **THE COURT:**  So I just have to engage.  I know, I know

23 that this case is going to be resolved in an expeditious way.

24 It's not going to go into August 17th, so we've dealt with that

25 issue.

1          MS. ARGUEDAS:  Yep.

2          THE COURT:  And we just have to be a little patient.

3          MS. ARGUEDAS:  I understand.

4          THE COURT:  And we have to translate our compassion --

5     our words of compassion into acts of compassion, you see.

6          MR. HEMANN:  Amen.

7          THE COURT:  So let's do the Friday witnesses.  If you

8     want to be dark on Thursday, that's fine.  I don't want to hear

9     a lot of, you know, cart.

10         MS. ARGUEDAS:  Yeah.  Can I ask this, Judge, two

11    things, I think it's only two things?

12         THE COURT:  Yes.

13         MS. ARGUEDAS:  First of all, procedural or whatever,

14    logistically, the Government, and I'm not complaining or

15    blaming in any way, the Government has a lot of FedEx employees

16    here in hotels and flying in and, you know, all of this.  Can

17    you ask them within the next couple of hours to figure out who

18    they do and don't need of our employees given all of this?

19         THE COURT:  Well, they'll let you know by 5:00 o'clock

20    tonight --

21         MS. ARGUEDAS:  Sure.

22         THE COURT:  -- or earlier if you know it.

23         MS. ARGUEDAS:  I mean, whatever you don't know, you

24    don't know, but some you know you're now not going to need.

25         MR. HEMANN:  I can say this based on the conversation

1   that we just completed, which is there are a number of people

2   who we're going to be able to say, "Don't come until next -- we

3   won't need you for sure until next Tuesday."  We'll be able to

4   say that.

5        We have a number of -- I think we have one FedEx witness

6   slated for today and two for tomorrow.  I think the one that's

7   on today should go today.

8            **MS. ARGUEDAS:**  Yes.

9            **MR. HEMANN:**  As far as I'm concerned, the two for

10  tomorrow we can put back with the cart as well at the

11  appropriate time.

12           **MS. ARGUEDAS:**  I just want you to release who you can

13  release.

14           **THE COURT:**  Okay.  And I want the two of you to have a

15  conversation --

16           **MS. ARGUEDAS:**  Right.

17           **THE COURT:**  -- outside my presence.

18           **MS. ARGUEDAS:**  Right.  Okay.  We will do that.

19       So I have a second thing, and I'm not trying to complicate

20  anything.  I'm trying to maybe simplify it, so either it is or

21  it isn't a good idea.

22       I talked to both Murphy and Willis this morning.  I read

23  them what I said yesterday from the transcript.  They confirmed

24  everything I said.  So there is no doubt in my mind that that

25  is what will happen; and there is no doubt in my mind that if

**PROCEEDINGS**

1   the Government calls them on the phone and asks them, does

2   exactly what I did, they're going to say exactly what -- of

3   course, you know and the Government knows --

4           **THE COURT:**  Well, I think I definitely want to hear

5   it.

6           **MS. ARGUEDAS:**  That's what I wanted to know.  I wanted

7   to know whether if they stipulated --

8           **THE COURT:**  No, no.  I want to hear it.  I want these

9   people to be subjected to the crucible of cross-examination.

10          **MS. ARGUEDAS:**  Okay.

11          **THE COURT:**  I want them to see John Hemann at his very

12  finest, you know, isn't-it-a-fact type of question.

13          **MR. HEMANN:**  I think they're our witnesses.  I can't

14  cross-examine them.

15          **THE COURT:**  Yes, you can.

16          **MR. HEMANN:**  No.  I'm a prosecutor.  I'm a direct

17  examination person.

18          **THE COURT:**  Oh, no.  Listen, I'll let everybody

19  cross-examine everybody.  I'm here to watch good

20  cross-examination.  I'm not --

21          **MR. HEMANN:**  "Tell me what happened next."  That's

22  going to be my question.

23          **THE COURT:**  No, I don't want to hear any of that.  I'm

24  so bored with that.

25          **MS. ARGUEDAS:**  Can I tell you, because this was

running through my mind all day yesterday?  Bob Feldman told me

a story about trying a case, a bench --

            THE COURT:  Should this be on the record?

            MS. ARGUEDAS:  It could be.  It could be.

            THE COURT:  I just wonder whether this part should be

on the record.

            MS. ARGUEDAS:  Maybe not.  We can take it off if you

don't.

     He had a bench trial in front of Judge Legge, and he did

some cross-examination with a flourish; and he turned to the

judge proudly and expectantly and Judge Legge said, "You know,

it's only me here."

            THE COURT:  That's great.  That's great.

            MS. ARGUEDAS:  Okay.  So here we go.

            THE COURT:  Okay.

            MR. HEMANN:  Okay.

            MS. ARGUEDAS:  Thank you.

            MS. AULT:  Good morning, Your Honor.

            THE COURT:  Good morning.

            MS. AULT:  And we would ask the Court's indulgence.

As Mr. Hemann said, we did hear the Court yesterday; however,

we had witnesses planned.

            THE COURT:  Go right ahead.  I understand.

            MS. AULT:  So we are going to proceed with the

witnesses we had planned.

**PROCEEDINGS**

1          So the United States calls Special Agent Jason Chin.

2          **THE CLERK:**  Will the witness please take the stand?

3    Remain standing.  Raise your right hand.

4                          **JASON CHIN**,

5    called as a witness for the Government, having been duly sworn,

6    testified as follows:

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Please be seated.

9          **THE WITNESS:**  Thank you.

10         **THE CLERK:**  Please state your full name, spell your

11   last name for the record.

12         **THE WITNESS:**  Jason Chin, C-H-I-N.

13         **MS. AULT:**  And, Your Honor, may I approach the

14   witness?

15         **THE COURT:**  Yes, of course.  And you don't have to ask

16   either.

17         **MS. AULT:**  And, Your Honor, what I'd like to do first

18   is, what the Court has up there and what Mr. Chin has up there

19   is a stack of documents that are all records that were produced

20   by the defendants, and so we would just like to move them in

21   en masse as statements of a party opponent.

22         **MR. RUBY:**  Your Honor, through the Court, may I please

23   have a stack of my own so I can look at them before they're

24   moved into evidence?

25         **THE COURT:**  It seems like a reasonable request.

1          **MS. AULT:**  Your Honor, I can provide counsel with the

2     stack that I have.  I don't have a separate stack for counsel.

3          **THE COURT:**  Well, this is what I'd like to do:  I'd

4     like to move them in subject to a motion to strike giving you

5     some time because you're not going to look at a thousand pages

6     right now; and any time in the next 24, 48 hours, you see some

7     document in there that you have some concern about, simply

8     raise it.  Is that --

9          **MR. RUBY:**  Sure.  That's just fine.

10         **THE COURT:**  You're representing all these documents

11    are documents of FedEx; is that correct?

12         **MS. AULT:**  Yes, Your Honor.

13         **THE COURT:**  Okay.  So at least we know where they came

14    from, and I will -- but I will admit them subject to a motion

15    to strike, and I understand that the motion to strike is based

16    at least in part on the fact that you haven't even seen these

17    documents.  I mean, you may have seen them at one time, but you

18    haven't seen them in this configuration and for these purposes.

19         **MR. RUBY:**  Indeed.  Thank you, Your Honor.

20         The second request I have is, if the agent is going to be

21    testifying about the documents or maybe even reading some of

22    them, I need a hard copy in front of me.  If Ms. Ault says that

23    she's giving that to me now, then I'll sit down; but I am going

24    to need --

25         **THE COURT:**  I can give you my copy.

PROCEEDINGS

1          MS. AULT:  Well, Your Honor, I mean, we did provide

2     the Defense with copies of all of our exhibits.  We got a

3     request late last night to provide them an extra copy.

4          THE COURT:  Well, okay.

5          MS. AULT:  It was just too late for us to do it.

6          THE COURT:  I just want to move forward.  I just want

7     to move forward.  So I can give you -- you're going to show

8     them on the screen; is that right?

9          MS. AULT:  Yes, Your Honor.

10         THE COURT:  Okay.  So why don't I just give this copy

11    to Mr. Ruby, and let me know if I need to look at something

12    closer, I will; and if not -- yeah?

13              (Courtroom Deputy and The Court conferring.)

14         THE COURT:  Pardon?  I have another set?  Oh, I have

15    another set.  So it's not even a hardship.

16         MR. RUBY:  Thank you, Your Honor.

17         THE COURT:  I was going to have to get FedEx to send

18    me some.

19         MR. RUBY:  Thank you, Your Honor.

20         THE COURT:  All right.  There we go.

21         MS. AULT:  Thank you, Your Honor.

22      So we would like to move in the following exhibits --

23         THE COURT:  And all this will be subject to a motion

24    to strike.

25         Go ahead.

**PROCEEDINGS**

1          **MS. AULT:** Exhibit 30-3 --

2          **THE COURT:** Well, wait a minute. I'm going to have to

3     move -- I'm now looking at your second revised exhibit list, is

4     that the right one?

5          **MS. AULT:** Yes, Your Honor.

6          **THE COURT:** And you say 30 dash?

7          **MS. AULT:** 3.

8          **THE COURT:** Hold on.

9                       (Pause in proceedings.)

10          **THE COURT:** Okay. 30-3. These are the FedEx credit

11     policies that appear on page 85?

12          **MS. AULT:** Yes, Your Honor.

13          **THE COURT:** Okay.

14          **MS. AULT:** 30-4, 30-8, 30-14, 30-16, 30-19, 30-12,

15     30-16 --

16          **MR. CASSMAN:** 16?

17          **MS. AULT:** 16.

18          **THE COURT:** 30-16, I marked it. I think it was

19     already --

20          **MR. CASSMAN:** Me too.

21          **MS. AULT:** Oh. I apologize. I have it twice.

22       30-37, 30-42, 30-72, 30-66, 30-30, 30-40, 30-48, 30-103,

23     and 30-111.

24       Now I'm going to go to 26. 26-10, 26-37.

25          **THE COURT:** 26-37?

PROCEEDINGS

1          MS. AULT:  37.

2          THE COURT:  Okay.

3          MS. AULT:  26-43, 26-44, 26-75, 26-76, 26-81, 26-96.

4          MR. CASSMAN:  I'm sorry.  I missed that last one.

5          MS. AULT:  26-96.

6      And then I apologize, Your Honor.  We're going to go back

7   to 26-1, 26-27, 26-14, 26-3, 26-13, 26-15, 26-25, 26-33, 26-44.

8          THE COURT:  26-44 I had previously.

9          MS. AULT:  I must have a duplicate.

10      26-45, 26-46, 26-52.

11      And then let's go to 16.  16-6, 16-17, 16-23, 16-34,

12   16-61, 16-73, 16-89.

13      And then I missed a couple in the 26 range.  So 26-50.

14          THE COURT:  Wait one minute.  26 dash?

15          MS. AULT:  50, five zero.

16          THE COURT:  Five zero.

17          MS. AULT:  26-54 and 30-34.

18          THE COURT:  30 dash?

19          MS. AULT:  34.

20      Let's go to the 40s.

21          MR. CASSMAN:  I'm sorry?

22          THE COURT:  40.

23          MS. AULT:  Four zero.

24          MR. CASSMAN:  30-40?

25          MS. AULT:  No.  Just four zero.  I'm just getting

**PROCEEDINGS**

```
 1   everyone to the right place.

 2          MR. CASSMAN:  Gotcha.

 3          MS. AULT:  40-32, 40-39, 40-30, 40-90, 40-81, 40-131.

 4          THE COURT:  41?

 5          MS. AULT:  131.

 6          THE COURT:  I'm sorry.

 7          MS. AULT:  40-131.

 8          THE COURT:  I don't think I have it.

 9          MR. CASSMAN:  I think it's on the bottom of page 102,

10   Your Honor.

11          THE COURT:  I'm sorry.  It's out of order.  Okay.

12   Thank you.

13          THE CLERK:  That's 40-131?

14          MS. AULT:  131.

15          MR. RUBY:  I didn't hear that.

16          THE COURT:  40-131.

17          MS. AULT:  40-131.

18          MR. RUBY:  Thank you.

19          MS. AULT:  41-9, 41-12, 50-20, 58-119.

20          MR. CASSMAN:  58-119?

21          MS. AULT:  119.

22      58-120, 58-121, 60-9, 60-17.

23          THE CLERK:  What was that?  17?

24          MS. AULT:  17, 60-17.

25      60-19, 60-22.
```

**PROCEEDINGS**

1      And now I'm going to have to go pick up some strays.

2   15-25.

3           THE CLERK:  Again?

4           MS. AULT:  15-25 and 15-26.

5      16-80, 16 -- did the Court find 16-80?

6           THE COURT:  Pardon?

7           MS. AULT:  16-80?

8      16-118, 16-8.

9           MR. CASSMAN:  I'm sorry.  I missed that one.

10          MS. AULT:  16-8.

11     25-2, 26-42, 26-57, 26-88, 32-1, 32-2, 32-8, 40-37, 40-42,

12  40-43, and 40-96.

13     I believe that's everything.

14          THE COURT:  Okay.  All those are admitted subject to

15  motion to strike.

16     (Trial Exhibits 015-25, 015-26, 016-6, 016-8, 016-7,

17  016-23, 016-34, 016-61, 016-73, 016-80, 016-89, 016-118, 025-2,

18  026-1, 026-3, 026-10, 026-13, 026-14, 026-15, 026-25, 026-27,

19  026-33, 026-37, 026-42, 026-43, 026-44, 026-45, 026-46, 026-50,

20  026-52, 026-54, 026-57, 026-75, 026-76, 026-81, 026-88, 026-96,

21  030-3, 030-4, 030-8, 030-12, 030-14, 030-16, 030-19, 030-30,

22  030-34, 030-37, 030-40, 030-42, 030-48, 030-66, 030-72,

23  030-103, 030-111, 032-1, 032-2, 032-8, 040-30, 040-32, 040-37,

24  040-39, 040-42, 040-43, 040-81, 040-90, 040-96, 040-131, 041-9,

25  041-12, 050-20, 058-119, 058-120, 058-121, 060-9, 060-17,

 1  060-19, and 060-22 received in evidence)

 2          **THE COURT:**  And you can show them.  You don't have to

 3  approach the witness.  You can do whatever you want with them.

 4          **MS. AULT:**  Thank you, Your Honor.

 5      And there will be a couple of other exhibits that the

 6  agent has helped to create, and so he will testify about those

 7  separately.

 8          **THE COURT:**  Okay.

 9          **MS. AULT:**  These are all FedEx records.

10                      <u>**DIRECT EXAMINATION**</u>

11  BY MS. AULT:

12  **Q.**   Special Agent Chin, where do you currently work?

13  **A.**   I work for the Drug Enforcement Administration in

14  San Francisco.

15  **Q.**   And how long have you been with the DEA?

16  **A.**   For about 11 years.

17  **Q.**   Can you maybe pull the microphone a little bit closer?

18  **A.**   (Witness complying.)

19  **Q.**   What group do you work in with the DEA?

20  **A.**   I work in the Financial Investigations Team.

21  **Q.**   What does the Financial Investigations Team do?

22  **A.**   We do regular drug cases, but we put an emphasis on

23  exploiting the financial side of the case.

24  **Q.**   And what did you do before you worked for the DEA?

25  **A.**   I was a credit analyst for Shell Trading in gas and power.

CHIN - DIRECT / AULT

1   **Q.**   Has the Financial Investigation Team been involved in an

2   investigation of Internet pharmacies?

3   **A.**   Yes.

4   **Q.**   How long has that investigation been going on?

5   **A.**   From approximately July 2005.

6   **Q.**   And what is an Internet pharmacy?

7   **A.**   An Internet pharmacy is basically a pharmacy that exists

8   virtually on the Internet.

9   **Q.**   Are Internet pharmacies also called online pharmacies?

10   **A.**   Yes, they are.

11   **Q.**   So we could use the two terms interchangeably?

12   **A.**   That's correct.

13   **Q.**   How do Internet pharmacies differ from what we call a

14   fulfillment or a brick and mortar pharmacy?

15   **A.**   Sure.  They differ in that a brick and mortar pharmacy

16   actually is a physical location versus an online pharmacy,

17   which is just on the Internet.

18   **Q.**   And when the DEA registers part of the distribution chain,

19   what parts of the Internet pharmacy process need to be

20   registered?

21   **A.**   What's the brick and mortar pharmacy that obtains the DEA

22   registration.

23   **Q.**   So the online pharmacy does not have to be registered, the

24   Internet website?

25   **A.**   That's correct.

**CHIN - DIRECT / AULT**

1    **Q.**    Well, I guess prior to 2009.

2    **A.**    Prior, that's correct.

3    **Q.**    After the passage of the Ryan Haight Act, did the Internet

4    website then also have to be registered?

5    **A.**    Yes, but it had to be attached to a brick and mortar

6    pharmacy.

7    **Q.**    And if you could look at Exhibit 1-1.

8    **A.**    (Witness examines document.)

9           **MS. AULT:**  Barbara, this screen isn't...

10                      (Pause in proceedings.)

11          **THE COURT:**  This will be admitted for -- I don't know

12   whether it was or not, but admitted for demonstrative purposes.

13         (Trial Exhibit 001-1 received in evidence)

14          **MS. AULT:**  Thank you, Your Honor.

15   **Q.**    Special Agent Chin, can you describe generally how the

16   Internet pharmacies that were part of your investigation

17   operated?

18   **A.**    Sure.  Generally the online pharmacies that I investigated

19   incorporated an online questionnaire model.  So in this

20   particular chart, it starts on the left-hand side with the

21   customer who's wanting to order a drug from an Internet

22   pharmacy, and that can be accomplished in a couple of ways.

23   Either the customer knows which website they want to go to, or

24   they could do a search via Google for a drug like phentermine,

25   for example, and that would return several different websites.

1       In the next step, once the customer has identified the

2    website that they want to order from, they would generally go

3    to an affiliate website, which is an advertising website; and

4    once they choose the order they would like to -- and once they

5    choose the drug they would like to purchase, they will be

6    forwarded to the actual online pharmacy website.  It's at this

7    online pharmacy website where you would enter in your billing

8    information, your shipping information, and also answer a brief

9    online medical questionnaire.

10   **Q.**   Okay.

11          **THE COURT:**  So let me ask a question, if I might.

12          **MS. AULT:**  Yes, sir.

13          **THE COURT:**  Let's say you have a customer.  The

14   picture you've got a person.  I don't know.  Anyway, let's say

15   she thinks she's too fat and so she's interested in getting a

16   diet drug.  How does it work?  Does she simply go on -- does

17   she go on something like Google and simply say, "I am too fat,"

18   or, "I can't sleep at night"?  Maybe I should use that rather

19   than some other analogy.  "I can't sleep at night."

20          Okay.  And then if she does that, "I can't sleep at

21   night," does it go to the affiliate?  How does it work?  How

22   does it -- what is the next step after she says, "I can't sleep

23   at night"?

24          **THE WITNESS:**  Generally what we've seen is people who

25   want to buy drugs on the Internet will know the drug they want

1    to purchase, so they'll search for that particular drug.

2            THE COURT:  Okay.  So she can write -- in Google, she

3    can say "Ambien"?

4            THE WITNESS:  That's correct.

5            THE COURT:  Okay.  So she writes "Ambien," types

6    "Ambien."  What happens next?  Does it go to this thing called

7    the affiliate?

8            THE WITNESS:  Well, what happens is when you search

9    for Ambien, you would get a return of several different

10   websites, and generally that would be the affiliate website.

11   So you'd click on that first link, for example, that comes back

12   in your search, and it would be to the affiliate website.

13           THE COURT:  Okay.  So then any -- is it that any of

14   the websites that come back are then characterized as affiliate

15   websites?

16           THE WITNESS:  In some cases, yes; in some cases, no.

17   Because sometimes what we've seen is the online pharmacy, you

18   could go directly to the online pharmacy website itself rather

19   than to an affiliate, but generally you would get affiliate

20   websites that would return first.

21           THE COURT:  Okay.  And the online pharmacy in this

22   diagram is the one in the middle?

23           THE WITNESS:  That's correct.  Yes, sir, the Internet

24   pharmacy.

25           THE COURT:  Okay.  So either she would go directly to

1   the online pharmacy, called the Internet pharmacy, or she would

2   go to an affiliate and the affiliate would then send her to the

3   online pharmacy?

4           **THE WITNESS:**  That's correct.

5           **THE COURT:**  Okay.  Thank you.

6   BY MS. AULT:

7   Q.   Perhaps we can use a real-world example.  You investigated

8   an online pharmacy called SafeScriptsOnline; is that correct?

9   A.   That's correct.

10  Q.   And what's SafeScriptsOnline in this diagram?

11  A.   SafeScriptsOnline would be the Internet pharmacy.  So the

12  entity in the middle of the chart.

13  Q.   And did SafeScriptsOnline have a number of affiliate

14  websites?

15  A.   Yes, they did.

16  Q.   And one of those was called dietpills.com?

17  A.   Yes.

18  Q.   And so if a customer were to search for something like

19  diet pills, would a website like dietpills.com come up?

20  A.   Yes.

21  Q.   And then when a customer went to dietpills.com and

22  selected phentermine, would she then be directed to the

23  SafeScriptsOnline Internet pharmacy website?

24  A.   Yes.

25  Q.   And that's where she would fill out the online

1    questionnaire and give her credit card information?

2    **A.**    That's correct.

3    **Q.**    And then would the Internet pharmacy SafeScriptsOnline

4    then give a commission to the owner of dietpills.com?

5    **A.**    Yes.

6    **Q.**    For generating that business?

7    **A.**    Yes.

8              **MS. AULT:**  Does that assist the Court?

9              **THE COURT:**  Yeah, I think it does.

10        In other words, what you're saying is that -- or what the

11   witness is saying is that affiliates can have different names,

12   and what they try to do is have names that would be used by a

13   customer in searching for -- ultimately searching for the diet

14   drug.  So, like, diet pills would certainly be an easy -- an

15   easy target --

16             **THE WITNESS:**  That's correct.

17             **THE COURT:**  -- an easy mark in terms of that.

18        And there is such a thing called an affiliate pharmacy --

19   this is going to demonstrate my total ignorance of how the

20   Internet works, so just bear with me, but it's probably a good

21   idea that I get it right here.

22        So the affiliate then, has it been created by the Internet

23   pharmacy, or is it a creation of just somebody out there having

24   a brilliant idea?  What is the --

25             **THE WITNESS:**  Well, the affiliate is a different

 1   individual than the actual online pharmacy generally.

 2        **THE COURT:**  Right.

 3        **THE WITNESS:**  So the affiliate site would be created

 4   by whoever that particular affiliate is.

 5        **THE COURT:**  But do they do that -- is that a business?

 6        **THE WITNESS:**  It is.

 7        **THE COURT:**  Affiliate pharmacies?

 8        **THE WITNESS:**  It is.

 9        **THE COURT:**  And all the affiliate pharmacies do is get

10   the initial inquiry from the customer and then send it off to

11   the Internet pharmacy?

12        **THE WITNESS:**  That's correct.  Their purpose --

13        **THE COURT:**  They have no other role?

14        **THE WITNESS:**  Their purpose is just to advertise and

15   forward the orders.

16        **THE COURT:**  Okay.  And they are not necessarily

17   created by the Internet pharmacy, but they need the Internet

18   pharmacy in order to accomplish -- in order to serve any

19   purpose at all, or they need a next step?

20        **THE WITNESS:**  That's correct.

21        **THE COURT:**  And are they created -- are they

22   created -- or wait.  Not use the word "created."  But are

23   they -- they have an agreement with the Internet pharmacy; is

24   that correct?

25        **THE WITNESS:**  They will -- yes, and part of that

 1    agreement is to link to that online pharmacy to forward those

 2    orders and in return for a commission.

 3            THE COURT:  Okay.  And based upon your -- you

 4    conducted a big investigation of this; right?

 5            THE WITNESS:  Yes.

 6            THE COURT:  Okay.  So based upon your investigation,

 7    do you have any opinion as to whether or not they, the

 8    affiliate, understood what the Internet pharmacy did as the

 9    next step and further steps?

10        And maybe you're going to get to this anyway, but I'm

11    trying to -- I'm trying to work my way through the chain in

12    order to determine in my own mind, since I know how it ends, to

13    what extent are the earlier people involved in this process

14    other than the mechanical process.

15        I mean, I understand obviously they're part of the

16    mechanics, but do they understand exactly what happens further

17    on down the line; or do they simply say, "Look, the only

18    service we perform, we perform it for everybody or anybody who

19    asks us to do it, is just to connect people.  We don't really

20    know what happens after the connection"?  That's my question.

21            THE WITNESS:  Yes, sir.  In the investigations that I

22    conducted or played a role in, the affiliates did know.  In

23    fact, some of the affiliates were prosecuted and convicted.

24            THE COURT:  They were?  Did I prosecute -- I mean, did

25    I have any of those cases?

1          MS. AULT:  So I don't believe that there was anyone

2    who was just an affiliate.

3    Q.   Robin Bloom, was she an affiliate of SafeScriptsOnline?

4    A.   Yes, she was.

5    Q.   Okay.  But she was also the affiliate manager; correct?

6    A.   That's correct.

7          MS. AULT:  So she was an affiliate, and then she would

8    manage the other affiliates for SafeScriptsOnline.

9          THE COURT:  But, at any rate, the answer is some of

10   those affiliates were prosecuted?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Okay.  Thank you.

13   BY MS. AULT:

14   Q.   And, in fact, in your investigation, did you come across

15   something called the Rx Affiliate Forum?

16   A.   Yes.

17   Q.   And what was that?

18   A.   It's a website where affiliates, or anyone who's

19   interested really in the online pharmacy industry, could go to

20   that website and post topics on there about particular online

21   pharmacies they were affiliated with and engage in discussions

22   with other affiliates.

23   Q.   Okay.  And did you find in your review of Rx Affiliate

24   Forum that they would discuss how the online pharmacies would

25   work and whether they were getting shut down and what the laws

1    were, and topics such as that?

2    A.   Yes.

3         MS. AULT:  Have we responded to the Court's questions?

4         THE COURT:  Oh, yes.  Go ahead.  Go ahead.

5    BY MS. AULT:

6    Q.   So once we get from the affiliate to the online pharmacy,

7    what happens then?

8    A.   Sure.  So what happens is the customer will go to the

9    Internet pharmacy, they'll enter their credit card information,

10   and then that credit -- the online pharmacy will do what's

11   called a preauthorization of the credit card.  So the

12   information -- the credit card information is sent to the

13   credit card processor, and a check is done to make sure there's

14   sufficient credit available on that customer's card to complete

15   the order.

16        If that passes, the order is then placed into a doctor

17   queue where a doctor --

18        THE COURT:  Before we get there, a question.  So the

19   affiliate then just simply forwards the request to the

20   Internet; is that right?  I mean, just following this diagram.

21        THE WITNESS:  Yes.

22        THE COURT:  And then we know that a questionnaire is

23   generated.

24        THE WITNESS:  That's correct.

25        THE COURT:  Okay.  Is it the Internet pharmacy that

CHIN - DIRECT / AULT

1   generates the form?

2        **THE WITNESS:**  Yes.  The Internet pharmacy has the

3   questionnaire on their site.

4        **THE COURT:**  I see.  So, in other words, if we were

5   just to do it in a temporal fashion, we would see the arrow --

6   the first arrow to affiliate would be number one; the second

7   arrow to the Internet pharmacy would be number two; and then

8   there would be an arrow from the Internet pharmacy back to the

9   customer, which would be number three, which would be the

10  questionnaire, which would include -- which would include an

11  inquiry as to the credit card information and other

12  information; and then we would have number four arrow, which

13  would be the one that's demonstrated here which shows a credit

14  card and a form.  Is that -- have I missed a step or

15  mischaracterized a step?

16       **MS. AULT:**  Just one clarification.

17  **Q.**   Does the Internet pharmacy send the form back to the

18  customer, or is it that when the customer goes to the affiliate

19  website, they're then directed to the Internet pharmacy

20  website, and the questionnaire is there and so that's -- the

21  customer is on that site and generates the information there

22  and then generates -- fills out the questionnaire and --

23       **THE COURT:**  So there isn't an arrow the other way?

24  **BY MS. AULT:**

25  **Q.**   There's no form that actually gets sent back to the

CHIN - DIRECT / AULT

1   customer; is that correct?

2   **A.**    That's correct.

3           **THE COURT:**  All right.

4   BY MS. AULT:

5   **Q.**    So after the customer provides that information, what is

6   the next step in the process?

7   **A.**    So after the credit card is verified or approved or that

8   preauthorization happens, the order gets placed in the doctor

9   queue, and the doctor who is working with the Internet pharmacy

10  is supposed to log in to that online pharmacy site and review

11  that customer's order and either approve or deny that order.

12          If the order is approved, then the order is moved into the

13  pharmacy queue, and the pharmacy -- the fulfillment pharmacy is

14  supposed to log in to the online pharmacy site and

15  download/print those customer orders, fill them, and prep them

16  for shipping.

17          **THE COURT:**  Before we get there, let me go back to

18  your diagram.  The diagram you have -- now let's assume that

19  two things have happened.  The customer has filled out the

20  questionnaire and filled out the credit card information.  And

21  then you show an arrow going to the credit card processor and

22  then back to the Internet pharmacy.  It also shows money.

23          **THE WITNESS:**  Yes, sir.

24          **THE COURT:**  Now, I need to have a slightly better

25  understanding in terms of timing.  Does this occur, that is,

CHIN - DIRECT / AULT

1    the arrow in both directions -- and I'll ask you about the

2    money in a minute -- but the arrow in both directions, does

3    that occur before the form is sent on to the doctor?  Does it

4    occur simultaneous with it?  Do you understand my question?

5            THE WITNESS:  Are you talking about the credit card

6    processing?

7            THE COURT:  Yes.  What I'm interested in, what I'm

8    interested in is whether the credit card company, the

9    processor, does its work before the doctor even sees the

10   inquiry, whatever it is, the form.

11           MS. ARGUEDAS:  Questionnaire.

12           THE COURT:  Questionnaire.  Thank you.

13       The questionnaire, do they do it before?

14       And also, by the way, when you see the money, does the

15   money -- and I know that's a symbol, but I'm trying to figure

16   out is that actually a payment that is a charge, or is that

17   simply this would be approved at this amount if the transaction

18   goes forward.  Do you understand my question?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Okay.  So can you tell me how that part

21   works?

22           THE WITNESS:  Sure.  So once the customer fills out

23   the questionnaire and they've input their credit card

24   information on the Internet pharmacy site, that credit card

25   information is sent to the credit card processor, and then it's

1   just a preauthorization or basically a check to make sure

2   there's enough credit on the account.  There's no money that

3   exchanged hands at that time.

4            **THE COURT:**  Okay.

5            **THE WITNESS:**  And if the -- if that credit card check

6   goes through, then the order is placed into the doctor's queue.

7            **THE COURT:**  Okay.

8            **MS. AULT:**  I was looking to see if we had a diagram

9   that would help the Court out.

10           **THE COURT:**  Well, no, I understand.  If I just take it

11  step by step, then I'll sort of get it at some point.

12  **BY MS. AULT:**

13  **Q.**   Okay.  So the credit card isn't actually charged at that

14  moment, it's just preauthorized, meaning they check with the

15  credit card company to make sure that the customer has enough

16  credit?

17  **A.**   That's correct.

18  **Q.**   Okay.  So then what happens next?

19  **A.**   So once the order goes to the fulfillment pharmacy and the

20  label is printed for the pill bottle and the shipping label,

21  that's also at the time when the tracking number is -- the

22  shipping tracking number is generated and also when the credit

23  card -- the customer's credit card is actually charged for the

24  order.

25       And after the pharmacy has finished filling that order and

 1  prepping it for shipment, the order is then turned over to a

 2  parcel carrier, in this instance FedEx, for that drug to be

 3  delivered to the customer.

 4  **Q.**   Okay.  So the customers' records are maintained in a

 5  database at the Internet pharmacy; is that correct?

 6  **A.**   That's correct.

 7  **Q.**   And the fulfillment pharmacy, will they have their own

 8  records of the prescriptions that they've filled?

 9  **A.**   Yes.

10       **THE COURT:**  Will the fulfillment pharmacy have a

11  record of the questionnaire?

12       **THE WITNESS:**  Generally what I've seen is they just

13  have a copy of the prescription --

14       **THE COURT:**  Okay.  So --

15       **THE WITNESS:**  -- or the document that's submitted.

16       **THE COURT:**  -- does the doctor have a copy of the

17  questionnaire?  Will he retain a copy of the questionnaire I

18  guess as part of an electronic file?

19  **BY MS. AULT:**

20  **Q.**   Well, in your experience when the doctors were asked for

21  records of the Internet pharmacy patients that they saw, were

22  they able to actually produce those records?

23  **A.**   No, because the questionnaire stays with the Internet

24  pharmacy.

25       **THE COURT:**  But they -- okay.  So here's what I'm

CHIN - DIRECT / AULT

1    trying to understand.  The doctor gets the questionnaire.

2         MS. AULT:  Well --

3         THE COURT:  Well, I mean, the doctor gets something,

4    doesn't he?

5    BY MS. AULT:

6    Q.   Does the doctor ever get anything, or does the doctor have

7    access to the Internet pharmacy website to see what's on the

8    Internet pharmacy website?

9         THE COURT:  I see.

10        THE WITNESS:  Yes, the doctor has access to the

11   Internet pharmacy website.

12        THE COURT:  Okay.  All right.

13   BY MS. AULT:

14   Q.   So unless the doctor were to actually print out or somehow

15   download to the doctor's own computer what was on the Internet

16   pharmacy website, the doctor wouldn't have an actual copy of

17   the questionnaire?

18   A.   That's correct.

19        THE COURT:  So the doctor doesn't retain -- other than

20   downloading, the doctor would not have a copy of the so-called

21   medical record or the request or the questionnaire, or however

22   one wants --

23   BY MS. AULT:

24   Q.   Is that correct?

25   A.   That's correct.

1              THE COURT:  So, in other words, if I were to go to the

2     doctor and say, "Doctor, there's a prescription for Ms. Jones

3     that you approved, and here's the date you approved it.  Could

4     I see a copy of the questionnaire from which you based your

5     opinion to issue the prescription?"

6          And in your experience the doctor would saying, "Sorry.  I

7     don't have it."  Assuming this is a cooperating doctor who can

8     talk to you, and so forth and so on, he would say, "Sorry.  I

9     don't have it."

10             THE WITNESS:  They most generally wouldn't have a hard

11    copy.  I suppose if the doctor could figure out where the order

12    came from, because sometimes these doctors work with multiple

13    online pharmacies, it would be possible for them to look into

14    the online pharmacy database.

15             THE COURT:  Well, they would have to go back to the

16    Internet pharmacy.

17         As I understand it -- and let me tell you why I'm asking

18    the question.  I'm asking the question that if FedEx, as an

19    example, decided that they wanted to see what is it that the

20    doctor based his or her opinion on in issuing the prescription,

21    say they wanted to find out, and let's say they actually have

22    permission of everybody to find out.  Okay?  So they go to

23    Dr. Jones, or doctor whoever he is in New Jersey or whoever he

24    was in Puerto Rico -- is that right?  Costa Rica?  I don't know

25    where he was.

1      They go to the doctor, and they say, "Doctor, we'd like to

2  look at the questionnaire that Ms. Jones filled out upon which

3  you based your prescription."

4      The doctor would have to say, as a general rule, "You

5  know, I don't have that record.  Maybe I could find it.  Maybe

6  I can go back to the pharmacy; and if it hasn't been destroyed,

7  I can get it for you, but I don't have it."  Is that right?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Thank you.

10     Go ahead.

11  BY MS. AULT:

12  Q.  Let me ask you this question:  If someone were to go to

13  the doctor and say, "Generally speaking, how does the process

14  work?  How do you approve -- how do you issue these

15  prescriptions," would the doctor be able to answer that

16  question?

17  A.  They would -- they would say they'd have to go into the

18  online pharmacy.

19  Q.  Would the doctor --

20          THE COURT:  Well, putting Ms. Ault's question, they

21  would be able to say -- I assume what she's getting at is that

22  a doctor would say, if asked the question, "Do you examine

23  these people before you give them -- approve a prescription,"

24  the doctor would say no.  The doctor could say that unless the

25  doctor actually did, but none of these doctors did.

CHIN - DIRECT / AULT

```
 1   BY MS. AULT:
 2   Q.   And let me ask you the question --
 3          THE COURT:  Is that right?
 4          THE WITNESS:  Yes.
 5          THE COURT:  I need an answer.
 6          THE WITNESS:  Yes.
 7          THE COURT:  Okay.
 8   BY MS. AULT:
 9   Q.   And let's talk about the fulfillment pharmacy.  The
10   fulfillment pharmacy maintained their own records; correct?
11   A.   In some instances, yes.
12   Q.   Okay.  Sometimes they would maintain copies of the drug
13   orders that they had filled for the Internet pharmacies?
14   A.   Yes.
15   Q.   At least for a short period of time?
16   A.   Yes.
17   Q.   And in your experience in dealing with these online
18   pharmacies, did they, generally speaking, fill orders for
19   customers in all 50 states or virtually all 50 states?
20   A.   Yes.
21   Q.   And do they, generally speaking, have very few doctors?
22   A.   Yes.
23   Q.   And those doctors were only located in one or two states;
24   correct?
25   A.   Yes.  Primarily it was just a limited number of states.
```

Q.   So on any given day in a fulfillment pharmacy that was

filling orders for Internet pharmacies, there would be a number

of packages packed up and ready to be shipped out to customers?

A.   Yes.

Q.   And those packages would be addressed to customers all

over the United States?

A.   Yes.

Q.   And if someone were to open those packages, someone would

see the name of one or two doctors on the orders and the pill

bottles for all of those orders?

A.   Yes.

Q.   So someone would be able to see that there was a doctor --

one doctor who presumably is located in one place issuing

orders for patients located all over the country?

A.   Yes.

Q.   And is it physically possible for that one doctor to

physically examine patients in Ohio and New Jersey and

California all on the same day?

A.   No.

Q.   So eventually the drugs get delivered by FedEx to the

customer; correct?

A.   That's correct.

Q.   And in your experience in your investigation with Internet

pharmacies, was FedEx always the carrier that delivered?

A.   They were not always.

**CHIN - DIRECT / AULT**

1   **Q.**   Okay.  Who else delivered the drugs in your investigation?

2   **A.**   UPS was another carrier.

3   **Q.**   Okay.  Did you have any drugs delivered by the Postal

4   Service?

5   **A.**   Later.  It would have been later on.

6   **Q.**   What do you mean by "later on"?

7   **A.**   So, generally, it was FedEx and then UPS, and then later

8   on in I'd say 2011 approximately or 2012 it was a little bit of

9   Postal.

10  **Q.**   Okay.  And which carrier delivered the majority of the

11  drugs in your experience?

12  **A.**   FedEx.

13  **Q.**   And so in this model, does the doctor ever meet the

14  patient?

15  **A.**   No.

16  **Q.**   Conduct a physical exam?

17  **A.**   No.

18  **Q.**   Conduct any tests?

19  **A.**   No.

20  **Q.**   And typically how were the doctors compensated?

21  **A.**   They were compensated on a per-order basis.

22  **Q.**   And approximately how much were they paid?

23  **A.**   Approximately 5 to $10 per order.

24  **Q.**   And typically how many orders did a doctor review in a

25  given day?

1   **A.**   It could be hundreds of orders in a day.

2   **Q.**   And typically how long did the doctor's review take?

3   **A.**   About 2 to 5 seconds.

4   **Q.**   And for the particular Internet pharmacy that you

5   investigated, how many of the orders were for controlled

6   substances?

7   **A.**   Upwards of 90 percent of those orders.

8   **Q.**   And based on your investigation for a typical retail brick

9   and mortar pharmacy, what percentage of the prescriptions for

10  that typical retail brick and mortar pharmacy are controlled

11  substances?

12  **A.**   Approximately 11 percent.

13  **Q.**   Okay.  So after the customer gets the drugs, what happens

14  next?

15  **A.**   The money gets transferred.

16  **Q.**   Okay.  And can you explain that process?

17  **A.**   Sure.  So what happens is after the order receives -- I

18  mean, after the customer receives the drug order, what happens

19  is the money is disbursed.  And the starting point is the

20  customer's issuing bank for that credit card will send the

21  money to the acquiring bank, which is the -- the acquiring bank

22  is the bank where the merchant account is held.  So that

23  merchant account belongs to the Internet pharmacy.  So the

24  money goes from the issuing bank to the acquiring bank, and

25  then is deposited into the Internet pharmacy's account.

1        And from --

2    **Q.**   What happens to it from there?

3    **A.**   From that point, the money is disbursed to all of the

4    other players or participants in this particular online

5    pharmacy operation.  So the doctor gets paid, the pharmacy gets

6    paid, the affiliate gets paid, and FedEx gets paid.

7    **Q.**   And in your experience with your investigations, how do

8    the prices of drugs ordered on an Internet pharmacy compare to

9    the prices of drugs that someone could get from a brick and

10   mortar retail pharmacy?

11   **A.**   They're highly marked up.

12   **Q.**   By how much?

13   **A.**   Two to three times.

14        **THE COURT:**  Sorry.  You're saying the drugs on the

15   Internet are two to three times, as a general rule, more

16   expensive than the drugs at a non-Internet pharmacy?

17        **THE WITNESS:**  That's correct.

18   **BY MS. AULT:**

19   **Q.**   And throughout your investigation, what did you learn

20   about the reasons why people were ordering drugs from online

21   pharmacies?

22   **A.**   There was a number of reasons.  Some cases the people were

23   addicted to these drugs, so the Internet was an easy outlet for

24   them to order these drugs.  In some cases some people weren't

25   able to get more from their physicians, so they went to the

1   Internet to order more of the drugs.  In some cases doctors

2   refused to give the customers a prescription for the drug, so

3   they went to the Internet to purchase it.

4   **Q.**   Okay.  Now, at some point in time your investigation also

5   began to encompass FedEx; is that correct?

6   **A.**   Yes.

7   **Q.**   Approximately when did that start?

8   **A.**   In approximately April 2008.

9   **Q.**   And what steps have you taken in that investigation?  What

10  have you done?

11  **A.**   Interviews of FedEx employees and former employees, as

12  well as requesting records from FedEx, including e-mails,

13  policies and procedures, and shipping records.

14  **Q.**   Okay.

15       **MS. AULT:**  And, Your Honor, I have to take a moment to

16  pause here and ask the Court to step out of the role of trier

17  of fact and into the role of Court.

18       Previously the Court had ruled on a *motion in limine* that

19  the agent was not allowed to talk about the 2008 subpoena,

20  which is why he has referred to it as a request, but I don't

21  know if that still applies.

22       **THE COURT:**  He can say anything.

23       **MS. AULT:**  Okay.  Thank you.

24       **THE COURT:**  I mean, if there's an objection, I'll hear

25  an objection, but go ahead otherwise.

CHIN - DIRECT / AULT

1    BY MS. AULT:

2    Q.   Okay.  And so when you said you requested records, how did

3    you do that?

4    A.   We issued a subpoena to FedEx.

5    Q.   All right.  And, I'm sorry, you interviewed employees?

6    A.   Yes.

7    Q.   Approximately how many?

8    A.   There were approximately 70 to 80.

9    Q.   And did other employees testify before the Grand Jury?

10   A.   Yes, they did.

11   Q.   And approximately how many documents have been collected

12   in response to the subpoenas, specifically documents collected

13   from FedEx?

14   A.   Approximately 1 and a half to 2 million records.

15   Q.   And have you reviewed a large number of these?

16        THE COURT:  Was this a Grand Jury subpoena?

17   BY MS. AULT:

18   Q.   Was it a Grand Jury subpoena?

19   A.   Yes, it was.

20        THE COURT:  Okay.

21   BY MS. AULT:

22   Q.   And have you reviewed a large number of those records?

23   A.   Yes.

24   Q.   What general categories of documents did you collect?

25   A.   E-mail communications, policies and procedures, shipping

**CHIN - DIRECT / AULT**

1    records.

2    **Q.**   All right.  And so based on your review of the records,

3    can you tell us, what is a FedEx account holder?

4    **A.**   Sure.  A FedEx --

5          **MR. RUBY:**  I'm sorry.  I didn't hear the last thing

6    that was said.

7          **MS. AULT:**  FedEx account holder.

8          **MR. RUBY:**  Account holder?

9          **MS. AULT:**  Holder.

10         **MR. RUBY:**  Thank you.

11   BY MS. AULT:

12   **Q.**   What is a FedEx account holder?

13   **A.**   An account holder would be a FedEx customer who has a

14   shipping account with FedEx.

15   **Q.**   And does someone have to have a FedEx account in order to

16   ship a package by FedEx?

17   **A.**   No.

18   **Q.**   So what are some of the reasons why someone would want to

19   have an account?

20   **A.**   Some of those reasons would include discounts, pickup, and

21   automation services.

22   **Q.**   At the time that is at issue in this case, which is

23   roughly 2000 to 2010, did FedEx have a Credit Department?

24   **A.**   Yes.

25   **Q.**   And what did that department do?

1    **A.**    The Credit Department would generally assess the

2    creditworthiness of their customers and also monitor the

3    receivables.

4    **Q.**    And how did FedEx extend credit to its customers?

5    **A.**    The way that FedEx extended credit was to allow customers

6    to ship and then bill them for those shipments at a later date.

7    **Q.**    What were the typical, I guess, payment terms for just a

8    normal FedEx account?

9    **A.**    It was around 15 days.

10   **Q.**    So FedEx would ship for the customer for 15 days, and then

11   bill them at the end of the 15-day period?

12   **A.**    They would allow -- yes, generally they would allow them

13   to ship for a certain period of time and then allow 15 days for

14   payment.

15           **THE COURT:**  Well, wait.  Wait.  Let me make sure it's

16   clear on this.

17       I understand -- are you saying that they would have a

18   15-day period once they got the bill to pay the bill?  In other

19   words, does FedEx send out a bill and then -- this is under the

20   normal circumstances -- and say to the customer, "Please pay

21   within 15 days"?

22           **THE WITNESS:**  My understanding is for the credit

23   terms, that you would have 15 days to pay.

24           **THE COURT:**  From?

25           **THE WITNESS:**  To pay.

1          **THE COURT:**  From?

2          **THE WITNESS:**  From the time you receive an invoice.

3          **THE COURT:**  Okay.  So, in other words, if you receive

4    an invoice the day of the shipment, you have 15 days from the

5    shipment?  If you receive the invoice 5 days after the day of

6    the shipment, you'd have 20 days from the date of the shipment?

7          **THE WITNESS:**  I'm sorry.  Could you say that again?

8          **THE COURT:**  Sure.  If it's 15 days from the date of

9    the invoice, of the sending of the -- receipt of the invoice --

10   pardon me -- from the receipt of the -- maybe it doesn't make

11   any difference.  I don't know.

12        But I'm just trying to make sure that -- they didn't get a

13   bill -- the customer wouldn't get a bill and have to pay it

14   immediately under the normal circumstances.  They would have

15   some period of time under the terms of the agreement to make

16   the payment, whether it be 15 days or some other period.  Is

17   that right?

18         **THE WITNESS:**  My understanding would be 15 days to

19   pay.

20         **THE COURT:**  Okay.  All right.  That's fine.

21   **BY MS. AULT:**

22   **Q.**  So did the Credit Department have ways of dealing with

23   accounts that they considered unstable from a credit

24   perspective; in other words, they weren't sure that at the end

25   of the pay period that they were going to get paid?

**CHIN - DIRECT / AULT**

1  A.   Yes.

2  Q.   And what are some of the ways they had to deal with that?

3  A.   They could require financial security be posted on the

4  account, whether it be a bank letter of credit or security

5  deposit; or they could change the terms on the invoicing to be

6  a shorter period of time; or they could require payments to

7  come in in a faster period of time.

8  Q.   So they could require payment every day, for example?

9  A.   Yes.

10  Q.   Or every five days?

11  A.   Right.

12  Q.   Did they also have something called EZ debit?

13  A.   Yes.

14  Q.   And what is that?

15  A.   An EZ debit is basically an automatic withdrawal out of a

16  customer's -- FedEx customer's bank account.  So FedEx could

17  make a request to that customer's bank account for payment of

18  the shipping services, and the payment would automatically

19  happen.

20  Q.   So instead of sending a bill and waiting for the customer

21  to pay, FedEx would go to the customer's bank account and just

22  withdraw the money?

23  A.   That's correct.

24  Q.   From your investigation, did you find that FedEx's

25  Credit Department had certain policies and procedures in place

CHIN - DIRECT / AULT

1   for dealing specifically with Internet pharmacies?

2   **A.**   Yes.

3   **Q.**   What actions did the Credit Department take in general

4   terms with respect to Internet pharmacy accounts?

5   **A.**   It included requiring the online pharmacy accounts to

6   either go on EZ debit or post a credit card or some other sort

7   of financial security, such as a letter of credit or security

8   deposit.

9   **Q.**   And did you, in your review of the records you gathered

10  from FedEx, come across documents that related to how that

11  policy developed?

12  **A.**   Yes.

13  **Q.**   So approximately when did employees in the

14  Credit Department -- or when did you find that employees in the

15  Credit Department started to notice problems with FedEx's

16  Internet pharmacy accounts?

17  **A.**   It was approximately 2003, early 2004.  Approximately.

18  **Q.**   And what were the problems that they noticed?

19       **MR. RUBY:**  Excuse me, Your Honor.  I have to object to

20  the question as phrased about what people knew at FedEx.  That

21  calls for a conclusion beyond these general propositions he's

22  testifying to.  There's no foundation.

23       **THE COURT:**  Okay.  Can you lay a foundation?

24       **MS. AULT:**  Certainly.

25  **Q.**   Did you review -- I think that you stated that you

1  reviewed several hundred thousand pages of FedEx's records;

2  correct?

3  **A.**   Yes.

4  **Q.**   And did those include a number of e-mails and memos and

5  other documents involving the FedEx's Credit Department?

6  **A.**   Yes.

7  **Q.**   And did those include e-mails and memos and other

8  documents reflecting the employees' communications amongst each

9  other about developing the credit policies and procedures in

10  2004?

11  **A.**   Yes.

12  **Q.**   And is your testimony here based on your review of those

13  records?

14  **A.**   Yes.

15          **MS. AULT:**  Is that sufficient, Your Honor?

16          **THE COURT:**  Well, I think that's sufficient for him to

17  render an opinion; and then, of course, that opinion is subject

18  to cross-examination because the opinion is only as good as the

19  reasons behind it.  And if you -- you can deal with it on

20  cross.

21          **MR. RUBY:**  May I, Your Honor?

22          **THE COURT:**  Yes.

23          **MR. RUBY:**  Two issues.  Number one, it should be

24  pointed out this gentleman has never been disclosed as an

25  expert, so it's not an expert opinion.

```
 1            THE COURT:  I appreciate that.

 2            MR. RUBY:  And, secondly, in terms of foundation, all

 3    right, there are hundreds of thousands of e-mails.  It might be

 4    that one of them offered in evidence would establish the point

 5    that they're interested in, but for cross-examination --

 6            THE COURT:  But that's cross.  That's cross.

 7            MR. RUBY:  But from a cross-examination standpoint --

 8            THE COURT:  You can ask him what document he's looking

 9    at.  You can even ask him what is the basis for his opinion.

10    That's all cross, and in your hands, it will be well-stated.

11    So, I mean, I'm not concerned about that.

12            MR. RUBY:  All right.

13            THE COURT:  I appreciate that, but the weight -- well,

14    as to the first objection, I'm sure you're right and I'm

15    disregarding that.

16        As to the second objection, I think you can deal with it

17    on cross.

18            MR. RUBY:  Thank you.

19            MS. AULT:  Thank you, Your Honor.

20    Q.   So when did the employees -- based on your review of the

21    records, when did employees in the Credit Department first

22    start to notice problems with FedEx's Internet pharmacy

23    accounts?

24    A.   It appeared to be around late 2003, early 2004 time

25    period.
```

**CHIN - DIRECT / AULT**

1   Q.   And the records that you reviewed, what do they reflect

2   were the problems that the employees started to notice?

3   A.   Some of the instances contained instances in which some of

4   these online pharmacy customers would just disappear, and FedEx

5   wasn't able to get in contact with them so they were leaving

6   very large outstanding bills with FedEx, and also some law

7   enforcement action against some of these online pharmacy

8   operators.

9   Q.   And based on your review of the records, who began to

10  notice the problem with the online pharmacy accounts?

11  A.   It was people -- employees within the Credit Department.

12  So Bonnie Wagner and Josh Croft.

13  Q.   Who was Bonnie Wagner?

14  A.   She was a credit analyst.

15  Q.   And who is Josh Croft?

16  A.   He was the credit manager.

17  Q.   Now, if you would look at Exhibit 1-6.

18  A.   (Witness examines document.)

19        MR. RUBY:  1-6?

20        MS. AULT:  1-6.

21  Q.   Are these a series of organizational charts that you

22  drafted in a less pretty form and then someone took them and

23  made them prettier?

24  A.   Yes.

25  Q.   Okay.  And how did you create this organizational chart?

1   **A.**   It was based on some of the records provided by FedEx,

2   including some of their org. charts and talking to some of the

3   FedEx witnesses.

4   **Q.**   So these are the positions they told you that he had held?

5   **A.**   Yes.

6       **MS. AULT:**  Your Honor, I would like to move 1-6 into

7   evidence.

8       **THE COURT:**  Admitted.

9       (Trial Exhibit 001-6 received in evidence)

10      **MS. AULT:**  And then perhaps if you could put up

11  revenue operations from, let's say, 2006.  It's about the

12  middle of the document.

13  **Q.**   And so on this chart, Bonnie Wagner, during the time

14  period you were talking about in 2004, what was her position?

15  **A.**   In 2004, credit analyst.

16  **Q.**   And Josh Croft, what was his position?

17  **A.**   He was a credit manager.

18  **Q.**   Did Bonnie Wagner report to Josh Croft?

19  **A.**   Yes.

20      **MS. ARGUEDAS:**  Your Honor, may we have a moment?

21      **THE COURT:**  Why don't we take a recess.  Let's take a

22  recess, a 15-minute recess.  Okay?  Thanks.

23              (Recess taken at 10:19 a.m.)

24          (Proceedings resumed at 10:35 a.m.)

25      **THE COURT:**  Please continue.

1          **MS. AULT:**  Thank you, Your Honor.

2  **Q.**   Special Agent Chin, when Bonnie Wagner and Josh Croft, I

3  guess -- did Bonnie Wagner and Josh Croft elevate these issues

4  that they were seeing with online pharmacies to their

5  management chain?

6  **A.**   Yes.

7  **Q.**   And who was next up in their management chain?

8  **A.**   It would have been Kendell Black.

9  **Q.**   Did he elevate it in his management chain?

10  **A.**   Yes.

11  **Q.**   Who did he elevate it to?

12  **A.**   Betty Hale.

13  **Q.**   What was Kendell Black's position at this time in 2004?

14  **A.**   He was a senior manager of Credit and Collections.

15  **Q.**   And what was Betty Hale's position?

16  **A.**   She was managing director in Credit or managing director

17  of U.S. Revenue Operations.

18  **Q.**   She was a managing director in U.S. Revenue Operations and

19  Kendell Black was the senior manager over Credit and

20  Collections?

21  **A.**   Yes.

22  **Q.**   Which was also in U.S. Revenue Operations?

23  **A.**   Yes.

24  **Q.**   If you could turn to Exhibit 30-3.

25          And if you could blow up where it says -- so this is an

**CHIN/ DIRECT/ AULT**

1   email chain from whom to who?

2   **A.**   An email from Josh Croft to Betty Hale and Kendell Black.

3   **Q.**   And what's the date on it?

4   **A.**   March 31st, 2004.

5   **Q.**   If you could blow up the first couple of paragraphs under

6   *summary of issues*, please.

7        If you could just read the first two paragraphs under

8   *summary of issues*.

9   **A.**   "We are seeing an increase in the number of online

10  pharmacies being set up and quickly accumulating very large

11  balances.  To date there is no standard state regulation of

12  this industry.  This lack of regulation has led to several

13  cases of fraud and illegal selling and shipping of controlled

14  substances.  We have several examples of online pharmacies that

15  have been shut down by state governments.  The majority of the

16  online pharmacies use FedEx to ship their products.  The number

17  of accounts is rapidly increasing and is a growing concern due

18  to our credit exposure.  USRO has identified 99 online pharmacy

19  accounts with a total balance of 4.6M.  See the attached

20  spreadsheet for account details."

21  **Q.**   What is USRO?

22  **A.**   U.S. Revenue Operations.

23  **Q.**   And the attached spreadsheet, if you could turn to page 2.

24  Is that the --

25        **THE COURT:**  USRO, that's a FedEx group?

**CHIN/ DIRECT/ AULT**

1   BY MS. AULT:

2   Q.   Is that a FedEx group?

3           THE COURT:  That's an entity within FedEx?

4           THE WITNESS:  Yes.  It's --

5           THE COURT:  Yeah.  I mean, it's a department or

6   something in FedEx; it's not the United States government?

7           THE WITNESS:  That's correct.

8           THE COURT:  That's obvious.

9   BY MS. AULT:

10  Q.   It's revenue operations for FedEx within the

11  United States; is that correct?

12  A.   Yes.

13  Q.   As opposed to Worldwide Revenue Operations?

14  A.   Right.

15  Q.   Is U.S. Revenue Operations located in FedEx within

16  Worldwide Revenue Operations?

17  A.   Yes.

18  Q.   And this list that is attached, is that the list of 99

19  online pharmacies that the Credit Department identified?

20  A.   Yes, it is.

21  Q.   And according to Mr. Croft, how much money did those

22  online pharmacies owe FedEx?

23  A.   4.6 million.

24  Q.   And what did Mr. Croft recommend that FedEx do?

25        Can we go back to page 1 and go down to the bottom where

1    it says *recommended actions*.

2    **A.**   Mr. Croft made several recommendations, including setting

3    a maximum credit limit of $100,000 for an online pharmacy if

4    that could be backed up with the financial information for that

5    customer, and if not, that the online pharmacy customer would

6    have to post a security deposit, go on EZ-Debit, or provide a

7    prepayment or an accelerated payment plan.

8         He also recommended that U.S. Revenue Operations have more

9    flexibility in acting quickly on the online pharmacy accounts.

10   And he wanted to waive the 15-day sales notification relating

11   to those online pharmacy accounts prior to cashing.

12        He also wanted to have all requests for new online

13   pharmacy accounts be forwarded to the Credit Department prior

14   to their account establishment.  And he also wanted it to be

15   known up front that the fulfillment centers could be

16   responsible for payment if the online pharmacies couldn't pay.

17   **Q.**   And the fulfillment center, what is that?

18   **A.**   That's the pharmacy, the fulfillment pharmacy.

19   **Q.**   The actual brick and mortar pharmacy sending out the

20   drugs?

21   **A.**   That's correct.

22   **Q.**   He makes a reference in here to *cashing an account*.  What

23   does that mean?

24   **A.**   Essentially revoking the credit privileges for the FedEx

25   account.

**CHIN/ DIRECT/ AULT**

1  **Q.**   What effect does that have?

2  **A.**   That would basically deny the customer all the benefits

3  they would have for having a FedEx account, like the pickup

4  service and the discounts.

5  **Q.**   And would they no longer be able to ship and pay later?

6  **A.**   That's correct.

7  **Q.**   So they would have to pay for any shipments that they did

8  up front?

9  **A.**   Yes.

10       **THE COURT:**  But it would not -- it would not

11  prevent -- FedEx is not saying, as you understand it -- is not

12  saying we're not going to do business with these people?  Is

13  that one of the options, is to refuse to do business?

14       **THE WITNESS:**  Yes.  I mean, that would --

15       **THE COURT:**  I mean, is it listed here?  I don't know.

16  I'm trying to understand the memo.

17       **THE WITNESS:**  Well, the cashing and account answer the

18  first part.  It's not necessarily closing the account.  It's

19  just revoking the credit privileges for the account.  So in

20  order to ship on the account, the customer would have to pay in

21  advance of each shipment.

22       **THE COURT:**  But theoretically, though -- I don't know

23  enough about this, but theoretically, the online pharmacy could

24  say if they had a rather lucrative or sustainable, in their

25  view -- sustainable operation, they could say, *Okay, we're*

1   *going to -- we'll cash out.  We'll give you the cash in*

2   *advance?*  They could do that?

3   **BY MS. AULT:**

4   **Q.**    Theoretically is that possible?

5   **A.**    Yes.

6            **THE COURT:**  Okay.  So, in other words, that wouldn't

7   be so different from if I want to go to FedEx and send a

8   package.  If I go into FedEx, they're not going -- if I go into

9   FedEx, they may ask for a lot more than just -- well, anyway,

10  if a customer goes into FedEx off the street, they would

11  normally have to just pay cash in advance of the delivery of

12  the product; right?

13           **THE WITNESS:**  That's correct.

14           **THE COURT:**  Yeah.  So, in other words, it would

15  treat -- it would treat the -- this group of customers, at

16  least one of the options they would always have is to treat

17  them as they would treat any off-the-street customer?

18           **MS. ARGUEDAS:**  Right.

19  **BY MS. AULT:**

20  **Q.**    Is that correct?

21  **A.**    Yes.

22  **Q.**    Okay.

23           **THE COURT:**  Yeah.  I don't want to put words in your

24  mouth.  You should answer it as you understand the evidence to

25  be.  Thank you.

1   BY MS. AULT:

2   Q.   Okay.  And then did Mr. Black and Ms. Hale then take this

3   issue up their management chain further?

4   A.   Yes.

5   Q.   Who did they take it to?

6   A.   Karl Stingily.

7   Q.   Who was Karl Stingily at this time?

8   A.   He was president of the Worldwide Revenue Operations.

9   Q.   He's the vice-president of Worldwide Revenue Operations,

10  and U.S. Revenue Operations is under him?

11  A.   Yes.

12  Q.   So it goes Bonnie Wagner, Josh Croft, Kendell Black, Betty

13  Hale, Karl Stingily?

14  A.   That's correct.

15  Q.   And if you could look at Exhibit 30-4.  So if you could

16  flip to the second page and the email that's at the very bottom

17  of the page, is that the email that we were just looking at

18  where Josh Croft gives a summary of the issues and recommended

19  actions?

20  A.   Yes, it is.

21  Q.   Okay.  And does Betty Hale forward that email to Karl

22  Stingily?

23  A.   Yes, she does.

24  Q.   Could you read the email that she writes when she forwards

25  that.

1    **A.**    "Please read the below information regarding FedEx's

2    exposure with online pharmacy accounts.  These accounts are

3    very hard to control as generally once cashed, the customer

4    begins shipping on a dormant account that credit isn't aware is

5    tied to the cashed account.  There is a lot of background info

6    not included in the below summary.  In my opinion, this is

7    FedEx's biggest exposure currently."

8    **Q.**    And so did -- and was there a further exchange between

9    Ms. Hale and Mr. Stingily?

10   **A.**    Yes.

11   **Q.**    And did Ms. Hale then end up asking Josh Croft to send

12   some examples of what was going on so that she could send them

13   to Mr. Stingily?

14   **A.**    Yes.

15   **Q.**    So let's look at some of those examples.

16          Can you put up pages 1 and 2.  And then blow up the

17   examples.

18          So how many examples did Josh Croft provide?

19   **A.**    There is six examples.

20   **Q.**    And is it possible to make those any bigger?  Okay.

21          So of those six examples, how many did Mr. Croft say were

22   under investigation by the DEA?

23   **A.**    There were four.

24   **Q.**    Which ones were those?

25   **A.**    That was Innovative Remedies, EVA Global, Clinical

 1  Solutions, and Dipardi Pharmacy.

 2  **Q.**   Okay.  For a couple of those, did he say that they were

 3  under investigation by FedEx Security and the DEA?

 4  **A.**   Yes, he did.

 5  **Q.**   For which ones?

 6  **A.**   For Innovative Remedies and EVA Global.

 7  **Q.**   What did Mr. Croft say they were under investigation for?

 8  **A.**   For fraud, illegal selling of controlled substances.

 9  **Q.**   And what did Josh Croft suggest to Betty Hale that he

10  wanted to do?

11  **A.**   What he suggested is he suggested that they needed a

12  better alignment with sales to solve the problem and he wanted

13  the accounts to basically be sent to -- or these customers to

14  be sent to the Credit Department first before they could

15  establish an account.

16  **Q.**   So he wanted -- instead of them establishing an account

17  and then credit finding out about it later, he wanted credit to

18  know about it when they were establishing an account?

19  **A.**   That's correct.

20  **Q.**   And was that procedure different than what FedEx did with

21  a typical new customer that they had?

22  **A.**   Yes.

23  **Q.**   Typically would they allow the customer to establish the

24  account first and then, if necessary, do a more extensive

25  credit check on the back end?

1    **A.**    Yes.

2    **Q.**    When they established a new account, would they do a sort

3    of brief credit check like an Experian credit check?

4    **A.**    In some cases, yes.

5    **Q.**    So one of the examples that Josh Croft gave was Clinical

6    Solutions; is that correct?

7    **A.**    Yes, it was.

8    **Q.**    All right.  And if you could, we'll move on to the next

9    part.  What did Karl Stingily do with the information that he

10   received from his employees in Credit and Collections?

11   **A.**    He reached out to the -- some of the vice-presidents in

12   the sales organization.

13   **Q.**    And so Credit was responsible for securing accounts,

14   correct, or making sure that -- I guess Credit and Collections

15   together were responsible for making sure that FedEx got paid;

16   is that right?

17   **A.**    Yes.

18   **Q.**    What was sales responsible for?

19   **A.**    Finding customers, finding new customers to sign up

20   accounts with FedEx.

21   **Q.**    And so Karl Stingily, who was in charge of Revenue

22   Operations, which is the getting paid side of the house, he

23   reached out to his counterparts in the sales side of the house?

24   **A.**    That's correct.

25   **Q.**    And can you look at Exhibit 30-8.

1            **THE COURT:**  This is a question.  I don't know whether

2    it's contested or not that this kind of information didn't work

3    its way up to, we'll call them, decision-makers or people high

4    up.  I think that's in part what you're directing these

5    inquiries, to show that it wasn't at Level X, but it was Level

6    X and Y and Z, and you're certainly entitled to do that and I

7    don't know that they're going to get up and deny that they

8    didn't have this kind of information.

9            **MS. AULT:**  I don't either, Your Honor.

10           **THE COURT:**  Okay.  But let me turn to another aspect

11   of it, which is the Sales Department.  When we say that the

12   Sales Department was in charge of going out and soliciting

13   clients, because it's the business.  You had to get the

14   clients, people to use FedEx.

15       Is there an argument here that FedEx gave these online

16   pharmacies more favorable treatment than they would have to any

17   other customers similarly situated in order to get some

18   proportion or some portion of their business?  And I ask that

19   question so -- not to be unclear about it or try to be as clear

20   as I can.  It seems to me if you know somebody is involved in

21   an illegal operation, as what the Government contends, one of

22   the things you might do in order to address that issue is to

23   give more favorable terms to those people in order to get them

24   on board because they generate so much money on an ongoing

25   basis.

 1          And I'm trying to figure out whether there's any argument

 2     that they went out and solicited this business in the way of

 3     giving them more favorable treatment than they would have

 4     anybody.

 5          First I want to ask the Government and then you can

 6     respond.

 7          Do you understand my question.

 8          **MS. AULT:**  I do.  I think that --

 9          **THE COURT:**  You say it was very lucrative.   I

10     understand that.  Whether it was or not, I understand that's

11     the argument.

12          So my question is okay, let's say you want to get in as

13     part of the action of this lucrative business.  One way to show

14     that you want to do it, I suppose, is to give easier terms,

15     more favorable terms, solicit their business in a way that is

16     over and above what you would do with any, quote, deadbeat or

17     hard person to collect from.

18          FedEx's position, as I understand it, is these people,

19     that is, these entities, were very hard to collect from.  They

20     became a problem over time.  For a variety of reasons, they

21     became a problem over time.  So they instituted a whole series

22     of policies, which you've gone through, this whole series of

23     policies to ensure that they got paid.  Okay.  Any business

24     does that.  Every business does that.  Or they -- if they can.

25     Now, maybe they can't.  But if they can, they want to make sure

**CHIN/ DIRECT/ AULT**

1   they get paid for the work that they perform.  And you'd want

2   a, quote, responsible business that is responsible to its

3   shareholders or responsible in connection with the business to

4   make sure that they don't give, quote, free services or

5   services that are uncompensated.

6        But what I'm looking for is whether or not the Government

7   contends just they did this with this knowledge and there's --

8   and anything unusual in the sense that they gave them a better

9   deal, but they still gave them the same deal that they would

10  for any other customer who wasn't paying or was a difficult

11  pay.

12        **MS. AULT:**  So, Your Honor, I think that what the

13  evidence will show -- and we'll have to see what the evidence

14  shows -- is that these policies were unique to the online

15  pharmacy industry.

16        **THE COURT:**  And when you say *unique*, I just want to

17  make sure I understand it.

18        Do you mean unique in the sense that others similarly

19  situated weren't given the same concerns or same policies or

20  same action, or was it unique because it was, as one of the

21  witnesses -- as one of the emails says, it was the largest

22  problem -- I guess her words were -- I copied them down --

23  something to the effect FedEx's biggest exposure currently.

24  Okay.

25        **MS. AULT:**  It was --

1      **THE COURT:**  Unique in that sense or unique that they

2   treated these people differently than they would have to those

3   people who were similarly situated?  It's almost like an equal

4   protection argument.

5      **MS. AULT:**  What I'm struggling with is the Court's use

6   of the term *similarly situated*.  We believe that they were

7   unique in that there was -- there were no other customers who

8   were similarly situated because FedEx was not having a problem

9   with any of their other customers getting regularly shut down

10  by law enforcement.

11     **THE COURT:**  No.  No.  I'm just talking about payment.

12  I'm not talking about the reason it was shut down.  I'm just

13  talking about payment.

14     **MS. ARGUEDAS:**  May I answer?

15     **MS. AULT:**  And then, Your Honor --

16     **THE COURT:**  No, not yet.

17     **MS. AULT:**  And then with respect to payment -- and,

18  again, we will have to see what the evidence shows, but with

19  respect to payment, we believe that these policies were unique

20  in that this was the only customer segment where there was a

21  policy put in place where the entire industry had to be secured

22  under these types of credit policies from the beginning of --

23     **THE COURT:**  Okay.  And you know what I would say,

24  Ms. Ault, although I can't think of examples, I'd be surprised

25  if that is accurate.  I would be surprised if there weren't

1  industries that are here today/gone tomorrow, but, you know,

2  you're right.  I'll wait for the evidence.  But just so you see

3  what I'm looking at --

4          **MS. AULT:**  I --

5          **THE COURT:**  -- it's whether it's that.  I need -- I

6  would like to know that.

7      Now let's hear briefly from Ms. Arguedas, because it's not

8  her turn.

9          **MS. ARGUEDAS:**  Briefly?  Your Honor.

10          **THE COURT:**  Briefly.  I'm keeping a time clock.  I'm

11  going to make sure everybody gets the same amount of time.

12      Go ahead.

13          **MS. ARGUEDAS:**  We do know the answer to this.  We do

14  have the evidence to this.  The Government has it and we have

15  it.  These are the answers.

16      Number one, when they imposed this credit policy on online

17  pharmacies, they were making it worse for the online

18  pharmacies.  Unlike their other general customers, they were

19  making them put up money in front in one way or another, so

20  they were making them, FedEx, less attractive to the online

21  pharmacy customers.

22      Secondly, they did use credit policies for other kinds of

23  organizations, so, for example, they did it in the dot com era

24  because they were here today and gone tomorrow.  They do it for

25  political campaigns.  They do it for flowers.  It is not

1   unique.

2       It is unique in this way only.  This is the first time

3   that they had a whole industry where they were saying we're

4   doing it for all of them instead of flowers around Valentine's

5   day or dot coms.

6       The most important thing I want to answer, which is known,

7   you will hear this evidence, and I'm remiss for not making this

8   more clear yesterday --

9           **THE COURT:**  Well, if you had time.

10          **MS. ARGUEDAS:**  -- is this:  The pricing agreements

11  that FedEx made with the online pharmacies and everybody else

12  in the world are absolutely based on volume.  People get some

13  kind of discount or they get whatever deal they get based on

14  volume.

15      And most important of all, the salesperson, who is talking

16  to the online pharmacy and writing those emails, they don't

17  make the pricing decisions.  They have nothing to do with the

18  pricing decisions.  They bring it over to somebody else in

19  FedEx who has no contact with the customer and the somebody

20  else in FedEx says okay, if you are doing a thousand a week and

21  we're delivering to residences, then this is the kind of price

22  you're going to have to pay.

23      Because the other point about this whole industry is that

24  the -- the thing FedEx does that has the most overhead and

25  makes the least profit is deliver a package to your house.

**CHIN/ DIRECT/ AULT**

1    They make their money when they deliver here to the federal

2    building.  Going to a house is a least-profitable thing they

3    do.  It's not that they don't want to do it.  They do want to

4    do it.  I'm not trying to say that.

5         But all of these things are known.  The Government has

6    known it for five years.  It's all coming out in evidence, and

7    some of it will come from Bonnie Wagner, who is the witness

8    after this.

9         Did I leave anything out?

10            **MR. CASSMAN:**  No.

11            **MS. AULT:**  Except that Bonnie Wagner is not the

12   witness after this.

13            **THE COURT:**  I appreciate that.

14        Go ahead.  Thank you.

15   **BY MS. AULT:**

16   **Q.**   Okay.  So the information that Mr. Croft provided to Betty

17   Hale and Kendell Black with the examples, was that information

18   forwarded up to Karl Stingily?

19   **A.**   Yes, it was.

20   **Q.**   Then did he forward that information to his counterparts

21   in sales?

22   **A.**   Yes.

23   **Q.**   And who were those?

24   **A.**   Rich Cocuzzci, Dave Russell and Michael Moriarty.

25   **Q.**   And what positions did they hold?

1   **A.**   They were vice-presidents.

2   **Q.**   Who is Diane Stokely, who is also on this email?

3   **A.**   She was the president of FedEx Customer Information

4   Services or FCIS.

5   **Q.**   What is that?

6   **A.**   She was also Karl Stingily's boss.

7   **Q.**   What was the solution that Mr. Stingily was proposing for

8   this problem?

9   **A.**   What he wanted to try to do was have a better alignment

10   process with sales and he also wanted to establish a maximum

11   line of credit if that was warranted.

12   **Q.**   Okay.  And did Josh Croft and Betty Hale also elevate the

13   online pharmacy issue to Cathy Ross?

14   **A.**   Yes.

15   **Q.**   And who was Cathy Ross?

16   **A.**   She was the Chief Financial Officer of FedEx Express.

17   **Q.**   Is that also the Federal Express Corporation?

18   **A.**   Yes, it is.

19   **Q.**   If you could look at Exhibit 30- 14.

20   What did Cathy Ross want them to do?

21   **A.**   Cathy Ross wanted or had requested that Credit prepare a

22   list of online pharmacies and include several different data

23   points within that list.

24   **Q.**   And the list that is attached to Exhibit 30-14, is that

25   the list that they came up with of online pharmacies for Cathy

**CHIN/ DIRECT/ AULT**

1 Ross?

2 **A.** Yes.

3 **Q.** And Exhibit 30-16, is that confirmation from Betty Hale

4 that this list was sent to Cathy Ross -- well, maybe you can

5 tell me who it was sent to.

6 **A.** Yes.  It is confirmation that it was sent to Diane

7 Stokely, Cathy Ross, and Karl Stingily.

8 **Q.** And so if you could on Exhibit 30-16.  If you could turn

9 to the second page.

10   Is Superior Drugs on this list?

11 **A.** Yes, it is.  In line 40.

12 **Q.** And if you could turn to page 8.

13   Are the accounts associated with Vincent Chhabra's

14 pharmacy on here?

15 **A.** Yes, they are.

16 **Q.** And how can you tell that Chhabra's accounts are on here?

17 **A.** The Chhabra accounts would be identified in Column C by

18 the number 885.

19 **Q.** And what is that number, 885?

20 **A.** That was Vincent Chhabra's national account that he had

21 set up with FedEx.

22 **Q.** And did the senior level officials that we talked about,

23 did they approve of the new credit policy?

24 **A.** Yes, they did.

25 **Q.** Is that what is reflected in Exhibit 30-19?

1          **MR. RUBY:** I didn't hear what exhibit that was.

2          **MS. AULT:** 30-19.

3          **MR. RUBY:** Thank you.

4          **THE WITNESS:** Yes, it is.

5    BY MS. AULT:

6    **Q.** So does this email reflect that Karl Stingily, as well as

7    the sales vice-presidents, and Cathy Ross all approved of the

8    credit procedures?

9    **A.** Yes, it is.

10   **Q.** Was there another senior executive in the sales

11   organization that was brought into the loop on the decision

12   about how to address the bad debt problem caused by online

13   pharmacies?

14   **A.** Yes.

15   **Q.** And is that reflected in Exhibit 30-12?

16   **A.** Yes, it is.

17   **Q.** If you could turn to page 8, which will have 1000 on the

18   bottom of it.  This refers to a Dan and a Don Colleran who were

19   brought into the loop.  Who are those people?

20   **A.** They are vice-presidents.  So Dan is a reference to Dan

21   Mullally, who is a senior vice-president in sales.

22   **Q.** Is he the superior to the other three vice-presidents?

23   **A.** Yes.

24   **Q.** Who is Don Colleran?

25   **A.** He was vice-president, but I think he was in charge of

1    Canada at the time.

2    **Q.**    And if you could turn to page 4.   Who is Michelle Linton?

3    **A.**    She was a manager in the FedEx Solutions Group.

4    **Q.**    All right.   And who did she say she had spoken to about

5    the online pharmacy issue?

6    **A.**    She had spoken with Dan Mullally.

7    **Q.**    What was his reaction?

8    **A.**    He had some follow-up questions for Credit.

9    **Q.**    And on page 3, are those Josh Croft's responses to the

10   questions?

11   **A.**    Yes, they are.

12   **Q.**    And if you could read Josh Croft's response to the

13   question of whether other online businesses posed the same risk

14   as online pharmacies.

15   **A.**    "We have not experienced similar results with other online

16   industries."

17   **Q.**    If you could hold on one second.

18        If you could go to the previous page, page 3.   And if you

19   could blow up this part.   Okay.

20        Special Agent Chin, please proceed.

21   **A.**    "We have not experienced similar results with other online

22   industries.   The Internet pharmacy industry has specific issues

23   that cause them to be very high risk from a bad-debt

24   standpoint.   Government regulations have not yet been

25   formulated for this industry and resulted in several cases of

**CHIN/ DIRECT/ AULT**

1   fraud and illegal selling of controlled substances.  Many

2   online pharmacies are forced out of business by the DEA.  We

3   are left with no ability to collect on the debt.  In addition

4   to the risk of being shut down by the DEA, we have found that

5   the majority of the online pharmacies have little or no credit

6   history and are simply a poor credit risk.  A primary example

7   is RxMedical.  This account was cashed on 3/19/04.  The account

8   has a 1.2 million balance and the owners cannot be located.

9   The original phone numbers supplied are no longer in service.

10  This is a typical example of an Internet pharmacy account where

11  we need a more detailed credit check on the front end to

12  determine how we can do business but reduce our credit

13  exposure."

14  **Q.**   What did Mr. Croft propose to do?

15  **A.**   What he -- what he wanted to do was to have a better

16  alignment with sales so that the online pharmacy customers

17  would be sent to the Credit Department for research first

18  before establishing an account.

19  **Q.**   If you could turn to the first page, please.

20      So in the process of trying to get these credit procedures

21  approved, Mr. Croft reports to Betty Hale and Kendell Black

22  some additional information.

23      And could you blow up this part.

24      What does he tell Mr. Black and Ms. Hale has happened?

25  **A.**   He tells them that the FBI and DEA were at Universal

**CHIN/ DIRECT/ AULT**

1  Pharmacy, Gem Pharmacy, and Partial Solutions and that they had

2  been shut down.

3  **Q.**   And was this information similarly -- if you could turn to

4  Exhibit 30-37.

5       Blow up this paragraph.

6       Was that information also communicated to Cathy Ross and

7  Diane Stokely?

8  **A.**   Yes, it was.

9  **Q.**   And who communicated that information to them?

10 **A.**   It was Karl Stingily.

11 **Q.**   Now, were these procedures eventually approved by both the

12 Credit and the Sales Department?

13 **A.**   Yes, they were.

14 **Q.**   And could we turn to Exhibit 30-42.

15      Is this how they were communicated to the sales force?

16 **A.**   Yes, it is.

17 **Q.**   What's the date on this sales brief?

18 **A.**   June 21st, 2004.

19 **Q.**   If you could turn to what is page 4, although it will say

20 VW-5 on the bottom.  If you could blow up this part.

21      So where it says, "Take note, Internet pharmacy account

22 procedures" -- if you could read the first paragraph, please.

23 **A.**   "Online pharmacy accounts are a growing concern to FedEx.

24 Government regulations haven't been formulated for these

25 companies.  As a result, several cases of fraud, illegal

1  selling and shipping of controlled substances have occurred.

2  The majority of these pharmacies use FedEx to ship their

3  products.  The increasing number of online pharmacy accounts

4  has unfortunately increased our credit exposure and our bad

5  debt.  It has also increased the investigations into fraud

6  cases for FedEx Security, who is working diligently with the

7  FDA and the DEA."

8  **Q.**   And the bullet points that are at the bottom of that page

9  and the next page, are those the procedures that were put into

10  place?

11  **A.**   Yes, they are.

12  **Q.**   Are those generally the procedures that we have been

13  discussing?

14       **MS. ARGUEDAS:**  Could the Government use the

15  microphone.  We really can't hear over here.

16       **MS. AULT:**  Thank you.  I'm trying, but I think it's

17  cutting out.

18       **MS. ARGUEDAS:**  No.  It's that you're not speaking into

19  the microphone.

20       **MS. AULT:**  I will do my best.

21       **THE COURT:**  Well, we can give you a lavalier or

22  something.

23  **BY MS. AULT:**

24  **Q.**   So do --

25       **MS. ARGUEDAS:**  Can we have the last question repeated,

 1   Your Honor?  I didn't hear it.

 2        **MS. AULT:**  I will repeat the last question.

 3   **Q.**   So the procedures that were put in place, are those

 4   generally the procedures that we have been talking about?

 5   **A.**   Yes, they are.

 6        **THE COURT:**  So this last sentence, the sentence says,

 7   "It has also increased the investigations into fraud accounts

 8   for FedEx Security, who is working diligently with the FDA and

 9   the DEA."  Do you see that?

10        **THE WITNESS:**  Yes, sir.

11        **THE COURT:**  Okay.  And was there any response in

12   your -- in your search of the records, was there any notation

13   that addressed that particular sentence, that you came across?

14   In other words, was there an email in response to that, any

15   questions asked, *what do you mean about working with FDA and*

16   *DEA?*  Was there anything in response to that?  Because, I mean

17   there, are a million emails, so I'm just trying to make sure

18   that --

19        **MS. AULT:**  You're talking about within this Sales and

20   Credit chain to approve the policy?

21        **THE COURT:**  Exactly.

22   **BY MS. AULT:**

23   **Q.**   Did you see --

24        **THE COURT:**  Did you locate any further elaboration on

25   that particular issue?

1          THE WITNESS:  Not with respect to this specific

2   statement here.  In terms of like we talked to people and we

3   tried to figure out the source of where this came from, like

4   people within Credit and Sales --

5          THE COURT:  I'm sorry.  Who wrote this memo, the

6   email?

7   BY MS. AULT:

8   Q.   As far as you can tell from your investigation, who

9   drafted this statement that went into the sales brief?

10  A.   It would have been with Bonnie Wagner and Josh Croft.

11         THE COURT:  Okay.  With those two people.  Did you

12  interview those two people?

13  BY MS. AULT:

14  Q.   Did those two people testify in front of the grand jury?

15  A.   Yes, they did.

16  Q.   Have you reviewed their grand jury transcripts?

17  A.   Yes.

18         THE COURT:  But they are going to be called as

19  witnesses?

20         MS. AULT:  Yes, Your Honor.

21         THE COURT:  Thank you.  That's fine.  We'll listen to

22  them.  Okay.

23         MS. AULT:  If you will indulge me for a moment,

24  Your Honor, I will make sure that I ask them those questions.

25         THE COURT:  Who are the people again?

**CHIN/ DIRECT/ AULT**

1             **MS. AULT:**  The people who drafted the credit policy?

2    **Q.**   Who were those people?

3    **A.**   Bonnie Wagner and Josh Croft.

4             **THE COURT:**  Bonnie Wagner.  And it's your

5    understanding that they were the authors of this document?

6             **THE WITNESS:**  Yes.

7    **BY MS. AULT:**

8    **Q.**   Based on your review of the documents, did the credit

9    policy in 2004 solve the problem of FedEx losing money when

10   online pharmacies -- well, losing money because of online

11   pharmacies?

12   **A.**   It did not.

13   **Q.**   So what did FedEx then do to address the problem?

14   **A.**   They essentially strengthened the policy to apply to all

15   online pharmacy accounts.  They had to -- and when I say that,

16   they had to -- all online pharmacy accounts now had to provide

17   some additional financial security.

18   **Q.**   Okay.  And is that what's reflected in Exhibit 30-72?

19   **A.**   Yes, it is.

20   **Q.**   All right.  If we could flip to the second page.

21           So there is an email at the bottom of the page from Josh

22   Croft.  And what is the date on that email?

23   **A.**   June 2nd, 2005.

24   **Q.**   And so this is about a year after the 2004 sales brief

25   that we were just looking at?

1   **A.**    That's correct.

2   **Q.**    And generally speaking, what were the enhanced procedures

3   that were now put in place?

4        If we could have 2 and 3 up.

5   **A.**    So the enhanced measures would be to require not only a

6   credit card or EZ-Debit billing, but that all online pharmacies

7   had to have cash security deposit or bank letter of credit.

8   **Q.**    And so before they needed EZ-Debit or credit card billing,

9   which was how FedEx, I guess, collects the money.  But now they

10  also needed a security deposit or a bank letter of credit?

11  **A.**    That's correct.

12  **Q.**    Did he say --

13        **THE COURT:**  Now I'm trying to understand.  The first

14  policy -- before the change in the policy, it was applied to

15  whom?  And then subsequently it was applied to every online

16  pharmacy.

17       So who is it -- what -- what was the expansion of the

18  application?  From what group to the full group?  What was the

19  first group?

20  **BY MS. AULT:**

21  **Q.**    Can you answer that question?

22  **A.**    So it was for all online pharmacies.

23        **THE COURT:**  At the beginning?

24        **THE WITNESS:**  Yes.

25        **THE COURT:**  Well, then I don't understand.

1   BY MS. AULT:

2   Q.   So were they adding additional measures?   In the

3   beginning, did they have to have EZ-Debit or a credit card?

4   A.   Yes.

5           THE COURT:   I guess what I'm saying is that it wasn't

6   a larger group that they were applying to.   It was that those

7   measures failed to address the problem.   Is that it?  Or both

8   or what?

9       Was there a greater expanse of customers or was it simply

10  that we tried -- there were five things and we did two of them

11  and they weren't working so we then did --

12          MS. ARGUEDAS:   That's it.

13          THE COURT:   That's it.   Okay.

14  BY MS. AULT:

15  Q.   So is it the second part?

16  A.   Yes.

17  Q.   All right.   So they added a security deposit and a bank

18  letter of credit.   Now all online pharmacies had to have that?

19  A.   That's correct.

20  Q.   Does that essentially mean that the online pharmacies had

21  to put some money down in advance?

22  A.   Yes.   Well, either a security deposit or a letter of

23  credit so something to back up the financials so FedEx would

24  have some sort of recourse.

25  Q.   And if you could turn to the first page of Exhibit 30-72.

1   If you could do this page.  I'm sorry.  Page 1.  And if you

2   could blow up this part.  Actually if you could blow up this

3   part down here first.

4        So the email at the bottom of the page is from Grant Kuhn.

5   Who was Grant Kuhn Pams?

6   **A.**   Grant Kuhn was a District Sales Manager.

7   **Q.**   What was he complaining about in this email?

8   **A.**   Mr. Kuhn?

9   **Q.**   Uh-huh.

10  **A.**   He was complaining about having to follow through with

11  Credit's request because UPS was trying to get his customer.

12  **Q.**   And how did Josh Croft respond to that?

13          **THE COURT:**  Just a minute.

14          **MS. AULT:**  Go back to here.

15  **Q.**   And so how did Mr. Croft respond to that?

16  **A.**   He responded by saying that the risk related to the

17  account was simply too high and that FedEx's lost over six

18  million in the Internet pharmacy industry to this point, and he

19  also explained to Mr. Kuhn that typically what is seen is a

20  good payment history up until the pharmacy is either shut down

21  by the FDA or becomes immediately insolvent.

22  **Q.**   And I will take a moment here to, before we go into this,

23  inquire if it will be necessary for us to address the question

24  of the agency relationship between Services, Federal Express

25  Corporation and FedEx Corporation?

1          **THE COURT:**  Services.  What is this?

2          **MS. AULT:**  There are three defendants in this case,

3    Your Honor, and there has been an issue about the relationship

4    between the three of them.  There is a statute of limitations

5    issue, and we may need to acquire -- establish the agency

6    relationship between the three of them, which we will do at

7    this moment, unless that is not necessary.

8          **THE COURT:**  I don't know.  I guess they're into their

9    defense -- they're into their defense mode.

10         **MS. ARGUEDAS:**  Correct.

11         **THE COURT:**  Be careful what we agree to.

12         **MS. ARGUEDAS:**  Correct.

13         **MS. AULT:**  I guess I'm asking if the defense is

14   willing to stipulate to the agency relationship between the

15   three defendants.

16         **MS. ARGUEDAS:**  No.

17         **MS. AULT:**  Then we will proceed to talk about credit

18   forms.

19         **THE COURT:**  Go ahead.

20   **BY MS. AULT:**

21   **Q.**   If we could go to Exhibit 30-66.

22        So let's talk briefly about FedEx's corporate form.  Have

23   you reviewed documents that FedEx has filed publicly explaining

24   its corporate forum?

25   **A.**   Yes.

1  Q.   Basically how are FedEx Corporation, Corporate Services,

2  and FedEx Express related?

3  A.   So FedEx Corporation is the parent company, the holding

4  corporation.  Under FedEx Corporation, you have Federal Express

5  Corporation and FedEx Corporate Services.

6  Q.   So Federal Express Corporation, is that also known as

7  FedEx Express?

8  A.   Yes, it is.

9  Q.   All right.  And so the employees who worked in Credit and

10  Sales, for the most part which company did they work for?

11  A.   FedEx Corporate Services.

12  Q.   And the employees who actually deliver the packages, who

13  do they work for?

14  A.   For FedEx Express or Federal Express Corporation.

15  Q.   But the employee Cathy Ross, who approved the credit

16  policy in 2004, which company did she work for?

17  A.   Federal Express Corporation.

18  Q.   So she worked for FedEx Express, even though she was

19  approving a policy that was coming out of FedEx Corporate

20  Services?

21  A.   Right.

22  Q.   So if you could look at Exhibit 30-66, is this the

23  original email from Josh Croft with the enhanced credit

24  procedures that were put in place June 2nd, 2005?

25  A.   Yes.

**CHIN/ DIRECT/ AULT**

1   **Q.**   Does this have the attachments to that email?

2   **A.**   It does.

3   **Q.**   The first form -- and are these the forms that Mr. Croft

4   sent around as the forms that the customers needed to fill out

5   to implement those credit procedures?

6   **A.**   Yes, it is.

7   **Q.**   So the first form, what is that?

8   **A.**   The first form is a FedEx EZ-Debit Authorization

9   Agreement.

10  **Q.**   So this is page -- all right.  If we could blow up this.

11  And we need this part up here, too.

12       All right.  And so these were forms that people in Credit

13  were communicating to people in Sales that they had to get

14  their customers to sign; is that correct?

15  **A.**   Yes.

16  **Q.**   All right.  And Sales and Credit were both in Corporate

17  Services; correct?

18  **A.**   Yes.

19  **Q.**   Now, this document -- who is listed up in the upper

20  right-hand corner?

21  **A.**   FedEx Corporation.

22  **Q.**   And then who is going to send the debit advice to your

23  records marked "do not pay this invoice" when this EZ-Debit is

24  put in place?

25  **A.**   Federal Express.

**CHIN/ DIRECT/ AULT**

1  Q.   And then who is going to electronically draft your bank

2  account immediately following the tender of your package to

3  FedEx?

4  A.   I'm sorry.  Can you ask that question again?

5  Q.   Where does it say -- it says in there which company will

6  electronically draft your bank account immediately following

7  tender of your package to FedEx.

8  A.   Federal Express.

9  Q.   Okay.  Well, it says Federal Express will send you the

10 invoice, but then does it just say FedEx generically will

11 electronically draft your invoice?

12 A.   Yes.  FedEx.

13 Q.   And based on your review of the documents, where were

14 payments made to?  Which company were the payments made to?

15 A.   FedEx Express.

16 Q.   And then if you can turn to the next page, page 4, and

17 this says EZ-Debit Authorization Agreement.  Is this another

18 form they had to fill out to do EZ-Debit?

19 A.   Yes, it is.

20 Q.   If we could blow up this incredibly tiny language right

21 there.

22      And if you can, if you can read the first sentence.

23 A.   "By signing this form, I, on behalf of the company

24 identified above, company, authorize FedEx Corporation and its

25 successors and assigns or any of the existing or future

1  companies for which FedEx Corporation is the parent company,

2  including, without limitation, FedEx Express Corporation, to

3  debit from the company's bank account as referenced above

4  payment for all invoices of any type relating to any services

5  provided to the company by FedEx Corporation and its successors

6  and assigns or any of the existing or future companies for

7  which FedEx Corporation is the parent company, including,

8  without limitation, FedEx Express Corporation."

9  **Q.**    Okay.  So were the Corporate Services employees in Sales

10  and Credit getting this form signed by the customers on behalf

11  of FedEx Corporation and Federal Express Corporation?

12  **A.**    Yes.

13  **Q.**    If you could turn to page 5.

14      And is this what you have been referring to as the form

15  for the letters of credit or the letter of credit?  We need

16  this part over here.

17  **A.**    Yes, it is.

18  **Q.**    And, again, what letterhead is this on?

19  **A.**    Federal Express Corporation.

20  **Q.**    So this is an agreement with Federal Express Corporation

21  also known as FedEx Express?

22  **A.**    Yes.

23  **Q.**    If we could go to the next page.  And who is this

24  agreement set up to be signed by?

25  **A.**    A senior credit analyst.

**CHIN/ DIRECT/ AULT**

1   Q.   So the senior credit analyst, who is a Corporate Services

2   employee, would sign on behalf of Federal Express Corporation?

3   A.   Yes.

4   Q.   I think that's enough of that.

5        So did the enhanced procedures that we were talking about

6   that were established in 2005 -- did those solve the problems

7   FedEx was having with online pharmacies running up large debts

8   and then leaving Federal Express holding the bag?

9   A.   No, they did not.

10  Q.   So if you could bring up 40-42.  This is an email from

11  Mary Shelfer.  Who was she?

12  A.   A district sales manager.

13  Q.   And so a district sales manager, what level is that within

14  the Sales organization?

15  A.   So you would have an account executive, who would be on

16  the bottom, and then above the account executive would be the

17  district sales manager.

18  Q.   Can you blow up this.

19       And if you could read the first paragraph of that.

20  A.   "As we continue to collaborate moving forward, I want to

21  make sure that we all aware of the Internet pharmacy industry

22  and keep all our eyes and ears and arms around this very

23  volatile industry.  Is this a topic of knowledge or experience

24  for your inside sales teams?  I know that Lisa Acres, field

25  DSM, had some in Texas and I know of some in Colorado.  We are

1   just rampant with them here in Florida, and we are experiencing

2   questionable activity in the industry right now.  Some of the

3   pharmacies might call your teams and pose as a new or different

4   company to shield them from our eyes and intelligence, as we

5   have very strict guidelines about how to secure them so we are

6   not left with a tremendous debt if they are closed down by the

7   DEA."

8   **Q.**   What's the date on this email?

9   **A.**   June 29, 2006.

10  **Q.**   And so according to this email, is FedEx still having

11  difficulties with online pharmacies?

12  **A.**   Yes, they are.

13  **Q.**   And so if we could turn to Exhibit 30-103.

14       So what did FedEx do then?

15  **A.**   They sent out a revamped version of the credit procedures

16  to all of sales.

17  **Q.**   And this time did they add anything new or did they just

18  have a new communication of the same procedures?

19  **A.**   It was a new communication, but it included a little bit

20  more information about online pharmacies.

21  **Q.**   Okay.  And so when was that sent out?

22  **A.**   This was sent out July 6th, 2006.

23  **Q.**   If we could go to the second page, please.  If you could

24  read the paragraph where it says what is an online pharmacy.

25  **A.**   "An online or Internet pharmacy is any entity whose

1   primary business is the marketing and/or selling of

2   pharmaceuticals or weight loss aids via the Internet.  This

3   description does not include established pharmaceutical

4   companies or drugstore chains with an online presence in

5   addition to their physical storefront.  The products sold fall

6   into several subcategories such as diet pills, steroids,

7   vitamins, diabetic medications, in addition to controlled

8   prescription medication such as Viagra and Lortab."

9   **Q.**   Can you read what it says under how they operate?

10  **A.**   "The products are purchased through an Internet website.

11  Then the purchase order is filled by a fulfillment center,

12  drugstore, or warehouse who carries the requested product.  The

13  company operating the website and the company operating the

14  fulfillment center are normally separate companies.  Online

15  pharmacies often process and fulfill their orders via web API.

16  This solution is portable and allows them to easily move orders

17  from location to location."

18  **Q.**   And in your experience, conducting your investigations, is

19  that how online pharmacies operate?

20  **A.**   Yes.

21  **Q.**   And then if we could go to why this is important, which I

22  think is actually on the next page.

23  **A.**   "Many of these companies operate outside federal and state

24  regulations over the sale of controlled drugs which require

25  diagnosis and prescription by a licensed physician.  Drugs

purchased from these sites may be diluted or counterfeit.

Several sites have been shut down by the government without

warning or simply disappeared, leaving large balances owing to

FedEx.  FedEx has written off more than six million in

unrecoverable revenue from these businesses since 2003.

Because these companies attempt to maintain a low profile, the

local sales professionals are often the last to know that large

numbers of packages are being shipped from their territory.

Account numbers that are imported or aligned to other

territories do not show up in our current visibility tools so

they may artificially inflate revenue in volume budgets and

then disappear."

**Q.**   And if you could read how do you recognize them.

**A.**   "These customers typically order large numbers of FedEx

padded packs to ship their product.  Large requests for padded

packs should be reported to local sales management immediately.

This order is usually the first contact that is made with

either Customer Service or inside Sales.  Also these businesses

may not look like a normal shipping operation.  Instead of

operating in a commercial warehouse business district, these

shippers may operate out of a retail or office location, a

blank storefront, a small brick and mortar pharmacy that never

had large shipping before, or even a basement.  The business

names on the airbill, its signs and telephone listings may not

match, and the name could be disguised so as to hide what their

**CHIN/ DIRECT/ AULT**

1  business purpose is."

2  **Q.**   And what were the salespeople supposed to do when they

3  found something that was an Internet pharmacy?

4         **MS. ARGUEDAS:**   Could we use the microphone,

5  Your Honor.   We couldn't hear that.

6  **BY MS. AULT:**

7  **Q.**   What were the salespeople supposed to do when they

8  identified something that was an Internet pharmacy?

9  **A.**   Submit that account information or customer information to

10  the Credit Department.

11  **Q.**   And then what was the Credit Department going to do?

12  **A.**   They would obtain security, some sort of financial

13  security for those accounts.

14  **Q.**   And were the salespeople instructed to do anything else

15  other than refer the matter to Credit?

16  **A.**   Just to refer the matters to Credit.

17  **Q.**   So as part of the process of developing and implementing

18  this -- these credit procedures, did FedEx's Credit Department

19  maintain a list of the online pharmacies that had accounts with

20  FedEx?

21  **A.**   Yes, they did.

22  **Q.**   And when did the Credit Department start maintaining that

23  list?

24  **A.**   It was as early as March 2004 approximately, around that

25  time frame.

**CHIN/ DIRECT/ AULT**

1  Q.   By May of 2004, how many online pharmacies were on the

2  list?

3  A.   There were approximately 100.

4  Q.   And by 2010, how many online pharmacies were on the list?

5  A.   Approximately 600.

6  Q.   And was that list of online pharmacies circulated to

7  senior level FedEx officials?

8       If we could have Exhibit 30-16.

9           **THE COURT:**  What was the number in 2006?

10 BY MS. AULT:

11 Q.   2004, May of 2004, how many had they identified?

12 A.   Approximately 100.

13 Q.   And by May of -- and by 2010, how many had they

14 identified?

15 A.   Approximately 600.

16 Q.   And was that list circulated to senior people in FedEx?

17 A.   Yes, it was.

18 Q.   And was that list regularly circulated within the

19 people -- I guess was it maintained -- who maintained that

20 list?

21 A.   It would be the individuals in the Credit Department,

22 Bonnie Wagner, Josh Croft and Kendell Black.

23 Q.   And did they -- did Kendell Black, who I think you said

24 was the senior manager in credit, did he regularly review that

25 list?

**CHIN/ DIRECT/ AULT**

1   **A.**   Yes, he did.

2   **Q.**   And did he also review it regularly with Betty Hale?

3   **A.**   Yes.

4   **Q.**   And who was she?

5   **A.**   She was the managing director.

6   **Q.**   And if we could look at Exhibit 30-111.

7         **MR. RUBY:**  30-111?

8         **MS. AULT:**  Yes.

9   **Q.**   Do you have that?

10  **A.**   Yes.

11  **Q.**   Okay.  If we could look at this email from Steven Wallace.

12  Who was Steven Wallace?

13  **A.**   He was in the Credit Department.

14  **Q.**   And this is January of 2007; is that correct?

15  **A.**   Yes, it is.

16  **Q.**   Can you read what he says in that first paragraph there.

17  **A.**   "An online pharmacy is any entity with a primary business

18  of marketing and/or selling pharmaceuticals or weight loss aids

19  over the Internet.  At times they may have a small brick and

20  mortar presence, but typically this is just a front.  Usually I

21  determine if the company is considered an online pharmacy based

22  on my conversations with Sales and/or the customer and Internet

23  research.  A typical online pharmacy has a website offering

24  prescriptions for premium price after an online or

25  over-the-phone consultation, rarely goes through an insurance

1    provider, and there is no face-to-face consultation.  After the

2    doctor conducts this consultation, the Rx is written and sent

3    to a fulfillment center for the prescription to be filled and

4    sent to the customer.  Also there are several known online

5    pharmacy fulfillment centers that most of these guys use that

6    send me a red flag that they are probably an online pharmacy,

7    too.  For more details on online pharmacies, please refer to

8    the sales point under keyways account number setup, online

9    pharmacies account number setup."

10           **MS. AULT:**  Your Honor, Ms. Espinoza has just informed

11   me that this was not on the list that I read, so we would like

12   to move 30-111 into evidence.

13           **THE COURT:**  What is it?  It's 30 --

14           **MS. AULT:**  It's 30 dash 111.

15           **THE CLERK:**  111?  I apologize.  It is.

16           **MS. AULT:**  That is actually in evidence.

17           **THE COURT:**  Okay.  This is 30-111?

18           **MS. AULT:**  Yes.

19           **THE COURT:**  It's from Mr. Wallace to Ms. Huggins?

20   **BY MS. AULT:**

21   **Q.**    Yes.  Who are Victoria Huggins and Kimberly Abreu?

22   **A.**    Victoria Huggins an account executive and Kimberly Abreu

23   is a district sales manager.

24           **THE COURT:**  And Mr. Wallace?

25           **THE WITNESS:**  He is an employee within FedEx's Credit

1    Department.

2                **THE COURT:**  He is from the Credit side?

3            **MS. AULT:**  Yes.

4            **THE WITNESS:**  Yes.

5            **THE COURT:**  He is communicating to the Sales side?

6            **MS. AULT:**  Yes.

7    **Q.**   And how did Mr. Wallace do with his description of how an

8    online pharmacy works, based on your experience?

9    **A.**   He did a pretty good job.

10   **Q.**   So is he aware that there was no face-to-face

11   consultation?

12   **A.**   Yes.

13   **Q.**   And how did he say he identified what an online

14   pharmacy -- what -- which of their customers was an online

15   pharmacy?

16   **A.**   Well, he had a couple of ways of doing it.  It was either

17   through talking with Sales or through doing online research.

18   He also knew of several -- he also knew of the common

19   fulfillment centers that were used by the online pharmacies.

20   **Q.**   So he could identify online pharmacies by seeing that they

21   were shipping from something he knew was a fulfillment center

22   for online pharmacies?

23   **A.**   That's correct.

24   **Q.**   And then if we could -- could you scroll down just a

25   little bit.

1          And so did the people in the Credit Department sometimes

2     find something that they thought was an online pharmacy, but

3     then they determined it actually wasn't?

4     **A.**    In this particular case, this entity was determined to not

5     be an online pharmacy.

6     **Q.**    Okay.  So this is an example of Mr. Wallace doing some due

7     diligence or -- with the salespeople to figure out that this

8     was not an online pharmacy?

9     **A.**    That's correct.

10    **Q.**    Now, according to the --

11         **THE COURT:**  I assume in your investigation you talked

12    to a number of FedEx employees; is that correct?

13         **THE WITNESS:**  Yes.

14         **THE COURT:**  Okay.  Did any of them tell you that they

15    had had experience -- medical training or medical experience?

16         **MR. RUBY:**  Your Honor, if the Court -- if the Court

17    please, I'm sorry --

18         **THE COURT:**  Am I preempting your examination?  What?

19         **MR. RUBY:**  No.  You're asking for a question that he

20    shouldn't answer legally.

21         **THE COURT:**  Why?

22         **MR. RUBY:**  Because the interviews took place,

23    according to his testimony, starting in 2008, and they were

24    not, to my understanding, any interviews that interviewed

25    people in their capacity as employees or representatives of

 1    FedEx.  I rose a couple times before, but we didn't quite get

 2    to this point.

 3        His testimony from emails, which obviously were written

 4    within the course of employment, I haven't objected to because

 5    there isn't an objection.  But as to statements made in these

 6    face-to-face interviews, which the witness has dated starting

 7    in 2008, are hearsay and they're not subject to the statement

 8    of a party exception because they were not given under

 9    circumstances where the interviewees were speaking for or

10    within their duties with the company.

11        **THE COURT:**  Okay.  So let's -- your objection may be

12    well taken.  Notwithstanding your objection, I'd like to know.

13    You know that old rule of evidence, the overarching rule of

14    evidence is the judge would like to know the answer.

15        **MR. RUBY:**  Yeah.

16        **THE COURT:**  So subject to that -- subject to your

17    objection -- and it may be that I would strike it or not

18    consider it based upon some further discussion of that.

19        **MS. ARGUEDAS:**  We like the question and the answer.

20        **THE COURT:**  I thought it was a pretty good question.

21        **MR. RUBY:**  I'm not a critic.

22        **THE COURT:**  Okay.  So back to the question.

23        Did any of these people who are FedEx employees or former

24    FedEx employees tell you during the course of the interview

25    that they were -- that they were medical doctors or that they

**CHIN/ DIRECT/ AULT**

1  had had training in the field of medicine?

2          **THE WITNESS:**  They did not.

3          **THE COURT:**  Okay.  Thank you.

4          **MS. ARGUEDAS:**  I didn't hear him, but I think he said

5  no.

6          **THE COURT:**  No.

7  **BY MS. AULT:**

8  **Q.**   So if you could turn to Exhibit 30-40.  And this is an

9  email from Bonnie Wagner.  Who is she?

10 **A.**   She was an analyst in the Credit Department.

11 **Q.**   And so Josh Croft and Kendell Black, who we have been

12 talking about, they were her management chain; correct?

13 **A.**   Yes.

14 **Q.**   And Cindy Blankenship, what department was she?

15 **A.**   She was in Collections.

16 **Q.**   So what, generally speaking -- what was Bonnie discussing

17 in this email?

18 **A.**   There is a discussion about an online pharmacy customer.

19 A discussion about one of the websites that Ms. Wagner had

20 found for this particular customer.

21 **Q.**   Okay.  And so did Ms. Wagner say that based on the

22 information she found on the website, she was going to add the

23 customer to the credit list of online pharmacies?

24 **A.**   Yes.

25 **Q.**   If we could take a look at the information that she found

1    on the website, what was the customer's name?

2    **A.**    Caroline Street Clinic.

3    **Q.**    If you could read where it says how it works and what we

4    do for you.

5    **A.**    "You can conveniently and comfortably talk with our

6    doctors and pharmacists using the Internet.  You will have your

7    prescriptions written and your medications prescribed quickly

8    and easily from the comfort of your computer.  You will save

9    valuable time because you won't have to wait in a doctor's

10   office to be seen.  You'll stay healthier because you won't be

11   exposed to other patients who may possibly be contagious.

12   You'll save money because you aren't subject to a high fee

13   common with a normal office visit.  Your questionnaire is done

14   online, not in a doctor's office.  PillValue.com offers

15   medications that are often called *embarrassment drugs*.  By

16   using Internet technology, PillValue.com enables you to get

17   your medications you need without any hassle or embarrassment.

18   You'll get what you need without error."

19   **Q.**    And if you could read the sentence in the bottom paragraph

20   that starts with "research and experience have shown."

21   **A.**    "Research and experience have shown that there is no

22   reason to suggest that an in-person review of your medical

23   history is any more significant than an online consultation.

24   What's more, you can enjoy the entire process from the comfort

25   of your computer over the Internet.  It is a safe, private, and

1    easy way to seek treatment."

2    **Q.**   So according to this website, how are you going to

3    interact with the doctor?

4    **A.**   You would just fill out an online questionnaire.

5          THE COURT:   But you have to read the first sentence.

6    "We use top physicians and two of the most technically-advanced

7    pharmacies in the United States.  All are fully licensed to

8    practice in the United States.  Our physicians can spot medical

9    factors that would rule out certain medications by doing a

10   simple review of your medical history."

11        So that's a sentence that preceded this sentence.

12          MS. AULT:   Yes, Your Honor.

13          THE COURT:   Okay.  So, I mean, one reading that might

14   very well come to the conclusion that this process is

15   sanctioned by physicians if one reads that -- knowing nothing

16   else, just reading the paragraph.

17   BY MS. AULT:

18   **Q.**   And knowing nothing else, just reading the paragraph, is

19   the physician conducting an in-person examination?

20          THE COURT:   No, not that.  I know that.  I mean, it

21   says it in the next sentence.  But I think you have to read the

22   sentences together because the sentence standing alone that we

23   don't have an -- that we don't have a face-to-face

24   consultation, just reading that alone, you'd say *Oh, really,*

25   *how many come*?  Or *Is that okay?*  Or is that, you know -- *is*

 1  *that medically permissible*?

 2      And then you read the first sentence -- and I'm not saying

 3  it is because it's not.  But you read the first sentence and it

 4  says we have doctors who say that it is.  And they're fully

 5  licensed.

 6      I'm just pointing out that when one reads it, you do have

 7  to read that sentence to put it in the perspective of what a

 8  reader would see if they read it.

 9          **MS. AULT:**  Yes, Your Honor.

10          **THE COURT:**  That's all.  Thank you.  Go ahead.

11          **MS. AULT:**  And I wasn't trying to hide anything from

12  Your Honor.  I was just trying to move things along.

13          **THE COURT:**  I know you aren't.

14  **BY MS. AULT:**

15  **Q.**  So --

16          **THE COURT:**  And I'm just trying to save

17  cross-examination.

18  **BY MS. AULT:**

19  **Q.**  So if we can look at Exhibit 30-48.  And this again

20  involves Bonnie Wagner and Kendell Black; is that correct?

21  **A.**  Yes, it does.

22  **Q.**  And generally speaking, what is Bonnie Wagner -- what did

23  she -- what did she do and what is she describing to Mr. Black?

24  **A.**  She's discussing her review of the Rxaffiliateforum.com

25  website and about the general information she found from that

1    website.

2    **Q.**    At the beginning of your testimony, we had some

3    discussions about affiliates, and I believe that you testified

4    that there was a website that the affiliates went to to

5    exchange information about the affiliates, their fulfillment

6    pharmacies, and a general online forum; is that correct?

7    **A.**    Yes.

8    **Q.**    Is this that online forum that you were talking about?

9    **A.**    Yes, it is.

10   **Q.**    And was Ms. Wagner able to make some connections between

11   different Internet and fulfillment pharmacies using the

12   information she found on that forum?

13   **A.**    Yes, she was.

14   **Q.**    Did she also find out some information about how the

15   affiliates were talking about FedEx?

16   **A.**    Yes, she did.

17   **Q.**    What kinds of things were they saying about FedEx?

18   **A.**    It was -- there was some discussion about how FedEx was

19   closing down some of the pharmacies for nonpayment.

20   **Q.**    And in particular, was there one online pharmacy in

21   particular that she was looking for information on?

22   **A.**    Yes.  She was trying to find some additional information

23   on Hope Mills.

24   **Q.**    Now, according to the credit policy, were sales employees

25   supposed to report suspected online pharmacies to Credit?

**CHIN/ DIRECT/ AULT**

1   A.   Yes.

2   Q.   And in addition to Sales, where else did Credit get

3   information about online pharmacies?

4   A.   They could do their own research online or they could

5   speak to the customers themselves.

6   Q.   And did they also get information from the collections

7   people?

8   A.   Yes.

9   Q.   If we could turn to Exhibit 30-30.

10         THE COURT:  By *customers*, who do you mean again?  You

11   mean the --

12         THE WITNESS:  The actual shippers to FedEx customers.

13         THE COURT:  The recipient of the package?

14         THE WITNESS:  No.  The accountholders.

15         THE COURT:  That's right.  Thank you.

16   BY MS. AULT:

17   Q.   And is this an example of the Credit Department getting

18   information from Collections?

19   A.   Yes, it is.

20   Q.   And generally speaking, what was the Collections' employee

21   trying to do in this particular example?

22   A.   To establish the connections among the different online

23   pharmacy accounts.

24   Q.   Okay.  And what type of information did the Collections

25   person use to do that?

1    **A.**   They were looking for common contact names for the online

2    pharmacy accounts.   They could also make associations through

3    common addresses and phone numbers.

4    **Q.**   Is that something that you saw in your review of the

5    records that FedEx employees and Sales, Credit and Collections

6    would do, is they would try to make connections between the

7    online pharmacies, between the online pharmacies and each

8    other, or the online pharmacies and fulfillment pharmacies

9    using information like that, contact information, addresses,

10   phone numbers?

11   **A.**   Yes.

12   **Q.**   All right.   And if we could just look at a couple of

13   examples --

14        **THE COURT:**   Can I go back to -- let me go back to the

15   placement of the order.   Way back.   Okay.

16        When the customer -- and I mean the recipient of the

17   drugs, the person who ordered the drugs, would be told that if

18   they order 100 Ambien, as an example, it would cost them X,

19   whatever that amount is.   Would that amount be broken down in

20   terms of shipping and handling or would it just say you want

21   100 pills, it's X dollars?

22        **THE WITNESS:**   So when the pharmacies I've seen -- it

23   can be both, but most of the ones I've seen will charge you a

24   price for the drug and then an additional shipping fee.

25        **THE COURT:**   And that would be known to the recipient?

1              THE WITNESS:  Yes.

2              THE COURT:  That is the customer.  So the customer

3      would see an invoice before placing the -- before placing the

4      order and before it goes to the bank, to see whether the credit

5      is approved because credit is approved in a particular amount,

6      I have to believe.  It would include two things, the price of

7      the drugs, plus something called shipping and handling,

8      whatever that is; is that right?

9              THE WITNESS:  Yes.

10             THE COURT:  And would it indicate that it was being --

11     in any of these communications between the recipient and the

12     other side, would it indicate that drugs were being shipped

13     FedEx?

14             THE WITNESS:  In some instances, yes, it would say

15     *FedEx shipping*, but the customer would also know -- when they

16     were about to receive their order, they would get a tracking

17     number that would be associated with the particular shipper.

18             THE COURT:  Okay.  Thank you.

19     BY MS. AULT:

20     Q.   So in your experience, you conducted a number of

21     undercover orders from a number of online pharmacies; correct?

22     A.   Yes.

23     Q.   And would you get some sort of automatically-generated

24     email communications at different points in the process?

25     A.   Yes, you would.

1  **Q.**   Would you get an automatically-generated communication

2  when your credit card was authorized, that first step?

3  **A.**   Yes.

4  **Q.**   That would say your order has been received and the credit

5  card has been approved?

6  **A.**   That did happen, yes.

7  **Q.**   And then you would also get another email when the product

8  was shipped; is that correct?

9  **A.**   Yes.

10  **Q.**   And typically, that second email would contain the name of

11  the shipper and the tracking number?

12  **A.**   It would, yes.

13  **Q.**   So it would say your package is coming FedEx next-day air

14  and give you the FedEx tracking number?

15  **A.**   Yes.

16  **Q.**   So if we could go back to Exhibit 30-30.  And go to

17  page -- if you could put up pages 3 and page 5.  And it looks

18  like Ms. Leung has already helpfully highlighted them for us.

19      So are these some of the online and fulfillment

20  pharmacies -- some of the accounts that this Collections person

21  was able to connect using information like the name, the

22  address, and the phone number?

23  **A.**   Yes, they were.

24  **Q.**   Okay.  And if you could look at -- there's a number of

25  these online pharmacies that -- can you blow up this one so

1    it's the same size as that one.

2              MS. ARGUEDAS:  I didn't hear that.

3              MS. AULT:  Actually, can you blow up -- we need to be

4    able to match up the lines.  Maybe that's not going to be

5    possible.

6    Q.    Okay.  So, for example, for this line No. 8, it says over

7    here that the collector has identified which people as

8    associated with that RxMedical Networks account.

9              MS. ARGUEDAS:  Excuse me, Your Honor.  We cannot hear

10   over here.

11   BY MS. AULT:

12   Q.    So the collector has identified which people as associated

13   with that account, RxMedical Networks?

14   A.    The names are Michael Bosanski, Vincent Chhabra, Louis

15   Cohen and Carolyn Yu.

16   Q.    And line 12, Rx Network, who has the collector identified

17   as associated with that account?

18   A.    Vincent Chhabra and Louis Cohen.

19   Q.    So two of the same names that they associated with

20   RxMedical Networks?

21   A.    Yes.

22   Q.    And does Louis Cohen also appear in line 21, which is

23   another Rx Networks account?

24   A.    Yes, he does.

25             MS. AULT:  Your Honor, I see that it's almost noon.

1   I'm about to turn to another topic.  So perhaps --

2          THE COURT:  Okay.  So let's take a recess until a

3   quarter of 1:00.

4          MR. HEMANN:  The only question, Your Honor, is we have

5   one witness who is here from New York.

6          THE COURT:  So put that person on.  You --

7          MR. HEMANN:  If we work it out, you're fine with it?

8          THE COURT:  Absolutely.

9          MS. ARGUEDAS:  Fine.

10                 (Lunch recess taken at 11:59 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FOSTER - DIRECT / HEMANN

| | |
|---|---|
| 1 | **Afternoon Session**                                    **12:49 p.m.** |
| 2 |        **THE CLERK:**  Do you want to call your witness? |
| 3 |        **MR. HEMANN:**  Good afternoon, Your Honor.  The |
| 4 | United States calls Susan Foster. |
| 5 |        **THE COURT:**  Okay.  Thank you. |
| 6 |        **THE CLERK:**  Ms. Foster, please raise your right hand. |
| 7 |                  **SUSAN FOSTER**, |
| 8 | called as a witness for the Government, having been duly sworn, |
| 9 | testified as follows: |
| 10 |        **THE WITNESS:**  I do. |
| 11 |        **THE CLERK:**  Please be seated. |
| 12 |    Please state your full name, spell your last name for the |
| 13 | record. |
| 14 |        **THE WITNESS:**  Susan Foster, F-O-S-T-E-R. |
| 15 |        **MR. HEMANN:**  Your Honor, I've placed a folder with the |
| 16 | exhibits that we'll be using with Ms. Foster there, and I gave |
| 17 | the clerk the original exhibits there that we'll be using. |
| 18 |                **DIRECT EXAMINATION** |
| 19 | BY MR. HEMANN: |
| 20 | Q.   How are you this afternoon, Ms. Foster? |
| 21 | A.   I'm well.  Thank you. |
| 22 | Q.   Can you tell the Court what it is that you currently do |
| 23 | for a living? |
| 24 | A.   What I do now? |
| 25 | Q.   Yes. |

**FOSTER - DIRECT / HEMANN**

1  **A.**   I am executive director of an organization called the

2  National Center for Physician Training in Addiction Medicine in

3  the Addiction Medicine Foundation.  We help to develop

4  fellowship training programs for physicians to make sure that

5  they are expert clinicians in treating addiction.

6  **Q.**   How long have you been doing that?

7  **A.**   For two years.

8  **Q.**   Before that, did you work for an organization called the

9  National Center On Addiction and Substance Abuse?

10  **A.**   I did.

11  **Q.**   And does that go by the acronym CASA?

12  **A.**   Yes.

13  **Q.**   Could you tell the Court what CASA is?

14  **A.**   CASA is a national public policy research organization

15  that conducts large policy studies on the impact of substance

16  use and addiction on America's populations and systems and

17  attempts to look at the issues in a comprehensive way, develop

18  recommendations for changes in policy and practice, to improve

19  health and reduce costs.

20  **Q.**   And CASA is affiliated with Columbia University?

21  **A.**   It was at the time I worked there.

22  **Q.**   When did you work at CASA?  What years?

23  **A.**   I worked from 1996 to 2014.

24  **Q.**   What positions did you hold at CASA during that 1996 to

25  2014 time frame?

1    A.    The entire time I served as vice president and director of

2    policy research and analysis.

3    Q.    What does that mean?

4    A.    That means I was responsible for all of the policy reports

5    that the organization did.

6    Q.    Did the organization during the time that you worked there

7    interact with third parties, with participants -- other

8    companies and organizations that might have --

9              THE COURT:  Excuse me.  Sorry.  We're getting -- we're

10   just trying to catch up on exhibits right here.

11        Are you using the third revised exhibit list or the second

12   revised exhibit list?

13        Oh, I've got the wrong one.  Okay.  I was -- my fault.  I

14   was looking at the defendants' exhibit List.

15        Okay.  So you're using the second revised exhibit list.

16             MS. AULT:  Yes, Your Honor.

17             THE COURT:  Okay.  Thank you very much.  That's the

18   one I'm using as well.

19        Okay.  Sorry.

20             THE WITNESS:  That's okay.

21             THE COURT:  Go ahead.

22   BY MR. HEMANN:

23   Q.    So, anyway, did CASA interact with outside other

24   organizations and businesses that might have some impact on

25   addiction?

FOSTER - DIRECT / HEMANN

1    **A.**    We interacted with multiple organizations in a variety of

2    different ways.

3    **Q.**    And, as you know, this case concerns FedEx.  Did there

4    come a time in your tenure at CASA that you interacted with

5    FedEx?

6    **A.**    Yes.

7    **Q.**    Could you describe for the Court how that interaction came

8    about?

9    **A.**    We began a study in 2002 on the diversion and misuse of

10   controlled prescription drugs.  In the course of the initial

11   phases of that study, we became aware that Internet -- the

12   Internet was being used for illegal trafficking of controlled

13   prescription drugs.

14       We did a first look at that in collaboration with

15   Beau Dietl Associates, which had done a study of this earlier

16   in 2003; and with them, we began -- we did a snapshot taking a

17   week in January of 2004 to look at how easy it was to get

18   controlled prescription drugs online without a prescription.

19       In the course of that study, we identified that it was, A,

20   very easy; and, B, that there were a wage of other institutions

21   and organizations that appeared to be involved in that.  Those

22   were the Internet service providers, financial institutions,

23   and the shippers.

24       **MS. ARGUEDAS:**  Objection, Your Honor.  This is getting

25   to be a narrative now.  It should be a Q & A.

**FOSTER - DIRECT / HEMANN**

1          **THE COURT:**  Okay.

2          **MR. HEMANN:**  I'll break it up a little bit,

3  Your Honor.

4  **Q.**   So you had participated with Beau Dietl & Associates in

5  this.  Are you -- what's the right word? -- commissioned?

6  **A.**   It was a cooperation.  They donated their services.

7  **Q.**   Okay.  And they conducted a study related to obtaining

8  controlled pharmaceuticals over the Internet?

9  **A.**   Correct.

10  **Q.**   Okay.  Did you at some point in time -- we're going to

11  talk a little bit more about what you found out about that

12  study -- at some point in time did you communicate with FedEx

13  regarding that study?

14  **A.**   Yes.

15          **MR. HEMANN:**  Your Honor, I can hand the witness some

16  exhibits.

17          **THE COURT:**  Oh, go ahead.

18          **MR. HEMANN:**  Thank you.

19  **Q.**   So, Ms. Foster, if you could look at Exhibit 060-015.

20  **A.**   (Witness examines document.)

21  **Q.**   Do you recognize that?

22  **A.**   I do.

23  **Q.**   What is it?

24  **A.**   It is a letter that our organization sent to Frederick

25  Smith December 8 of 2005 advising him of the findings of a

1   large report we did and identifying the possibility that his

2   services were being used to transport these drugs, and

3   recommending --

4   **Q.**   Let me -- I'll ask you a few questions about it in a

5   second.

6           **MR. HEMANN:**   Your Honor, the United States moves

7   Exhibit 060-015 into evidence.

8           **THE COURT:**   Admitted.

9        (Trial Exhibit 060-015 received in evidence)

10          **MR. HEMANN:**   And if you could put it up on the screen.

11  Thank you.

12  **Q.**   So you addressed this to Mr. Smith, the chairman of FedEx?

13  **A.**   Yes.

14  **Q.**   And did you include any documents with this letter?

15  **A.**   Yes.

16  **Q.**   What documents did you include?

17  **A.**   We included our completed study of Internet diversion,

18  which was called "Under the Counter."

19  **Q.**   I'd like to direct your attention to the

20  second-to-the-last paragraph on the first page of the letter,

21  and ask you to read it aloud.

22  **A.**   (reading)

23          "Only 6 percent of websites selling these drugs

24          require a prescription."

25  **Q.**   Sorry.  The whole paragraph, please.

1   **A.**   Oh, the whole paragraph?  Sorry.  (reading)

2           "Significant vehicles for acquisition of these drugs

3      are the nation's postal and shipping services.  For

4      example, our investigation found that rogue Internet

5      pharmacies have emerged as an unmonitored and unregulated

6      source of diversion for controlled prescription drugs.

7      Only 6 percent of websites selling these drugs require a

8      prescription prior to dispensing the drugs, and these

9      drugs are shipped to consumers from both inside and

10     outside the U.S."

11  **Q.**   Did your letter suggest any follow-up between CASA and

12  FedEx?

13  **A.**   Yes.

14  **Q.**   And what did the letter suggest?

15  **A.**   The letter suggested that they talk with me.

16  **Q.**   Did you participate in the drafting of this letter?

17  **A.**   I did.

18  **Q.**   Did you hear back from FedEx?

19  **A.**   We did.

20  **Q.**   If you could look at Exhibit 060-023, please.

21  **A.**   (Witness examines document.)

22  **Q.**   Is this the response you received from FedEx?

23  **A.**   Yes.

24  **Q.**   And if you could just look at the first --

25          **MR. HEMANN:**  Your Honor, the United States moves

 1   060-023 into evidence.

 2            **THE COURT:**  Admitted.

 3        (Trial Exhibit 060-023 received in evidence)

 4   **BY MR. HEMANN:**

 5   **Q.**   And, Ms. Foster, does the first paragraph of this letter

 6   acknowledge the receipt of your earlier letter and the enclosed

 7   report?

 8   **A.**   Yes.

 9   **Q.**   So I'd like to talk for a moment about the enclosed

10   report.  And if you could look, please, at Exhibit 060-016,

11   which is in front of you.

12   **A.**   (Witness examines document.)

13   **Q.**   Is that the report that you sent to FedEx?

14   **A.**   It is.

15   **Q.**   And the report that they acknowledged receipt of in the

16   December 30 letter?

17   **A.**   Yes.

18            **MR. HEMANN:**  Your Honor, the United States moves

19   Exhibit 060-016 into evidence.

20            **THE COURT:**  Admitted.

21        (Trial Exhibit 060-016 received in evidence)

22   **BY MR. HEMANN:**

23   **Q.**   This is -- about how long is the report?

24   **A.**   144 pages.

25   **Q.**   Is there a section in the report or a chapter of the

**FOSTER - DIRECT / HEMANN**

1   report that is specifically related to the Internet?

2   **A.**   Yes.

3   **Q.**   And that's Chapter 5?

4   **A.**   Correct.

5   **Q.**   If you could turn to, and it's numbered, page 63 of the

6   report.  I believe it's page 75 on the computer.

7   **A.**   (Witness examines document.)

8   **Q.**   Is that the chapter, Chapter 5, on the Internet?

9   **A.**   Yes.

10  **Q.**   Could you describe for the Court what role you personally

11  had in drafting the final product of this report?  What was

12  your job?

13  **A.**   My job was to make sure that it was accurate and written

14  in a manner that I thought was accessible.  I actually

15  participated in the writing and signed off on the writing.

16  **Q.**   If you could look at -- and, Ms. Leung, if you could blow

17  up the bottom three paragraphs there.  Thank you.

18      And if you could just read, I guess, just the third

19  paragraph for now.  The Court has it in front.

20      Well, let me summarize and see if this works first.  The

21  report acknowledges that there are certain -- or that CASA had

22  found that there were certain legitimate online pharmacies;

23  correct?

24  **A.**   Correct.

25  **Q.**   And then the report acknowledges that there were also

1  certain illegitimate or illegal online pharmacies; correct?

2  **A.**   Correct.

3  **Q.**   Okay.  And then as to those illegal or illegitimate

4  pharmacies, if you could look down to the bottom, that bottom

5  paragraph that starts with "Some of," and please read that.

6  And keep it a little slow for the court reporter, please.

7  **A.**   (reading)

8         "Some of these pharmacies provide consumers with

9         prescription drugs without a physical examination by a

10        physician.  The consumer fills out an online questionnaire

11        that is reportedly evaluated by a physician affiliated

12        with the online pharmacy.  Without ever meeting the

13        patient face to face, the physician approves the

14        questionnaire and then authorizes the Internet pharmacy to

15        send the drug to the patient.  Tens of thousands of

16        'prescriptions' are written each year for controlled and

17        noncontrolled prescription drugs through such Internet

18        pharmacies, none of which require medical records,

19        examinations, lab tests, or follow-ups.  Some of these

20        'rogue' Internet pharmacies provide such online

21        consultations free of charge; others refer customers to

22        'script' doctors who are willing to write prescriptions

23        for cash.  Finally, some Internet pharmacies dispense

24        prescription drugs without even the pretense of having a

25        physician's prescription."

1    Q.   The study that you partnered with Beau Dietl on comes up a

2    little bit later in this chapter; correct?

3    A.   Correct.

4    Q.   Could you tell the Court who or what Beau Dietl &

5    Associates is?

6    A.   Beau Dietl is a private investigative firm based in

7    New York City.

8    Q.   And if you could describe in a little bit more detail the

9    project that you -- that CASA did with Beau Dietl.

10   A.   We worked with Beau Dietl to do a snapshot of online

11   availability of controlled prescription drugs.

12   Q.   Okay.  Could you please turn to page 65 of the exhibit.

13        And, Ms. Leung, that's the next page.

14   A.   (Witness examines document.)

15   Q.   And look at the top right.  There's a paragraph that

16   begins with "In February 2004."  If you could please read that.

17   A.   (reading)

18        "In February 2004, CASA partnered with BDA to explore

19        the availability of controlled prescription drugs on the

20        Internet.  This analysis documented the number of Internet

21        sites that dispense opioids, CNS depressants and

22        stimulants, and identified which sites dispense controlled

23        drugs with a valid prescription, with an online 'doctor

24        consultation' or without any consultation or prescription.

25        The findings from this analysis is presented in detail in

1          CASA's 2004 publication, 'You've got drugs! Prescription

2          drug pushers on the Internet,' and its methodology is

3          presented in Appendix E of this report."

4    **Q.**   As part of this endeavor, did Beau Dietl attempt to

5    determine in some sample how many sites required -- how many of

6    these Internet sites required prescriptions?

7    **A.**   Yes.

8    **Q.**   If you could turn to -- and did they reach a conclusion

9    for the time frame that they were looking at?

10   **A.**   Yes.

11   **Q.**   If you could turn to page 66, which is the next page.

12   **A.**   (Witness examines document.)

13   **Q.**   And in the left column there is something -- a paragraph

14   that begins with "Few sites," and there's a couple of bullet

15   points underneath it.  If you could read that and the bullet

16   points, please.

17   **A.**   (reading)

18          "Few sites selling controlled drugs required a valid

19          prescription:"

20   Dot point:  (reading)

21          "Of the 157 anchor sites investigated, only 10

22          required a prescription prior to dispensing the drugs.

23          94 percent did not require a prescription, 41 percent

24          indicated that no prescription was needed, 49 percent

25          offered an 'online consultation,' and 4 percent made no

FOSTER - DIRECT / HEMANN

1          mention of prescriptions at all."

2          Second dot point:  (reading)

3               "4 percent (seven sites) asked for a faxed

4          prescription from the patient rather than the physician.

5          Only 2 percent (three sites) required that a prescription

6          be mailed."

7     Q.   These conclusions were from the 2004 Beau Dietl survey?

8     A.   Yes.

9     Q.   Did Beau Dietl repeat the survey a year later in 2005?

10    A.   Yes.

11    Q.   And were the results essentially the same in 2005 as they

12    were in 2004?

13    A.   Yes.

14    Q.   If you could please turn to the next page, page 67.

15    A.   (Witness examines document.)

16    Q.   There are a series of bullet points in the left column.

17    If you could please read the third bullet point.

18    A.   (reading)

19               "Approximately the same proportion of anchor sites

20          did not require or made no mention of a prescription

21          (95 percent in 2005 versus 94 percent in 2004)."

22    Q.   Did the report that you drafted and sent to FedEx talk

23    about the state of federal regulation of Internet pharmacies?

24    A.   Yes.

25    Q.   And what was the information?  What was your source --

**FOSTER - DIRECT / HEMANN**

1    CASA's source of information in preparing this summary?

2    **A.**   There were multiple sources in preparing our summary.  We

3    for the study reviewed over 2,000 publications.

4    **Q.**   Do you recall as you sit here today specifically what

5    sources you looked at in drafting the section on federal

6    regulation?

7    **A.**   Could you refer me to that section?

8    **Q.**   Oh, I'm sorry.  Certainly.  It's on page 68.

9    **A.**   (Witness examines document.)

10   **Q.**   And I guess my question is:  Are the sources footnoted --

11   **A.**   Yes.

12   **Q.**   -- throughout the -- I should have -- that was a much

13   better question -- throughout the section?

14   **A.**   Yes.

15   **Q.**   And those are the various sources that you relied on?

16   **A.**   That's correct.

17   **Q.**   And the footnotes are cited in the report and attached to

18   it; correct?

19   **A.**   Correct.  They are part of the report.

20   **Q.**   You're not a lawyer?

21   **A.**   No.

22   **Q.**   Was a lawyer involved in the drafting of the report?

23   **A.**   No.

24   **Q.**   So you were relying on the sources that you were cited

25   that were made part of the report?

FOSTER - DIRECT / HEMANN

1   **A.**   Correct.

2   **Q.**   If you could look at page 68, and there's a paragraph that

3   starts at the bottom of the left-hand column and continues to

4   the top of the right-hand column.  Do you see that?

5   **A.**   Yes.

6   **Q.**   Could you please read that.

7   **A.**   (reading)

8          "Internet pharmacies are authorized to sell

9          controlled substances only when there is a valid

10         prescription from a DEA-registered practitioner issued in

11         the usual course of professional practice.  Valid

12         prescriptions for Schedule II controlled substances can be

13         filled only if the patient or prescriber provides the

14         Internet pharmacy (or any pharmacy) with a signed original

15         prescription.  An original signed prescription, a

16         facsimile of the original signed prescription, or an oral

17         prescription immediately reduced to writing is permissible

18         for Schedules III through V controlled substance orders

19         provided that the pharmacy confirms that the prescription

20         and the practitioner are legitimate.  The DEA considers

21         unlawful Internet pharmacies that dispense controlled

22         substances based on an online health questionnaire and

23         Internet pharmacies that sell controlled substances

24         without any prescription."

25  **Q.**   And the next paragraph, please.

FOSTER - DIRECT / HEMANN

1   **A.**   (reading)

2          "According to the DEA, completing an online

3      questionnaire that is then reviewed by a doctor who is

4      hired by the Internet pharmacy cannot be considered the

5      basis for a legitimate doctor-patient relationship,

6      particularly because a consumer can more easily provide

7      false information in a questionnaire than in a

8      face-to-face consultation with a physician."

9   **Q.**   And if I wanted to know or explore whether you were

10   correct about your summaries, I could look at the footnotes and

11   look at those sources?

12   **A.**   Correct.

13   **Q.**   After you sent this report to FedEx, did you have further

14   contact with anybody from FedEx?

15   **A.**   Yes.

16   **Q.**   Who was that?

17   **A.**   Fred Mugno and Pat Oppenheimer.

18   **Q.**   And Mr. Mugno is the individual who sent the letter to you

19   on December the 30th?

20   **A.**   That's correct.

21   **Q.**   What was the purpose of your conversation?

22   **A.**   The purpose of the conversation from our perspective was

23   to understand what measures they had taken to address this

24   issue, to understand whether they had any additional measures

25   they would like to take, and to see whether or not there were

FOSTER - DIRECT / HEMANN

1   any other actions that might be helpful in addressing the

2   problem.

3   **Q.**   Was this an in-person or a telephone call?

4   **A.**   It was a telephone call.

5   **Q.**   And going into it with those purposes, what transpired on

6   the telephone call?

7           **THE COURT:**  Well, when was it?  I'm sorry.  What date?

8           **MR. HEMANN:**  Oh.

9           **THE WITNESS:**  January 23rd, 2005.

10          **THE COURT:**  January 23rd --

11          **THE WITNESS:**  No.  I'm sorry.  2006.

12          **THE COURT:**  -- 2006.  Telephone call between you and?

13          **THE WITNESS:**  Scott Mugno from FedEx and Pat

14   Oppenheimer.  Also on the call were three other people from my

15   office.

16  **BY MR. HEMANN:**

17  **Q.**   And Mr. Mugno's position is that which was listed in the

18   letter he wrote to you, Managing Director of Corporate Safety,

19   Health, and Fire Prevention?

20  **A.**   Yes.

21  **Q.**   What transpired on the telephone call with Mr. Mugno?

22  **A.**   They were unable to provide any real detail about the

23   measures that had been taken.  They did not have anyone from

24   Security on the call.

25  **Q.**   And did they give you any other reasons for why they were

FOSTER - CROSS / ARGUEDAS

1  not able to provide details about the measures that they were

2  taking?

3  **A.**   No.

4  **Q.**   In addition to the report that you -- the 2005 report that

5  you sent, the long one, did you send other reports over the

6  course of 2004 to 2008 to FedEx?

7  **A.**   Yes.

8  **Q.**   And was it other iterations of this same study?

9  **A.**   Of the same Internet section of the study.

10  **Q.**   Okay.  Over that period of time, 2004 to 2008, did the

11  findings of that study related to the issuance of prescriptions

12  change?

13  **A.**   There was some variability in the percentage requiring

14  prescriptions, but the overall nature of the problem did not

15  change.

16  **Q.**   And that was included in the series of reports that CASA

17  sent to FedEx?

18  **A.**   Yes.

19        **MR. HEMANN:**  No further questions, Your Honor.  Thank

20  you.

21        **THE COURT:**  Cross?

22                    **CROSS-EXAMINATION**

23  BY MS. ARGUEDAS:

24  **Q.**   Good afternoon.  My name is Cris Arguedas.  I represent

25  FedEx.

1          Let me ask you, did you send this report to the DEA too?

2     A.    Yes.

3     Q.    And the subsequent reports that you just mentioned?

4     A.    I know we sent -- I assume we did.  That would have been

5     our standard practice, but my own records right now indicate

6     that we sent the first one -- the first 2004 report and the

7     2005 report.  But we did have standard practice of sending

8     those reports to people who had indicated interest, as well as

9     to our usual mailing list, so I assume we did.

10    Q.    In taking a look at it's in front of you as 060-003, this

11    says "BT4," I think, at the bottom.  So the report talks about

12    contacting 157 sites selling controlled prescription drugs.  So

13    that was what was done over the period of one week?

14    A.    Contacting.  We identified.

15    Q.    Identified?

16    A.    Yes.

17    Q.    And they are websites, not pharmacies; right?

18    A.    They were websites that were either advertising or selling

19    controlled -- purporting to advertise or sell controlled

20    prescription drugs.  We identified them as either portal sites

21    that brought people in, or anchor sites which actually

22    completed the sale.

23    Q.    Right.  They're not pharmacies?

24    A.    They may be.  We don't know.  In some instances it

25    appeared that the anchor site may at the same time be the

1    pharmacy.  In other cases, they clearly weren't.

2    **Q.**   And hard to tell necessarily?

3    **A.**   Correct.

4    **Q.**   Okay.  So the subpoint here it says, "49 percent, 77" -- I

5    guess that's --

6             THE COURT:  I'm sorry.  Would you just identify

7    which --

8             MS. ARGUEDAS:  I'm sorry.  It's zero --

9             THE COURT:  Right.  It's 060, but what are the three

10   digits after?

11            MS. ARGUEDAS:  003.

12            THE COURT:  003.

13      Okay.  So this is the original -- this is the 2004?

14          MR. HEMANN:  I don't think I put this one into

15   evidence, although we have no objection to it being in

16   evidence.

17            MS. ARGUEDAS:  Oh.

18            THE COURT:  But this is the one -- this was not sent

19   to FedEx?

20            THE WITNESS:  This one was sent to FedEx.

21            THE COURT:  I'm sorry.  You've got drugs sent to

22   FedEx?  I thought you sent the -- then I'm confused.  Let me

23   just straighten it out.

24      I know in looking at your letter to FedEx, which is 015,

25   you identify a report.

FOSTER - CROSS / ARGUEDAS

1              THE WITNESS:  Correct.

2              THE COURT:  I thought the report you identified was

3      00 -- pardon me -- was 016, the July 2005.

4              THE WITNESS:  That is correct, sir.

5              THE COURT:  But --

6              THE WITNESS:  But we also sent the first 2004 report.

7              THE COURT:  And when was that sent?

8              THE WITNESS:  That was in, I believe, February of

9      2004.

10             THE COURT:  You don't have a -- okay.

11             MS. ARGUEDAS:  I'm quite --

12             THE COURT:  We have to stop.  You can do it but, I

13     mean, I need to do it too.

14         I don't -- I sort of don't get it.  In other words, I

15     thought that the first contact with FedEx was the letter that I

16     see to Mr. Smith dated December 8th, 2005, to which was

17     attached the 2005 report.  I don't see anything about the 2004

18     report.

19             MR. HEMANN:  So --

20             THE COURT:  Have I got that right?  Wrong?

21             MS. ARGUEDAS:  I'd be happy --

22             THE COURT:  Because now Ms. Arguedas is asking about

23     the 2004 report.

24             MS. ARGUEDAS:  No.  I'll withdraw the question, and

25     I'll talk about 060-016, and everything is perfect.

**FOSTER - CROSS / ARGUEDAS**

 1          **THE COURT:**  So I just --

 2          **MS. ARGUEDAS:**  Forget it.  Withdrawn.

 3          **THE COURT:**  Well, I don't know what to do about her

 4    evidence as to that she also sent the 2004 report in 2004 to

 5    FedEx.  I mean, is that -- should -- that's her testimony.  So

 6    my question is:  Okay.  What do I do?

 7          **MR. HEMANN:**  At the end of her testimony -- her

 8    direct, Your Honor, she testified that CASA sent the reports to

 9    FedEx on a regular basis, the reports.

10          **THE COURT:**  Well --

11          **MR. HEMANN:**  I didn't offer it -- to avoid in part

12    this very confusion and because the reports are essentially

13    duplicative, I did not offer it, but I'm happy for it to be in

14    evidence if --

15          **MS. ARGUEDAS:**  No.  Let's do it this way:

16    **Q.**   What did -- what report did you send to FedEx?

17    **A.**   Me personally?

18    **Q.**   Or --

19    **A.**   Our organization sent --

20    **Q.**   That you're personally knowledgeable about.  What do you

21    know for sure was sent?

22    **A.**   The 2004 "You've Got Drugs" report.

23    **Q.**   Okay.

24    **A.**   And the 2005 "Under the Counter" report, which was the

25    first personal contact we had.

1   Q.   Okay.  So I would like to direct my questions to 060-016.

2   And it's hardly worth all of this for the number of questions

3   I'm going to ask, but let me just ask you this:  So you talk in

4   this report about 157 anchor sites being investigated, and you

5   say -- it says, "49 percent offered an online consultation."

6   Do you see that?

7   A.   What page are you on, please?

8   Q.   66.

9   A.   (Witness examines document.)  "49 percent offered an

10  online consultation," yes.

11  Q.   Right.  That's the only thing I want to ask you about.  Do

12  you see that?

13  A.   Yes.

14  Q.   Okay.  So that is slightly less than half of the

15  respondents in this research are websites that offer, quote,

16  "online consultations"; is that right?

17  A.   It is 49 percent, yes.

18  Q.   Offered an online consultation?

19  A.   Offered an online consultation, yes.

20  Q.   Okay.  Among those that offered an online consultation, is

21  there anything in this report that describes what that online

22  consultation consisted of; for example, whether the website

23  asked for the phone number of the doctor for the customer?  Is

24  that in this report?

25  A.   No.

1   **Q.**   Okay.  And there's no information about whether or not the

2   website asked for the customer to send in an MRI or patient

3   records of some sort?  There just --

4   **A.**   No.

5   **Q.**   It's not said there?

6   **A.**   Correct.

7   **Q.**   Okay.  And I could go on but, basically, all that is known

8   in the report is what's said right there, quote, "online

9   consultation" with not a further definition; is that right?

10  **A.**   There is further reference to "online consultation"

11  elsewhere in the report.  The areas that I read earlier --

12  **Q.**   Right.

13  **A.**   -- that indicated that it was not considered to be --

14  **Q.**   Well, we're going to get to that.  What I'm asking now is:

15  No more description about what happened in the interaction on

16  the website; correct?

17  **A.**   Correct.

18  **Q.**   Okay.  Now, your report -- and now I guess I'm going to

19  use my own exhibit Numbers so I hope that's not going to be

20  confusing?

21       **THE COURT:**  Oh, yes, it is.  It's going to be

22  confusing.

23       **MS. ARGUEDAS:**  Well, let me try and maybe it won't be.

24  We may not have to refer to an exhibit.

25  **Q.**   Your report says that, "The Internet offers a convenient

**FOSTER - CROSS / ARGUEDAS**

1  and often more affordable means of purchasing prescription

2  drugs such that online sales have grown rapidly since the first

3  Internet pharmacies began in 1999"; correct?

4  **A.**    Correct.

5  **Q.**    Okay.  Thank you.

6        Your report says:  (reading)

7            "The growth" --

8            **THE COURT:**  The report you're referring to is 016.

9            **MS. ARGUEDAS:**  016.  Thank you.

10           **THE COURT:**  I'm doing it because I may have to look

11  back in the record, and I don't want to --

12           **MS. ARGUEDAS:**  Yes.

13           **THE COURT:**  -- I just don't want to --

14           **MS. ARGUEDAS:**  Okay.  Thank you.

15  **Q.**    The report also says:  (reading)

16            "The growth of online drug sales by state-licensed

17        legitimate and reputable Internet pharmacies has provided

18        significant benefits to customers."

19        Correct?

20  **A.**    Yes.

21  **Q.**    Your report also identifies some factors or indicators

22  that could suggest that a place was not legitimate; correct?

23  **A.**    Yes.

24  **Q.**    And one of them was if the website does not ask how to

25  contact your current physician; correct?

1    **A.**   That was one, as I recall, in a list of issues.

2    **Q.**   Okay.  And another one was if the website advises you to

3    have the drugs sent to Post Office Boxes other than -- instead

4    of other locations, like a residence; correct?

5    **A.**   These were examples.

6    **Q.**   Okay.  Thank you.

7         The --

8              **THE COURT:**  Well, just --

9              **MS. ARGUEDAS:**  Yeah.

10             **THE COURT:**  -- let me ask you, Ms. Arguedas, since I'm

11   sitting here thinking about it.  Does FedEx ship to Post Office

12   Boxes?

13             **MS. ARGUEDAS:**  It does not.

14             **THE COURT:**  That's my experience.

15             **MS. ARGUEDAS:**  They're not allowed to, or whatever.

16   They don't do it.

17             **THE COURT:**  I've tried many times.

18             **MS. ARGUEDAS:**  Yeah.  Right.

19             **THE COURT:**  Okay.  All right.  Thank you.

20   **BY MS. ARGUEDAS:**

21   **Q.**   Your report also has recommendations for change, and one

22   of the things that your report suggests is that Congress

23   clarify federal law about Internet pharmacies; correct?

24   **A.**   Correct.

25   **Q.**   And it also suggests that a law be passed to require

1    physical examinations before writing prescriptions; correct?

2    A.    Would you -- I don't recall that part.  Would you refer me

3    to that section?

4    Q.    Yes, I will.  I can read it to you, but to show it to you,

5    I have to look at their exhibit.

6          If maybe Wayne can help me.  To us it's 100-558, and it

7    ends in 4840.

8          How about if I read it to you, and I bet it will sound

9    familiar to you.

10   A.    Okay.

11   Q.    Let me try that.  (reading)

12             "Congress should clarify federal law to prohibit sale

13         or purchase of controlled prescription drugs on the

14         Internet without an original copy of a prescription issued

15         by a licensed DEA-certified physician licensed in the

16         state of purchase, based on a physical examination and

17         evaluation."

18   And then you go on to say:  (reading)

19             "... and to impose higher penalties for illegal sales

20         to minors."

21   Does that sound right?

22   A.    That was in the report, yes.

23   Q.    Okay.  Now, FedEx did respond to your letter in the person

24   of Scott Mungo not Fred Mungo; right?

25   A.    Scott, yes.

FOSTER - CROSS / ARGUEDAS

1   Q.   And you had a call on January 23rd which you discussed;

2   right?

3   A.   Yes.

4   Q.   And FedEx didn't have to call you back at all, did they?

5   A.   No.

6   Q.   In that call, FedEx told you that they were in contact

7   with government agencies, including the Drug Enforcement

8   Administration, about this issue; correct?

9   A.   Correct.

10  Q.   And they told you that they couldn't say much about it

11  because it had to do with law enforcement and it was

12  confidential; correct?

13  A.   My recollection is they told us that they didn't have

14  Security people on the call.

15  Q.   Okay.  You also were in touch with, in March of 2006, Jim

16  Byrom from the Drug Enforcement Administration; correct?

17  A.   Yes.

18  Q.   And he told you that the DEA was in touch with FedEx and

19  that he and his boss, Matt Murphy, had had a very productive

20  visit to FedEx in Memphis to discuss this very issue; correct?

21  A.   That's correct.

22  Q.   And the DEA told you that they were not at liberty to

23  discuss the details of their conversation with FedEx; correct?

24  A.   That's correct.

25  Q.   And the DEA also told you that there were a great number

1    of difficulties in investigating pharmaceutical diversion over

2    the Internet; correct?

3    **A.**    Yes.

4    **Q.**    And the DEA Agent Jim Byrom said to you, "We desperately

5    need stronger federal laws to clarify legitimate Internet

6    prescription-writing practices"; correct?

7    **A.**    Correct.

8    **Q.**    DEA Agent Byrom also talked to you about the idea of

9    establishing a clearinghouse of information; correct?

10   **A.**    Yes.

11   **Q.**    And that was his idea to -- a possible idea, but it came

12   from Mr. Byrom -- to model itself after something that existed

13   for the National Center for Missing and Exploited Children;

14   correct?

15   **A.**    Yes.  I don't know that it was his idea.  He was

16   explaining it.

17   **Q.**    Okay.  In terms of between the two of you --

18   **A.**    Yes.

19   **Q.**    -- he brought it up?

20   **A.**    Yes.

21   **Q.**    Okay.  And he told you that the purpose of that idea was

22   that it could be a way for the federal government to share

23   information with private companies about who was a potentially

24   bad, illegal pharmacy so that they could act on it; correct?

25   **A.**    He thought it would make it easier, yes.

1  Q.   For the DEA to share information with private companies by

2  going through this clearinghouse idea that a nonprofit would

3  run?

4  A.   He -- I just want to be sure that I'm being clear here.

5  He did say that, you are correct, but he did not say that they

6  couldn't do that now.  His -- I mean then.  His understanding

7  was that this might be a way to facilitate that process.

8  Q.   Because what he told you is, "Many businesses would like

9  to be rid of this nuisance, but they are reluctant due to their

10  liability that they may incur if they deny services"; correct?

11  A.   I'm sure he said that.

12  Q.   And his point was if they deny services when they haven't

13  been able to get information from the Government that would

14  give them the justification to deny services, so that maybe the

15  clearinghouse idea could solve that problem?

16  A.   My understanding --

17        MR. HEMANN:  I object to that on the ground that --

18        THE COURT:  Sustained.

19        MS. ARGUEDAS:  I withdraw it, and I'm finished.  Thank

20  you.

21        THE COURT:  Can I ask a question?

22        THE WITNESS:  Certainly.

23        THE COURT:  You sent this letter to FedEx because

24  they're a common carrier?

25        THE WITNESS:  Because they were one of the four main

```
 1    carriers identified as being vehicles for shipping.
 2              THE COURT:  And who are the other three?
 3              THE WITNESS:  It was UPS, DHL, and -- wait a minute.
 4              MS. ARGUEDAS:  Post Office.
 5              THE WITNESS:  USPS.
 6              THE COURT:  The Postal Service?
 7              THE WITNESS:  Correct.
 8              THE COURT:  Did you send letters to all four?
 9              THE WITNESS:  We did.
10              THE COURT:  Okay.  And did you get responses from all
11    four?
12              THE WITNESS:  No.
13              THE COURT:  Did you get a response from the Postal
14    Service?
15              THE WITNESS:  No.
16              THE COURT:  Did you have any follow-up with the Postal
17    Service?  They didn't respond to your letter.
18              THE WITNESS:  No.
19              THE COURT:  Go ahead.
20              MS. ARGUEDAS:  You're showing me up, Your Honor.  I
21    have no further questions.
22              THE COURT:  I have a very good seat at this trial.
23         Mr. Hemann?
24              MR. HEMANN:  I don't have any further questions of
25    this witness.
```

1         **THE COURT:**  Thank you very much for coming.  Okay.

2                      (Witness excused.)

3         **MS. AULT:**  Your Honor, at this time we'd like to

4    resume the testimony of Special Agent Chin.

5         **THE COURT:**  Thank you.

6                      **JASON CHIN,**

7    called as a witness for the Government, having been previously

8    duly sworn, testified further as follows:

9         **THE COURT:**  Just as an aside, you see one of the

10   advantages of asking questions from where I sit is I don't care

11   about what the response is in a sense.  I mean, I have to say,

12   as a lawyer, I would exercise some judgment on both sides,

13   Prosecutor and Defense, whether I should ask the question

14   because maybe the response would leave me in a worse position

15   had I not asked the question.

16       But sitting where I sit today, there is no response I

17   don't want to hear whatever that response is.  So I don't fault

18   the parties for not asking the question.  It's that I come at

19   it with a slightly different perspective.

20       Okay.  Go right ahead.

21         **MS. AULT:**  Thank you, Your Honor.

22                  **DIRECT EXAMINATION**  (resumed)

23   BY MS. AULT:

24   **Q.**  Special Agent Chin, did FedEx testify before Congress on

25   the subject of Internet pharmacies?

CHIN - DIRECT / AULT

1    **A.**   Yes, they did.

2    **Q.**   How many times?

3    **A.**   Twice.

4    **Q.**   Who testified and when?

5    **A.**   So in July 2004, it was Robert Bryden, who was the

6    vice president of Corporate Security; and in December --

7    December 2005, it was Bruce Townsend, who was the corporate

8    vice president of Security.

9    **Q.**   And why did Townsend testify the second time instead of

10   Bryden?

11   **A.**   Because Mr. Bryden had retired from the company and

12   Mr. Townsend took over his position.

13   **Q.**   And was the substance of the testimony on the two

14   different occasions essentially the same?

15   **A.**   Yes.

16          **MS. AULT:**  Your Honor, at this time we would like to

17   play, it's a short video, of Mr. Townsend's testimony.

18          **THE COURT:**  Sure.  Is it an exhibit?

19          **MS. AULT:**  This is Exhibit 60-20.

20          **THE COURT:**  And it's in evidence already?

21          **MS. AULT:**  I believe so.

22                  (Pause in proceedings.)

23          **THE COURT:**  60-20?

24          **MS. AULT:**  Yes.

25          **THE COURT:**  Okay.  Admitted.

 1            MR. RUBY:  Do I have that?

 2            MS. AULT:  It's a video.

 3            THE COURT:  60-20 is the video and 60-21 is the

 4    transcript.  So I'll admit both of them.

 5          (Trial Exhibits 060-20 and 060-21 received in evidence)

 6                      (Counsel conferring.)

 7            THE COURT:  Pardon me?

 8            MR. RUBY:  I'm sorry, Your Honor.  I'm trying to talk

 9    to Ms. Ault to see if I have it.

10            THE COURT:  Sure.  Go ahead.

11                      (Counsel conferring.)

12            THE COURT:  So both the video and the transcript are

13    admitted.

14            MS. AULT:  Thank you, Your Honor.

15      So we are going to start with a very short section.  Can

16    you start at 1:58?

17      You'll have to bear with us a little bit on the

18    technology.

19                  (Video was played but not reported.)

20            MS. AULT:  Is it possible to fast forward just a

21    little bit?  Ah, here we go.

22                  (Video was played but not reported.)

23            MS. AULT:  And can you fast forward to 2:22?

24                  (Video was played but not reported.)

25    \\\

1    BY MS. AULT:

2    Q.    So did Mr. Townsend testify that they cannot link Internet

3    pharmacy to a shipping site unless the law enforcement makes

4    that association for us?

5    A.    Yes, he did.

6    Q.    And at the time that he testified in December of 2005, was

7    FedEx's Credit Department maintaining a list of online

8    pharmacies who had accounts with FedEx?

9    A.    Yes, they were.

10   Q.    And at the time of this testimony, approximately how many

11   online pharmacy accounts were on that list maintained by the

12   Credit Department?

13   A.    Approximately 500.

14   Q.    Did the documents that you received from FedEx contain

15   some with a BT designation in --

16         THE COURT:  Can I see -- before we keep on going, I

17   want to see the transcript a minute.  That's an exhibit?

18         MS. AULT:  Yes, Your Honor.

19         MR. RUBY:  I have it here.

20         THE COURT:  Well, let me get the Government's copy of

21   the transcript.  Just give me two minutes.  I want to look at

22   something.

23         MS. AULT:  I will have our excellent paralegal,

24   Mary Beros, find that for us.

25         THE COURT:  All right.  I appreciate it.

1          MR. RUBY:  I have the Government's copy if that will

2    help things.

3          MS. AULT:  She'll find it, a copy we can hand up.

4          THE COURT:  It's in evidence.  I admitted it.

5       Give me two minutes.  Okay?

6          MS. AULT:  All right.  And you'll need to give that

7    back to Ms. Espinoza because that's the original.

8          THE COURT:  I will.  I promise I'll give it back to

9    you.

10                    (Pause in proceedings.)

11         THE COURT:  Okay.  Thank you.

12   BY MS. AULT:

13   Q.   When you obtained documents from FedEx, did you receive

14   some with a designation of BT in the lower right-hand corner?

15   A.   Yes.

16   Q.   And what did that mean?

17   A.   That represented this document was from Bruce Townsend's

18   paper files.

19   Q.   And that's the Bruce Townsend who testified -- we just saw

20   testify?

21   A.   Yes.

22   Q.   Included in those files was there the written testimony of

23   the other witnesses who were testifying before the same

24   committee hearing on the same day -- or the same committee

25   hearing?

1    **A.**   Well, for the 2005?  There were testimony from 2004 that

2    were in Bruce Townsend's files.

3    **Q.**   Okay.  So is it the testimony from 2004 that was in his

4    files?

5    **A.**   Yes.

6    **Q.**   Okay.  And can we look at -- well, all right.

7         Let's take a look at Exhibit 60-9.

8    **A.**   (Witness examines document.)

9    **Q.**   And is this the written statement of John Taylor of the

10   FDA?  Is this one of the documents that was in Bruce Townsend's

11   file?

12   **A.**   Yes.

13   **Q.**   And that designation in the lower right-hand corner,

14   BT 499, does that indicate that it came from Mr. Townsend's

15   files?

16   **A.**   Yes.

17   **Q.**   In Mr. Taylor's written testimony -- if we could go to

18   page 9, which is 507 in the paper copy, 9 on the computer --

19   did Mr. Taylor talk about something called the VIPPS,

20   V-I-P-P-S, list of online pharmacies?

21   **A.**   Yes, he did.

22   **Q.**   What is the VIPPS list?

23   **A.**   VIPPS stands for Verified Internet Pharmacy Practice

24   Sites, and it's an accreditation program that's administered by

25   the National Association of Boards of Pharmacy.  Basically they

CHIN - DIRECT / AULT

1   make sure that the online pharmacies who have the VIPPS

2   certification abide by all the appropriate standards of care

3   and all of the relevant laws.

4   **Q.**   Okay.  And did Mr. Taylor provide examples of illegal

5   Internet pharmacies in his testimony?

6   **A.**   I'm sorry.  Could you say that again?

7   **Q.**   Did Mr. Townsend provide examples of illegal Internet

8   pharmacies in his testimony?

9   **A.**   Mr. Townsend?

10  **Q.**   I'm sorry.  Mr. Taylor.  I apologize.

11  **A.**   Yes.

12  **Q.**   Thank you for listening very carefully.

13       Can we go to page 18, which is page 516 in the paper copy?

14  **A.**   (Witness examines document.)

15  **Q.**   And if you could blow up the part on the bottom that talks

16  about RxClinic.

17       Who was the owner of RxClinic?

18  **A.**   Vincent Chhabra.

19  **Q.**   And according to this, what was Vincent Chhabra indicted

20  for?

21  **A.**   Illegal distribution of controlled substances over the

22  Internet.

23  **Q.**   And what was he doing that led to his Indictment?

24  **A.**   He was allowing customers to order controlled substances

25  on the Internet simply by filling out a questionnaire.  There

1  was no examination.

2  **Q.**  And did Mr. Taylor relate what had happened to several of

3  the doctors and pharmacists who were also charged with

4  Mr. Chhabra?

5  **A.**  Yes, he did.

6  **Q.**  What did he say?

7  **A.**  He said that there were multiple doctors and pharmacists

8  who worked with Mr. Chhabra who had pled guilty and were

9  convicted.

10  **Q.**  And was Mr. Chhabra a FedEx customer?

11  **A.**  Yes, he was.

12  **Q.**  Now, if we could go to Exhibit 60-17, which is part of the

13  Congressional Record from the hearing that Mr. Townsend

14  testified on December 13th of 2005.  This is the written

15  testimony of Joseph Rannazzisi.  Who is Mr. Rannazzisi?

16  **A.**  He was in charge of the diversion program in DEA.

17  **Q.**  Okay.  And was the written record of that session of

18  Congress during which Mr. Townsend testified, was that sent to

19  FedEx?

20  **A.**  It was sent to FedEx.

21        **MR. RUBY:**  I'm sorry, Your Honor.  I didn't hear the

22  witness' testimony.

23        **THE WITNESS:**  It was.  FedEx had a copy of this.

24  **BY MS. AULT:**

25  **Q.**  Did you find a copy in Mr. Townsend's files?

1   **A.**   No.

2   **Q.**   Where did you find a copy of it?

3   **A.**   In Kathryn Rand.

4   **Q.**   And who is she?

5   **A.**   She was in the Congressional Affair -- or Governmental

6   Affairs Office in FedEx.

7   **Q.**   And if we could look at Mr. Rannazzisi's written

8   testimony.  If we can go to page 5, which will have 138 on the

9   bottom.

10      What did Mr. Rannazzisi say was the problem -- or identify

11   as the problem of Internet drug trafficking?

12   **A.**   That Internet drug traffickers offered drugs for sale

13   without a prescription, without benefit of a legitimate

14   doctor-patient relationship and at highly inflated prices.

15   **Q.**   And if we could flip to the next page, page 6.

16   **A.**   (Witness examines document.)

17   **Q.**   What are some of the characteristics of an illegal

18   Internet pharmacy that Mr. Rannazzisi identified?

19   **A.**   He stated that they advertise that no prescription is

20   necessary.  They fail to participate in any insurance plan and

21   require payment by credit card or cash/COD; offer a limited

22   selection of medications for sale, mostly controlled substances

23   and lifestyle drugs.  They fail to request the name, address,

24   and phone number of a current physician.  They're willing to

25   deliver drugs to a Post Office Box or other location to avoid

1    detection by authorities, and they deceptively and inaccurately

2    advise about the law and why it is permissible to obtain

3    pharmaceutical controlled substances from foreign countries via

4    the Internet.

5    **Q.**   And then can you read the next paragraph, please.

6    **A.**   (reading)

7            "As part of the scheme, online consultations

8         consisting of medical questionnaires filled out by an

9         individual purport, yet fail, to create a legitimate

10        doctor-patient relationship.  A legitimate doctor-patient

11        relationship includes a face-to-face consultation where a

12        licensed physician can examine the physical symptoms

13        reported by a patient before making a diagnosis and

14        authorizing the purchase of a prescription medicine.

15        Filling out a questionnaire, no matter how detailed, is no

16        substitute for this relationship."

17   **Q.**   And did Mr. Rannazzisi say that DEA's position on this

18   issue was supported by other organizations?

19   **A.**   Yes, he did.

20   **Q.**   And what other organizations were those?

21   **A.**   The Federation of State Medical Boards and the American

22   Medical Association.

23   **Q.**   And then can we look at the last paragraph in that

24   section?  Can you read that, please.

25   **A.**   (reading)

1              "Pharmaceuticals can be purchased legitimately over

2         the Internet, but only if the proper protocols are

3         followed.  Currently, there are only 12 DEA-registered

4         pharmacies that have been included on a list of Verified

5         Internet Pharmacy Practice Sites (VIPPS) compiled by the

6         National Association of Boards of Pharmacy (NABP), and

7         independent nonprofit organization of licensing boards.

8         The NABP list identifies to the public those online

9         pharmacy practice sites that are appropriately licensed,

10        are legitimately operating via the Internet, and that have

11        successfully completed a rigorous criteria, review, and

12        inspection.  Most other Internet pharmaceutical sales in

13        the United States are legally suspect and potentially very

14        dangerous."

15   Q.   And did Mr. Rannazzisi also provide any examples of

16   illegal Internet pharmacies?

17   A.   Yes, he did.

18   Q.   Can we turn to page 7?  And if you can look at the bottom

19   here (indicating).

20   A.   (Witness examines document.)

21   Q.   Which online pharmacy does this relate to?

22   A.   This relates to the online pharmacy organization owned and

23   operated by Johar Saran.

24   Q.   And what does it say that Mr. Saran did that was illegal?

25   A.   They were supplying pharmaceutical controlled substances

1  directly to U.S. Internet customers without a medical

2  examination by a physician.

3  **Q.**   And was Mr. Saran a FedEx customer?

4  **A.**   Yes, he was.

5  **Q.**   And was this the operation where FedEx provided assistance

6  with the agents executing search warrants on FedEx packages

7  that were, I guess, being shipped out from Mr. Saran's

8  pharmacies?

9  **A.**   Yes, it was.

10           **THE COURT:**  When you say that Mr. -- what's his?

11  Name, Rannazzisi?

12           **THE WITNESS:**  Rannazzisi?

13           **THE COURT:**  Yes, that person.

14      When you say that his testimony was in the files of FedEx,

15  you found that to be the case because in response to a subpoena

16  it was furnished?

17           **THE WITNESS:**  Yes, sir.

18           **THE COURT:**  And was the testimony in isolation?  Was

19  it part of a compendium of testimony on a given day before the

20  subcommittee?  Do you know?

21  **BY MS. AULT:**

22  **Q.**   Do you recall what you -- how you found -- what was it

23  associated with when you found those pieces of testimony?

24  **A.**   My recollection is that there were other records of

25  testimony.

**CHIN - DIRECT / AULT**

1    Q.   And was this part of the process of either preparing for

2    the testimony -- either preparing for the testimony in 2004 or

3    preparing for the testimony in 2005?  There were some e-mails

4    exchanged between congressional staffers and the Congressional

5    Affairs --

6              **THE COURT:**  No, no, no.  Then I'm not asking my

7    question.

8              **MS. AULT:**  Okay.

9              **THE COURT:**  The three exhibits which are -- only I

10   guess one of which, maybe two -- okay.

11        I'm looking at 060-17, 060-18, 060-19.  Okay.  Those

12   three.  They say "Congressional Record of Testimony at

13   Hearing."  This witness testified from 060-017; right?

14             **MS. AULT:**  Yes.

15             **THE COURT:**  Okay.  Now, looking at it and having some

16   experience with congressional testimony, it's generally found

17   in a book, a compendium of this was the testimony before the

18   subcommittee on oversight, et cetera, et cetera, on a

19   particular day.

20             **MS. AULT:**  I believe I understand.

21   Q.   Were these attached to e-mails that you found sent to

22   Kathryn Rand in FedEx?

23             **THE COURT:**  I'm sorry.  He sent?

24             **MS. AULT:**  No, no, no.  That congressional staffers

25   sent to Kathryn Rand at FedEx.

1          THE COURT:  How could they have been if they --

2          MS. AULT:  No.  I'm sorry.  Not these.  I apologize.

3   So --

4          THE COURT:  Let's slow down.

5          MS. AULT:  Let's slow down.  Let me back up.

6          THE COURT:  Because the argument, the argument is:

7   Here was something sent to FedEx which identified all sorts of

8   things.

9          MS. AULT:  Yes.

10         THE COURT:  And we know that's true because it was in

11  the FedEx files.  So what I'm interested in is:  Was it, for

12  example, Mr. Rannazzisi's testimony sent to Mr. X and saying,

13  "Read this.  Read this.  It identifies all these problems"?

14      Or was it simply a book of the proceedings simply either

15  sent or acquired by FedEx without any indication as to "Read

16  this.  Don't read this.  This is important," and so forth and

17  so on?  Because these things go on and on and on.

18         MS. AULT:  Yes, Your Honor.

19         THE COURT:  There are mountains and mountains of

20  information and hearings, and so forth, that are conducted by

21  Congress in which an individual may testify, as this indicates

22  Mr. Townsend testified on the same -- arguably the same day

23  that Mr. Rannazzisi testified, although he wasn't part of the

24  panel that I saw.

25      And the question is he may -- or FedEx may have wanted it

```
 1   or sought it or was given it because Mr. Townsend testified and

 2   not because Mr. Rannazzisi testified, and that's the question.

 3        So what I'm really asking this witness was:  In connection

 4   with 060-017, was there anything that specifically identified

 5   that, or was it simply a part of a compendium of testimony that

 6   was given on that date?  If he knows.

 7             MS. AULT:  Okay.  So let me, now that I understand

 8   your question.

 9   Q.   So this Exhibit 060-017, that's part of the official

10   Congressional Record, correct, that we --

11   A.   Yes.

12   Q.   Okay.  Now, did you find -- although it is not 060-017 --

13   did you find a copy of this among materials that congressional

14   staffers had e-mailed to Kathryn Rand of FedEx?

15   A.   What I found was a record of the testimony in -- provided

16   as part of our request for records from FedEx in which it was

17   just identified as a record from Kathryn Rand.

18   Q.   Okay.  So you received this as part of a record of

19   Kathryn -- something that came from Kathryn Rand's files?

20   A.   Yes.

21   Q.   Okay.  And do you know how she got it?

22   A.   I do not know.

23   Q.   Okay.

24   A.   Or don't -- yeah.

25   Q.   Okay.
```

1          MS. AULT:  And I believe Your Honor had made a

2     reference to 060-018.  I don't believe that one is in evidence.

3          THE COURT:  Okay.  But it's the same thing.  It's just

4     Mr. Dahl's testimony.

5          MS. AULT:  Yes.

6          THE COURT:  Okay.

7     BY MS. AULT:

8     Q.   And then, however, Mr. Taylor's testimony, 060-009, that

9     came from the files of Mr. Townsend.

10    A.   Yes.

11    Q.   Now, were there follow-up discussions between FedEx and

12    congressional staffers or follow-up e-mails that you found

13    after Mr. Townsend's testimony?

14    A.   There was some communication involving, yes, a

15    congressional staffer and, I believe, Ms. Rand.

16    Q.   Okay.  And Exhibit 06 --

17         THE COURT:  Just remind me who Ms. Rand is, please.

18    BY MS. AULT:

19    Q.   Who is Ms. Rand?

20    A.   She's a FedEx employee in the Governmental Affairs Office.

21         THE COURT:  Thank you.

22    BY MS. AULT:

23    Q.   Exhibit 060-022, is that one of those communications?

24    A.   Yes.

25    Q.   And could we have that up, please.  And can we look at the

**CHIN - DIRECT / AULT**

1  e-mail on the -- the first e-mail on the bottom of the page

2  once we get it up?  022.  Sorry.  16-22.  I know I'm not

3  supposed to do the zeros.

4      Okay.  Can we look at this e-mail down here (indicating)?

5      That's from Alan Slobodin.  Who is that?

6  **A.**  He's a congressional staffer.

7  **Q.**  And can you read that e-mail, please.

8  **A.**  (reading)

9          "Check this out.  Looks like at least some of the DEA

10         registration info is already available online for a price.

11         Do you think this is the kind of information that will

12         help FedEx sort out the legit Internet pharmacy shippers?"

13     It provides a website HTTP:\\www.deadiversion.usdoj.gov\

14  drugreg\faq.htm.  (reading)

15         "In addition the DEA provides a list of active DEA

16         registrants to the National Technical Information Service

17         (NTIS), a component of the United States Department of

18         Commerce.  This list of active DEA registrants may be

19         obtained from NTIS as a single purchase monthly or

20         quarterly by calling 1-800-36" --

21  **Q.**  You don't have to read all that.

22      Okay.  So how did Ms. Rand respond to that?

23  **A.**  She thanked Mr. Slobodin for the update.

24  **Q.**  And did she say she would forward it to someone?

25  **A.**  Yes.  She said she would forward it to the Security team.

**CHIN - DIRECT / AULT**

1   **Q.**   And then how did Mr. Slobodin respond to that?

2   **A.**   Mr. Slobodin provided a link to the VIPPS website.

3   **Q.**   And what did he say about that?

4   **A.**   He said:  (reading)

5         "Here are the 12 DEA-registered Internet pharmacies."

6   **Q.**   Okay.  Now, was he correct, that those are the 12

7   registered DEA Internet pharmacies?

8   **A.**   These are the approved VIPPS certified pharmacies.

9   **Q.**   All right.  So there are more than 12 DEA-registered

10  pharmacies?

11  **A.**   Yes, more than 12 DEA-registered pharmacies.

12  **Q.**   But the VIPPS list from the National Association of Boards

13  of Pharmacy, at that time the verified Internet, whatever that

14  stands for, that only had 12 on it?

15  **A.**   Yes.

16  **Q.**   Now, does a pharmacy have to be -- or an online pharmacy

17  have to be certified by VIPPS to be legitimate?

18  **A.**   No.

19  **Q.**   But checking the VIPPS list is one way to check to see if

20  an Internet pharmacy is operating legitimately?

21  **A.**   That's correct.

22  **Q.**   And then Ms. Rand forwarded this to Mark --

23         **THE COURT:**  Wait.  How many pharmacies are there?

24         **MS. AULT:**  I'm sorry?

25         **THE COURT:**  There were at that time about how many

```
 1   pharmacies?  500?
 2           MS. AULT:  Okay.
 3   Q.   So the VIPPS list had how many pharmacies on it at that
 4   time?
 5           THE COURT:  Well, 12.
 6           THE WITNESS:  12.
 7   BY MS. AULT:
 8   Q.   And how many online pharmacies did FedEx's credit list
 9   have on it at that time?
10   A.   Approximately 500.
11   Q.   All right.  And how many pharmacies were there in the
12   United States?
13   A.   There was --
14   Q.   That's a trick question.
15           MS. ARGUEDAS:  I didn't hear his answer.
16           THE COURT:  I'm just trying to figure it out.  I'm
17   just trying to figure it out.
18       In other words, are you suggesting that FedEx should have
19   gotten this list of -- paid some money, by the way, and gotten
20   the list that would tell them of the thousand pharmacies out
21   there, 12 are perfectly okay?  Really?
22       I mean, that's great.  That's great.  So are you
23   suggesting those 12 they shouldn't bother with, but the 982
24   others or 988 others they ought to investigate?  I'm just
25   trying to figure out what does this mean.  What does this mean?
```

1        **MS. AULT:**  Your Honor, perhaps --

2        **THE COURT:**  I'll tell you one thing it means.  It

3   means that there was some attempt to cooperate between the two.

4   It certainly does that.  It shows that Congress and the DEA --

5   I mean, Congress and FedEx is in communication on this issue,

6   but I just don't understand how helpful it is to give a list of

7   12 out of a thousand and then expect a private company to vet

8   986 others.

9        I assume these 12 aren't even an issue in this case or in

10  any case, but go ahead.  I just am observing.

11  **BY MS. AULT:**

12  **Q.**   There was -- the CASA Columbia report identified that

13  96 percent approximately of the Internet pharmacies that they

14  found were illegitimate.

15       Did I get my numbers wrong?

16       **MS. ARGUEDAS:**  Well, that's not exactly right,

17  Your Honor.  So I --

18       **THE COURT:**  Well, it says what it says.

19       **MS. ARGUEDAS:**  It says what it says, but only

20  49 percent were even talking about online pharmacies.  So --

21       **MS. AULT:**  That --

22       **MS. ARGUEDAS:**  So --

23       **MS. AULT:**  We can debate that.  Let me ask it this

24  way --

25       **MS. ARGUEDAS:**  It says what it says, but it doesn't

1   say what the Government just said.

2   BY MS. AULT:

3   Q.   In your experience in dealing with Internet pharmacies,

4   approximately what percentage of them were actually legitimate?

5        THE COURT:  Well, I don't know that he can give that

6   advice.  I mean, you'd have to lay quite a foundation for him

7   to come up with that statistic.  Do you want to lay a

8   foundation how many and what was the inquiry?  I mean, there

9   are a thousand pharmacies out there.  Tell us the names.  Which

10  of the thousand did you vet?  Do you really want to go down

11  that road?  Because it's now -- it's going to take the rest of

12  the day.

13       I think you're just asking the question because it was

14  suggested rather than why don't you go back and just -- I don't

15  mean to interrupt you, but I don't think we can allow testimony

16  for which there is no foundation and then require a foundation,

17  which will be way out of time in dealing with this, and even

18  then I don't even know what it leads to.  I'm not even clear in

19  my mind.

20       MS. ARGUEDAS:  Certainly it wasn't said to FedEx,

21  whatever it is, that this would elicit.

22       THE COURT:  You said a list, and you said these 12 --

23  the Government sent a list -- the Government -- the legislative

24  branch sent a list and said, "Here are 12 that are fine.  And,

25  by the way, you can go on this website; and if you pay some

 1    money, you can go on this website and you can find these 12."

 2        By the way, I'm not even sure it said 12.  It says, "If

 3    you want to know who the 12 are, go on the website.  It will

 4    cost you something.  And those we think are perfectly fine.

 5    This will help you.  Don't worry about those."  That's what it

 6    says.

 7    **BY MS. AULT:**

 8    **Q.**   So, Mr. Chin, at the time that this was sent, how many

 9    pharmacies were on the VIPPS website as VIPPS certified?

10    **A.**   There were 12.

11    **Q.**   And do you have to pay to go to the VIPPS website and see

12    the 12 pharmacies?

13    **A.**   No.  It's free.

14    **Q.**   Okay.  So the payment was about a different website having

15    to do with DEA registrations; is that correct?

16    **A.**   That's correct.

17            **THE COURT:**  I'm sorry.  I was -- my fault.  What do

18    you have to pay for?

19            **THE WITNESS:**  To get a list of the registered DEA

20    pharmacies, but the VIPPS list was free, that anybody in the

21    public can access that.

22            **THE COURT:**  Okay.  And there's no issue, is there,

23    that the pharmacies that are in question in this case were

24    registered?

25            **MS. AULT:**  Whether the registrations were valid for

CHIN - DIRECT / AULT

1    the entire time the pharmacies were --

2              THE COURT:  I'm not asking whether they were valid.  I

3    don't know whether I figure out if I'm dealing with somebody

4    whether it's a valid registration.  I certainly can -- by the

5    way -- well, why don't you answer my question.

6              MS. AULT:  Your Honor --

7              THE COURT:  They're all registered, aren't they?

8              MS. AULT:  They're registered.  The registrations may

9    not have been valid during the entire time they were operating.

10             THE COURT:  Okay.  So if a person paid some money -- I

11   mean, someone would say, "Gee, FedEx was a little cheap.  They

12   didn't pay the money to find out about the registration."  But

13   had they paid the money and had we had Company X, Chhabra's

14   company, Smoley's company, dah, dah, dah, dah, dah, would we

15   have seen a registration -- valid or not, valid or not -- would

16   we have seen a registration?

17             MS. ARGUEDAS:  Yes.

18             MS. AULT:  I cannot -- I am not testifying.  I cannot

19   say that for all of the pharmacies there was a valid

20   registration.

21             THE COURT:  Are you aware of any evidence that would

22   suggest that these companies that FedEx dealt with were not

23   registered?  That's my question.  So I know you're not

24   testifying, but I want to find that out.

25             MS. AULT:  The pharmacies, no.  The doctors, yes.  So

the pharmacies, I don't believe that there were any pharmacies

that were not DEA registrants.  Whether their registrations

were current or not --

             **THE COURT:**  So what relevance is it, then?  What

relevance is it that there was a list of pharmacies that were

registered that the DEA had access to?

        Because, if anything, had they paid the money and checked

it out, it would have, if anything, confirmed the fact that

this was a registered pharmacy.  Even though this pharmacy was

out there violating the law left and right, if they looked, it

would have a registration.

        So it wouldn't -- if anything, it would lead the consumer

in the wrong direction.  It would almost suggest that the --

since -- or putting it another way, since the act of

registration is solely in the hands of the United States

Government, I think, whether or not they registered somebody,

and if the statute is the statute they can take away the

registration if they think it's a danger to the community and

so forth, they have that power, at least to temporarily -- to

initiate action to take it away.  I don't know whether they can

take final action or not.  Maybe it has to go through an

administrative agency and so forth, but they can initiate that

action.  And that may or may not be a matter of public record.

I don't even know that.

        But if anybody looks at the website, this DEA website,

1    they would think that if it's registered, that means at least

2    the DEA doesn't apparently have a problem with this entity,

3    doesn't it?  Because if they had a problem with it, why didn't

4    they do something with the registration?

5            MS. AULT:  Your Honor, I would submit that it's the

6    same thing as having a license to drive a car.  The government

7    may license you to drive a car.  That doesn't mean that you can

8    drive your car in a manner that is illegal.  And unless and

9    until the government catches you driving your car in a manner

10   that's illegal, you will still have a license.

11           THE COURT:  So let's say the government received

12   reports that every time you get into your car, you get into

13   accidents, you threaten -- you cannot drive because you're 74

14   years old, and whenever you go out there, you hit -- first of

15   all, you start hitting the garage, then you hit the wall, then

16   you hit the bicycle in the way, and you hit everything, and

17   they get one report after another, after another.  Can the DMV

18   take some action towards you?  Because I know people -- I know

19   people who have done that; that is to say, they were the

20   subject of that.

21       Are you saying that the only way the DEA can take some

22   action against a licensee is if there's a criminal conviction?

23           MS. AULT:  No, but they can only take action against a

24   licensee based on due process, which involves probable cause.

25   It involves administrative process.  They can't simply go and

CHIN - DIRECT / AULT

1    take away --

2            THE COURT:  So you're saying they didn't have probable

3    cause?

4            MS. AULT:  I'm saying that, Your Honor, they don't

5    know about every single illegal Internet pharmacy.

6            THE COURT:  I'm not asking every single one.  Are you

7    saying -- did they have probable cause to take any action

8    against any of these pharmacies?  Did they have probable

9    cause --

10           MS. AULT:  Well --

11           THE COURT:  -- during this eight-year period?

12           MS. AULT:  Yes, Your Honor.  And there will be --

13           THE COURT:  Okay.  And did they take action against,

14   as an example, the Smoley group?  Did they take action against

15   them?  They were under investigation for, what, eight years?

16   Six years?

17           MS. ARGUEDAS:  Superior for eight years.

18           THE COURT:  Superior.  That's who I meant.  Superior.

19   Did they take action against them?

20           MS. AULT:  Yes.

21           THE COURT:  And when?

22           MS. AULT:  In 2010.

23           THE COURT:  In 2010.  So what happened in 2004, '5, or

24   '6, '7, '8 and '9?  Did they not have probable cause during

25   those years?

1          MS. AULT:  For many of those years, they did not.

2          THE COURT:  Okay.  Now, are you saying they didn't

3   have probable cause, FedEx should have stopped shipping?

4          MS. AULT:  Yes.

5          THE COURT:  Okay.  That's your position.

6          MS. AULT:  That is our position, Your Honor.

7          THE COURT:  Okay.  Even though the Government didn't

8   have probable cause, the private citizen had what?  What do we

9   call that, by the way?

10          MS. AULT:  Your Honor --

11          THE COURT:  What do we call -- what do we call -- for

12   the Government to act, they need probable cause.  For a private

13   citizen to act, what shall we call it?  A suspicion?  A

14   thought?

15          MS. AULT:  No, Your Honor.

16          THE COURT:  An inspiration?  What do we call that?

17          MS. AULT:  Your Honor, the Government's role is to

18   identify people who are committing crimes, and based on

19   probable cause and then beyond a reasonable doubt to convict

20   people and send them to prison or otherwise take some action

21   against them that restricts their liberty or takes their money.

22      A private citizen's responsibility at all times is not to

23   commit a crime.  A private citizen has an obligation -- well, I

24   mean, law enforcement does, too; but a private citizen has an

25   obligation when they know or there is a high probability that

1    they are participating in an illegal action, they have an

2    obligation not to do it.

3            THE COURT:  And is it your position that they knew

4    more about, for example, this operation and so forth, they knew

5    much more about it than the Government did?

6            MS. AULT:  Your Honor, in some instances --

7            THE COURT:  They knew more -- they knew more about the

8    doctors, about the ordering, about the Internet, about all of

9    that?  They knew more than you did?

10           MS. AULT:  Your Honor, it's not about whether they

11   knew more than we did.  The standard is different.

12           THE COURT:  You just told me -- you just told me you

13   didn't have probable cause.

14           MS. AULT:  Your Honor, they don't need -- what they

15   need to do is not participate in the crime.

16           THE COURT:  I understand that.

17           MS. AULT:  We're not talking about --

18           THE COURT:  There's no question that that's right,

19   that they shouldn't participate in a crime, but that's not what

20   you know.  That's what did you do.  So we're asking about what

21   you knew, and that's where I'm confining my questions because,

22   after all, this is a phase about what did they know.

23       And you're telling me they -- I'm not sure you're telling

24   me they knew more than -- FedEx knew more than the federal

25   government than the DEA knew or didn't.

 1          And the evidence that you present to me here is evidence,

 2     if anything, at least in terms of registrations and so forth,

 3     that would cut the other way.

 4          I could imagine that somebody would say, "Well, the DEA is

 5     very concerned, law enforcement in 2005.  Big hearing, DEA

 6     agents testified.  We're very concerned about this problem."

 7     That's what they say.  And they should be very concerned about

 8     this problem.

 9          Now we're talking about this registration.  We've drilled

10     down to that.  They're very concerned about the problem.  They

11     are not taking any action against the registrant.  And you told

12     me they didn't take action against the registrant because they

13     didn't have probable cause.

14          So then I ask you:  Well, what did FedEx have?  What is it

15     FedEx had?  They're, quote, "co-conspirator," what did they

16     have?  And you're saying, well, they had more knowledge -- are

17     you saying they had more knowledge than DEA?  Because we'll

18     have -- we'll hear that in this trial.

19          Go ahead.

20          **MS. AULT:**  Thank you, Your Honor.

21          And I will say that there will be evidence on all of that.

22     We are simply -- this is not the order in which we had

23     originally intended to present the evidence at trial.

24          **THE COURT:**  Oh, no.  I'm just highlighting issues that

25     I'm thinking about as I see and hear the evidence so that you

CHIN - DIRECT / AULT

1    can be prepared to address it.

2         MS. ARGUEDAS:  Your Honor, I didn't actually get an

3    answer to the question of is it the Government's position that

4    FedEx had more knowledge than the DEA about Superior, and the

5    answer to that is absolutely not.  And I think the Government

6    should tell you that, because it's not close.

7         They were doing controlled buys.  They were interviewing

8    the people who owned Superior.  They talked to the doctors.

9    There is no possible way that anyone could say that FedEx knew

10   more than the DEA about Superior, and I think they should have

11   to answer the question.

12        THE COURT:  Whether they choose to answer a question

13   is up to them.

14        MS. AULT:  Your Honor, it's simply not the standard.

15        THE COURT:  No, I don't think we're asking what the

16   standard is.  I was asking a factual question to which I will

17   apply the standard.

18        But the factual question is:  Do you contend as a matter

19   of fact that FedEx knew more than the DEA knew about this

20   operation?  And we took as an example Superior Drugs.  Maybe I

21   should use some other example.  Do you contend that the

22   evidence will show that they knew more than you did?

23        MS. AULT:  I will contend that --

24        THE COURT:  When I say "you," I don't mean you

25   personally.

1              **MS. AULT:**  The evidence will show that FedEx knew

2    things the DEA did not know, and that the DEA knew things that

3    FedEx did not know.  Whether what is quantified as "more," they

4    certainly had different spheres of information.

5              **THE COURT:**  Okay.  Okay.  That's your answer.  Fine.

6    Thank you.

7         Go ahead.

8    **BY MS. AULT:**

9    **Q.**   So the VIPPS list of National Association of Boards of

10   Pharmacies approved Internet pharmacies, there are 12 on it?

11   **A.**   Yes.

12   **Q.**   In 2005?

13   **A.**   Yes.

14   **Q.**   In December of 2005, about how many Internet pharmacies

15   were on the credit list as active accounts at FedEx?

16   **A.**   Approximately 250.

17   **Q.**   And how many of those were on the VIPPS list?

18   **A.**   There were none.

19   **Q.**   So I want to turn now and talk about the Sales Department.

20   How was the -- at this time, how was the -- and I just want to

21   talk about the field sales organization -- how was the field

22   sales organization structured?

23   **A.**   The way it works in terms of positions is there's an

24   account executive, there's a district sales manager, there's a

25   managing director, and then there's a vice president.

**CHIN - DIRECT / AULT**

1   **Q.**   And were the account representatives organized by sales

2   territory?

3   **A.**   Yes.

4   **Q.**   And is that a geographic territory?

5   **A.**   Yes.

6   **Q.**   So a particular representative would be responsible for

7   customers in a particular geographic area?

8   **A.**   Yes.

9   **Q.**   And how were the account representatives compensated?  Did

10  they have a base salary and then some sort of variable

11  compensation?

12  **A.**   Yes, they did.

13  **Q.**   And how did -- how was the account executive's variable

14  compensation generally -- generally speaking, how is it

15  calculated?

16  **A.**   Calculated based upon their goal.  Whether or not -- how

17  they performed against their goal.

18  **Q.**   And what was the goal -- just in general broad-brush

19  terms, what was the goal comprised of?  How did they set that?

20  **A.**   It would be revenue from one period of time plus a stretch

21  or an improvement or a growing of the goal.

22  **Q.**   So, generally speaking, the account executives were

23  expected to do at least the same amount of business they had

24  done the year before and then grow the business?

25  **A.**   Yes.

1   **Q.**   And did managers receive bonuses as well?

2   **A.**   Yes.

3   **Q.**   And for the district sales managers, how were those

4   calculated?

5   **A.**   It was a roll-up of account executives who worked under

6   them.  So it would be a roll-up of all the account executives

7   up to the district sales manager level.

8   **Q.**   Now, generally speaking, was it true that the accounts in

9   the sales representative's geographic territory, the revenue

10   from those accounts would be attributed to the sales

11   representative responsible for that geographic territory; that

12   that sales representative would get credit for the revenue in

13   that area?

14   **A.**   Yes.

15   **Q.**   Now, was there an exception to that, that there could be

16   revenue generated in the territory but the account executive

17   would not get credit for it?

18   **A.**   Yes.

19   **Q.**   And what was that exception?

20   **A.**   So that there could be revenue generated in the account

21   executive's area but they wouldn't get credit would be, for

22   example, an account that's in a catchall category.

23   **Q.**   Okay.  And what is the catchall category?

24   **A.**   A catchall category is just a classification for accounts

25   where you could put an account into catchall, and it would

CHIN - DIRECT / AULT

1    remove the goal from the account executive.

2    **Q.**    Okay.  So then that means that if an account in catchall

3    brings in a lot of revenue, no one sales executive will get

4    paid more because of that?

5    **A.**    Right.  It wouldn't affect their variable compensation.

6    **Q.**    But then if the account in catchall were to suddenly close

7    and there was no more money coming in, that would -- the

8    account executive would not be penalized for that either?

9    **A.**    That's correct.

10   **Q.**    So did FedEx's Sales Department have specific policies or

11   procedures for dealing with online pharmacies?

12   **A.**    Yes.

13   **Q.**    And were the sales representatives having issues that were

14   caused specifically by online pharmacies?

15   **A.**    Yes, they were.

16   **Q.**    If we could look at Exhibit 40-39.  And if we could look

17   at this e-mail (indicating).

18       And so this is sent from Eric Roberts.  Who is that?

19   **A.**    He's a sales analyst.

20   **Q.**    And Herman Robertson and Anthony Avella, who are they?

21   **A.**    Herman Robertson is a district sales manager and Anthony

22   Avella is a director of sales.

23   **Q.**    And I'm speaking in the present tense, but I mean what

24   were their positions in 2006.  Is that what you gave me?

25   **A.**    Yes.

CHIN - DIRECT / AULT

1   Q.   Okay.  Now, can you read the first paragraph there?

2   A.   Sure.  (reading)

3        "For the volatile compensation and alignment issues

4   for these online pharms, an AE ramps way up; then the DEA

5   comes in, catapults down and you are free for three

6   quarters trying to do adjustments."

7   Q.   Is that "three" probably "there"?  Or no.  I'm sorry.

8   So based on --

9        THE COURT:  "AE" means what?  Accounts what?  AE?

10       THE WITNESS:  Account executive.

11       MS. AULT:  Okay.

12  Q.   And based on your investigation so far, what does that

13  mean, catapults -- you ramp way up and then catapult down?

14  A.   That means the revenue shoots up and then comes tumbling

15  down.

16  Q.   Okay.  And how does that affect an account executive's

17  compensation?

18  A.   It would hurt the account executive's compensation because

19  it would be a loss of that revenue.

20  Q.   Okay.  So if the account grows by -- let's say, all of a

21  sudden a million dollars of new revenue comes into the account,

22  would the account executive's goal for the next year be

23  increased by that million dollars?

24  A.   Yes.

25  Q.   And then if that million dollars suddenly went away, would

CHIN - DIRECT / AULT

1  the account executive be expected to replace that million

2  dollars with revenue from something else?

3  A.   Generally, yes.

4  Q.   But is there a process of adjustments where the sales

5  executive's goal could get adjusted downward?

6  A.   Yes.  You could get an adjustment to your goal.

7  Q.   Okay.  So that they wouldn't necessarily -- they wouldn't

8  have to make up that million dollars if they got their goal

9  adjusted down so that the million dollars was no longer

10  counted?

11  A.   Yes.

12  Q.   All right.  Now can you read the rest of that e-mail from

13  Mr. Roberts?

14  A.   (reading)

15        "Here is a very controversial solution that I think

16       can maintain the interest in the business pursuit.

17       Protect Districts and AEs and remove the adjustment

18       challenge.  Online pharms should be given a dedicated

19       national account which behaves like a tracking account.

20       It is, in fact, a pricing national and drives no pricing.

21       Any account loaded into this national gets designated

22       pharm similar to the CRC and DEALR indicators.  After the

23       gravy from the pharm runs out as the DEA comes in, the

24       shipping nine-digit account gets deleted, remains in the

25       national for tracking purposes, and the nine-digit is

1          moved to the VP's catchall.  This would eliminate the

2          harm, ensure the pursuit, and enable us to track the

3          behavior of these businesses."

4     **Q.**   Okay.  And did that end up happening?

5     **A.**   No.

6     **Q.**   All right.  What --

7              **THE COURT:**  What are CRC and DEALR?  What is that?

8     **BY MS. AULT:**

9     **Q.**   Do you know what those are?

10    **A.**   No, I do not know what those stand for.

11             **MS. ARGUEDAS:**  We don't know either.

12             **THE COURT:**  Well, then let's take 10 minutes and think

13    about it.  15.

14                    (Recess taken at 2:27 p.m.)

15             **THE COURT:**  Now.

16    **BY MS. AULT:**

17    **Q.**   I believe that we were talking about catchall.  So based

18    on your investigation, did the Sales Department also have

19    specific policies and procedures for dealing with online

20    pharmacies?

21    **A.**   Yes.

22    **Q.**   And were the sales representatives -- okay.  Sorry.  I

23    lost my place.

24         So I believe that you testified that what Mr. Roberts had

25    suggested was not actually done.

1    **A.**    That's correct.

2    **Q.**    And we got hung up on this issue of what does CRCN dealer

3    indicate.  So what did sales end up actually doing with their

4    online pharmacy accounts?

5    **A.**    They ended up placing all of the online pharmacy accounts

6    into catchall.

7    **Q.**    All right.  If we could look at Exhibit 40-90.  And if you

8    could blow up this.

9         And who is Karen James?

10   **A.**    She's a sales analyst.

11   **Q.**    And can you just read her email, please.

12   **A.**    "This primary impacts the Gulf states region given the

13   state laws in Florida.  However, there may be others in the

14   division.  Any online pharmacies that you can identify now,

15   even if they are growing by leaps and bounds, should be moved

16   into catchall per uniform agreement between the field VPs and

17   Paul Jordan.  This is to counter the volatility with the online

18   pharmacies here one day and gone the next, the extensive volume

19   shifts, and the DEA laws.  RxLimited has already been moved.

20        "Please let me know of any others prior to April 2nd at

21   noon Central Standard Time.  Send me an Excel spreadsheet with

22   the territory number, entity number, entity name, and entity

23   zip.  The format is not too important as I know the time frame

24   is short.  As long as I have that information, I can work with

25   it."

**CHIN/ DIRECT/ AULT**

1    Q.   And how would moving online pharmacies into catchall help

2    with the problems that sales was having?

3    A.   It would -- it would remove the fluctuation in the revenue

4    for the online pharmacies from the account executives goals.

5    Q.   And if you could look at Exhibit 16-118.  What is this

6    document?  We should go to the second page.

7    A.   This is a form that was used by Sales to identify the

8    online pharmacies for placement into catchall.

9    Q.   If you could read the section where it says *purpose*.

10   A.   "The Internet pharmacy industry is governed by strict DEA

11   laws.  This type of business is generally very volatile in

12   nature and are here one day and gone the next day.  They're

13   often numerous large volume shifts associated with Internet

14   pharmacies as they move the shipping location often to avoid

15   detection DEA.  As such, Internet pharmacies are best placed in

16   catchall status when discovered.  Please note that this action

17   is for volatile pharmacies and not for stable, reputable

18   businesses."

19   Q.   Like the Credit Department, did the Sales Department also

20   go through and identify all of the accounts that they could

21   find that were online pharmacies?

22   A.   Yes, they did.

23   Q.   So that those could all be submitted to the catchall

24   category?

25   A.   That's correct.

1   **Q.**   All right.  If you could take a look at Exhibit 26-88.

2   Where was the -- this says GSR.  What was GSR?

3   **A.**   The Gulf States Region.

4   **Q.**   And where was that?

5   **A.**   Primarily in Florida.

6   **Q.**   And who are David Brown and David Russell?

7   **A.**   David Brown is a director in Sales.  And Dave Russell is a

8   vice-president.

9   **Q.**   And can you read the email that -- I'm sorry.  This is

10  26-88.

11      Can you read the email that David Brown sends to Dave

12  Russell.

13  **A.**   "Dave, attached find the changes/additions of pharmacy

14  accounts and their related impact.  Most pharmacy accounts were

15  primary since they did not own the multiple locations that they

16  would solicit to fill orders for them outside of Florida when

17  the DEA was on their trail."

18  **Q.**   And attached to that, is there a memo from Dave Brown to

19  Dave Russell dated February 29th, 2008?  That would be page 2.

20  **A.**   Yes, it is.

21  **Q.**   And just generally speaking, what was this memo about?

22  **A.**   It was discussing the performance of the Gulf state's

23  region from fiscal year 2008 to fiscal year 2007.

24  **Q.**   And when was FedEx's fiscal year?  What months did it run

25  from?

1   A.   It runs from June through May, so June 1st through May

2   31st.

3   Q.   And why did Mr. Brown state that his revenue or his

4   revenues were down?

5   A.   It was due to economic conditions and the pharmacy account

6   closures by the DEA.

7   Q.   Now, how much did he identify that the Gulf states regions

8   sales were down for Primary Express for the -- I'm sorry.

9        Okay.  Did he identify some sectors that were impacting

10  his revenue?

11  A.   Yes, he did.

12  Q.   And what sectors did he identify?

13  A.   Pharmacy accounts, financial mortgage, and flower

14  shippers.  And some other miscellaneous accounts.

15  Q.   I'm sorry?

16  A.   And some other miscellaneous.

17  Q.   And how much did he say that the revenue -- his revenue

18  was down for those four sectors?

19  A.   For the Primary Express, it was down 7.3 million.

20  Q.   Okay.  And if you could flip to the next page.  How much

21  does this indicate that primary accounts were down due to DEA

22  closures?

23  A.   Approximately 5.8 million.

24  Q.   Does he list anything there other than DEA closures as the

25  reason the pharmacy accounts were declining?

1   **A.**   No.

2   **Q.**   And then if you could flip to the last page, which is page

3   8 where he has a summary.  And what does Mr. Brown say about

4   the pharmacy accounts for Express Primary?

5   **A.**   "The pharmacy accounts represent 51.3 percent of the top

6   declining/lost accounts listed.  Their missing revenue shows up

7   in the YOY decliners and this revenue/volume history is still

8   in the Express ops affecting their decline in volume YOY."

9   **Q.**   I want to talk some about some specific -- look at some

10  specific pharmacies.  If we could look at Exhibit 30-16.  If

11  you could go to page 11.

12  **A.**   I don't have 30-16 in front of me.

13  **Q.**   That may actually be the wrong exhibit number, so we will

14  move on.

15       Can we go to Exhibit 26-10.  So can we start here with

16  this email down here.

17       So when we were talking about the credit policy getting

18  approved, I believe there were some emails discussing a -- the

19  shutdown of Universal and Gem Pharmacy by the DEA; is that

20  correct?

21  **A.**   Yes.

22  **Q.**   And Mr. Croft here again refers to Universal and Gem being

23  shut down by the DEA; is that correct?

24  **A.**   Yes, it does.

25  **Q.**   All right.

**CHIN/ DIRECT/ AULT**

 1          **THE COURT:**  What does it mean to say *cashed*?  It says,

 2   "We have cashed the following accounts."

 3       Are they able to then obtain funds or change credit

 4   relationships?

 5   **BY MS. AULT:**

 6   **Q.**  Can you explain the concept of *cashed*?

 7   **A.**  Sure.  Cashing an account is just a reference to revoking

 8   the credit on an account.

 9          **THE COURT:**  Revoke the credit on the account.  Okay.

10   So they can no longer -- this is in the future.  They can no

11   longer make credit purchases or they have no credit?

12   **BY MS. AULT:**

13   **Q.**  They can't ship on credit anymore; is that correct?

14   **A.**  That's correct.

15   **Q.**  They would have to pay for the packages they wanted to

16   ship first before they could take them out?

17   **A.**  That's correct.

18          **MS. ARGUEDAS:**  They could take it to the office and

19   ship it and they would have to pay while they're standing

20   there.

21          **THE COURT:**  Okay.  Does it mean just that, or would it

22   also include FedEx coming out to the pharmacy and --

23          **MS. ARGUEDAS:**  They would not pick it up, right.  They

24   would not come pick it up at the place.  The people would have

25   to go to the FedEx office, hand in the packages, and pay for it

**CHIN/ DIRECT/ AULT**

1   while they were standing there.

2          **THE COURT:**  Okay.

3   **BY MS. AULT:**

4   **Q.**   So to ask the witness the question, would FedEx come and

5   pick up the packages -- would FedEx's pickup services still be

6   available if the account was on cash?

7   **A.**   No.

8   **Q.**   Would the customer still receive discounts?

9   **A.**   They were not supposed to, no.

10         **MS. AULT:**  Does that answer the Court's questions?

11  Okay.

12  **Q.**   And then the other thing, so -- sorry.  I've lost my place

13  here.

14      Okay.  So can we flip to page 2, please.  So on the second

15  page, there is an email from Dave Waycaster.  He says that they

16  are in the process of re-billing three account numbers.  What

17  does that mean to re-bill?

18  **A.**   It would just -- it means to re-invoice, basically.

19  **Q.**   So does that mean that they're trying to collect money

20  that one account owes from a different account?

21  **A.**   It could be.  Like in the instance of a fulfillment

22  center, re-billing a fulfillment center for the shipping

23  charges.

24  **Q.**   And what does Mr. Waycaster say happened when he tried to

25  contact Gem Pharmacy?

1  **A.**  When he tried to contact Gem Pharmacy, he says he got a

2  person who would not get -- who would give no information at

3  all.  When I asked his name, he replied, "It doesn't matter."

4  **Q.**  Okay.  And then what does he say in the next paragraph?

5  **A.**  He says, "I think we need to move quickly and decisively

6  to get these accounts under control or we are going to find

7  empty offices where they once stood.  I suggest Mr. McKee

8  contact these individuals today to see what is going on."

9  **Q.**  And then can you read a little bit further?

10  **A.**  "He set these accounts up and has been working with them

11  so I'm sure he has a good working relationship with them.  I

12  need to know something today.  There are red flags popping up

13  everywhere suggesting that these people are about to

14  disappear."

15  **Q.**  Okay.  And how does Mr. Croft respond to him?

16       If we could go to the first page.

17  **A.**  He provides the information that Universal and Gem

18  Pharmacy were shut down by the DEA.

19  **Q.**  And how did Mr. Croft find out that Universal and Gem had

20  been shut down?

21  **A.**  It was information from the salesperson or another

22  co-worker.

23  **Q.**  And then Mr. Waycaster says -- or, I'm sorry, Mr. Croft

24  says, "It was determined that Parcel Solutions is related to

25  Universal as well.  All accounts numbers have been cashed," and

1   then he says, "I think there's a good chance that Hope Mills is

2   also related to Universal.  Hope Mills is currently open, but

3   we need to quickly determine if the account should be cashed."

4        Did they actually cash the Hope Mills account?

5   **A.**   No.  The Hope Mills account continued on.

6   **Q.**   Can you look at Exhibit 40-30.  Who are involved in this

7   email?  Who are Mark Hogan and Steve Pittman?

8   **A.**   Mark Hogan was a director in Security and Steve Pittman

9   was a security manager.

10  **Q.**   And who does this email say that Matty Morrow is?

11  **A.**   It states that, "Matty Morrow is a former federal agent

12  and acquaintance of Townsend's that is now working the private

13  sector."

14  **Q.**   And then can you read that last -- so the second paragraph

15  mentions that he has previously subpoenaed information from

16  FedEx and shared that information with the DEA; is that

17  correct?

18  **A.**   Yes.

19  **Q.**   And then can you read the last paragraph?

20  **A.**   "Morrow wanted to give us a heads-up that based on

21  information that has been developed, Account 284402065, Hope

22  Mills Universal, is allegedly using their FedEx account to

23  facilitate the distribution of illegal Internet drug shipments.

24  This information has been provided to the DEA so you may see

25  some additional law enforcement action in South Florida."

**CHIN/ DIRECT/ AULT**

1  **Q.**   And then he says that he'd pass the contact information

2  along to Express for followup; is that correct?

3  **A.**   Yes.

4  **Q.**   As far as you can tell from your investigation, was this

5  information given to anybody in Credit or Sales?

6  **A.**   Not as far as I've seen.

7  **Q.**   And did FedEx continue to ship drugs for Hope Mills?

8  **A.**   The shipping continued on this account, yes.

9  **Q.**   Now, if we can look at Exhibit 40-43.  This is in July of

10  2006.

11           **THE COURT:**  So let me ask -- can we go back to that?

12           **MS. AULT:**  Yes.

13           **THE COURT:**  Okay.  So October 31st, 2005, Morrow, who

14  is a former federal agent -- I don't know what that means, what

15  his present job is, but who knows.  Okay.  He says to FedEx

16  that Hope Mills Universal is allegedly using their account to

17  facilitate distribution of illegal drugs; right?  And then he

18  goes on to say, "This information has been provided to the DEA

19  so you may see some additional law enforcement action in South

20  Florida."

21      Okay.  And that's said on October 31st, 2005; right?

22           **THE WITNESS:**  Yes.

23           **THE COURT:**  And your testimony was that subsequent to

24  that date, FedEx continued to do business with Hope Mills?

25           **THE WITNESS:**  Yes.

1         **THE COURT:**  And for what period of time did FedEx

2 continue to work with Hope Mills, continue to provide services

3 subsequent to October 31st, 2005?

4         **THE WITNESS:**  The last shipment that I could identify

5 for that Hope Mills account was in approximately April, 2007.

6         **THE COURT:**  April in 2007.  So between October 31st,

7 2005 and April of 2007, did the DEA take any action with

8 respect to Hope Mills?

9         **THE WITNESS:**  Not -- not that I'm aware of.

10         **THE COURT:**  So they had -- if this is correct -- and

11 it's, of course, pure hearsay, no idea whether it's correct or

12 not, but at least -- but from FedEx's point of view, this is

13 what they're told.  FedEx is told that this information was

14 given to the DEA as of October 31st, 2005.  They were also told

15 that the DEA may do something about it.  Same information that

16 FedEx has.

17     And the DEA did nothing until 2007, is that correct, as

18 far as you know?  You are a DEA agent, aren't you?

19         **THE WITNESS:**  Yes, but --

20         **THE COURT:**  Okay.  So my question is did you do

21 anything?  Not you personally.  Did your agency do anything?

22         **THE WITNESS:**  What I was saying, in terms of the

23 shipping for the April 2007 date was the last shipment on that

24 FedEx account.

25         **THE COURT:**  Fine.  But up until -- okay.  But up until

 1   that date -- what did they do between 2005 and 2008?  Just tell

 2   me what they did with all of this information.  What did they

 3   do?

 4          THE WITNESS:  I'm not aware of any action by DEA on

 5   Hope Mills.

 6          THE COURT:  Fine.  So that's another way of saying

 7   *nothing*.

 8          MS. AULT:  And, Your Honor --

 9          THE COURT:  To your knowledge, nothing.  I'm just

10   pointing out what I think -- what you take -- what I would take

11   from this.  If I got this and I was told that law enforcement

12   has this information, notwithstanding whatever I did, good,

13   bad, indifferent, I think that the Government knows about all

14   this, and what does the Government do about all of this?  It's

15   just a point.  They're doing nothing.

16          MS. AULT:  Yes, Your Honor.  And I would simply say in

17   response to that, this:  That every citizen has an obligation

18   not to participate in crime, regardless of what law enforcement

19   is doing.  So --

20          THE COURT:  So if a cop points out to me that person

21   over there, *Don't go over with that person, he's violating the*

22   *law.  And if you go over, then you're going to violate the law*.

23   That's what he is saying to me.  He's violating the law.  I

24   say, *Really?  Yes, he's violating the law?  Really?*

25       So what happens?  Does the cop go over and arrest him?

1    Does the cop do anything?  No.  What do I think -- if I think

2    anything -- by the way, I'm a private citizen.  But if I think

3    anything, anything, and the cops aren't going over and doing

4    something, why is it so unreasonable for me to continue to do

5    business with him if law enforcement isn't doing anything about

6    him?

7         MS. AULT:  Your Honor, the evidence in this case --

8         THE COURT:  That's this evidence.  This evidence --

9    I'm asking you about this document you've just presented to me.

10   Forget everything else.  I'm asking you if you get this

11   document --

12        MS. AULT:  If you get this document --

13        THE COURT:  -- and you continue your course of conduct

14   and then the argument is that's the wrong -- that's an illegal

15   course of conduct, may or may not be, but one factor that I

16   know is that during this period of time, DEA isn't doing

17   anything.  How do I know that?  I know that because they're not

18   closed down.  That's how I know it.  That I'm continuing doing

19   business with them.  That's what I know.  Just from this

20   document as of this date and then 14 months or 18 months or 2

21   years -- 14 months after, 16 months -- I can't add -- 16 months

22   after it.  Didn't they know that?

23        MS. AULT:  Your Honor, if you were a drug courier --

24        THE COURT:  If I was what?

25        MS. AULT:  If you were a drug courier --

1          **THE COURT:**  Okay.  I'll put myself in those shoes.

2     I'll try to remember when I was.  Okay.  Go ahead.

3          **MS. AULT:**  And there were five people that you were

4     picking up packages from and three of them get arrested and two

5     of them do not and you were picking up the same packages from

6     all five of them and you continue to pick up packages from the

7     two who didn't get arrested and then a year later, those two

8     get arrested, you have committed a crime.

9          **THE COURT:**  Okay.  That's your argument.  Now I see.

10    Your argument is that since other people -- other people were

11    arrested, they should have not furnished the services to these

12    people, notwithstanding the fact that these people -- that the

13    activities of these people were known to the Government.  And

14    then one thinks -- can one think?  Is it totally unreasonable

15    for one to think that these people may not be violating the

16    law?  That maybe there is something about these people that

17    are -- that make it permissible?  Because we know the DEA is

18    letting them continue to do the very thing that you're

19    prosecuting FedEx for.  They're doing the very same thing.

20    Actually they're doing much worse because they're not just

21    delivering drugs; they're facilitating -- they're doing

22    everything.  They're aware of everything.  They're aware of

23    every end of the transaction.

24         Okay.  I'm just telling you that's a concern to me.

25         **MS. AULT:**  And I understand that, Your Honor.

```
 1            THE COURT:  Good.  Okay.
 2            THE WITNESS:  Can I add one thing to your question,
 3   Sir?
 4            THE COURT:  Sure.  Go right ahead.  Go right ahead.
 5            THE WITNESS:  So Hope Mills was the online pharmacy
 6   and it was using some of the pharmacies that we did shut down;
 7   for example, United Care Pharmacy.
 8            THE COURT:  Is this -- are you talking about -- I
 9   understand that, but is it the Hope Mills' account that we're
10   talking about here?  Is this number, 28440 dot, dot, dot, dot,
11   dot, is that the Hope Mills or is it the Universal or is it
12   some other account?
13            THE WITNESS:  This is for Hope Mills.
14            THE COURT:  Okay.
15   BY MS. AULT:
16   Q.   And then if we could turn to 40-43.  And if we could look
17   at the top email.  And this is July 6th, 2006; is that correct?
18   A.   Yes, it is.
19   Q.   So about a year later?
20   A.   Yes.
21   Q.   And who is German Bravo?
22   A.   He was an account executive.
23   Q.   And Faith Wilson, was she his district sales manager?
24   A.   Yes.
25   Q.   And this is about an adjustment.  Is that one of those
```

1   goal adjustments that we were talking about before?

2   **A.**   Yes, it is.

3   **Q.**   And Faith asks for additional information, and can you

4   please read what German Bravo says.

5        And, I'm sorry, what account is this about?

6   **A.**   This is about Hope Mills.

7   **Q.**   The same account we've been talking about?

8   **A.**   Yes.

9   **Q.**   Okay.  So can you please read what Mr. Bravo says.

10  **A.**   "Business did not move to another FedEx account.  This is

11  and was an Internet pharmacy account selling drugs illegally

12  over the Internet and its business was curtailed by the FBI.

13  *Undisclosed location* was put because the shipping address that

14  is listed on our database is an empty building that has been

15  unoccupied for over a year.  A credit card is being used to pay

16  for the few shipments they continue to do.  Please advise if

17  you need additional information."

18  **Q.**   And did FedEx continue to ship for Hope Mills after

19  knowing this information?

20  **A.**   Yes.

21  **Q.**   And the few shipments, do you know how many shipments they

22  continued to do after knowing this information?

23  **A.**   In terms of revenue, it was approximately $125,000.

24  **Q.**   Okay.  APH, was that also another business that shipped

25  with FedEx?

1  **A.**    It was another -- yes.

2  **Q.**    Can you look at Exhibit 26-37.  If you could flip to the

3  second page, please.  And if you could blow up the email from

4  Leslie Garvett.  Do you know who she is?

5  **A.**    That's an individual in Sales.

6  **Q.**    And Scott Sutterman?

7  **A.**    He's district sales manager.

8  **Q.**    Can you read what Ms. Garvett's concerns were.

9  **A.**    "I spoke with the senior manager, Tony Konin.  He said

10  that he refuses to pick APH up any longer because he says that

11  A.J. Hernandez is the same person that ran RxDiscount in North

12  Miami last year and owes us a half million dollars.

13      "I asked Tony if he was sure and he said yes.  He said the

14  DEA shut him down for illegally running his operation and that

15  he was on EZ-Debit, and when the Government shut him down, they

16  froze all his accounts and that's how he owes us money."

17  **Q.**    And then how does Mr. Sutterman reply?

18      It's at the top of the page.  Sorry.

19  **A.**    He sends the information to Joe Singler and Josh Croft.

20  **Q.**    And can you read the email at the top of the second page.

21  **A.**    "Joe, can you help with this situation?  I understand the

22  concern from Express ops, but if the account is current, not

23  much we can do.  Please advise ASAP.  Thanks."

24  **Q.**    Did FedEx continue to ship packages for APH?

25  **A.**    They did.

1    **THE COURT:**  Was there a response to this email?  It

2    says advise me ASAP.  Was there a response?

3    **BY MS. AULT:**

4    **Q.**    Does the email chain continue on the first page?

5    **A.**    It does continue.

6    **Q.**    And that continuation continues with Mary Shelfer, and who

7    is that?

8    **A.**    She's a district sales manager.

9    **Q.**    And the continuation of the email chain, what does it

10   relate to?

11   **A.**    It does relate to APH.

12   **Q.**    And what are they trying to do with APH?

13   **A.**    They were trying to get a bank letter of credit.

14   **Q.**    So they were trying to get the account secured under their

15   credit policy?

16   **A.**    Yes.

17        **THE COURT:**  Okay.  Thanks.

18   **BY MS. AULT:**

19   **Q.**    And then if you could turn to Exhibit 26-42.  And United

20   Care Pharmacy, was that another -- was that a fulfillment

21   pharmacy that FedEx shipped packages for?

22   **A.**    Yes, it was.

23   **Q.**    And is this again about Josh Croft and Kendell Black in

24   the Credit Department trying to get United Care Pharmacy

25   secured under the credit policy?

1    **A.**    Yes, it is.

2    **Q.**    And if you could please read the third paragraph of the

3    email on the first page, Mr. Croft is explaining why it's

4    necessary to secure UCP under the credit policy.

5    **A.**    "We are not targeting UCP as this is the approach that we

6    have been given by senior management regarding the handling of

7    all Internet pharmacy accounts.  We have many other Internet

8    pharmacy accounts with bank letters of credit in place.

9          "Internet pharmacy accounts represent a significant risk

10   unlike any other industry known to FedEx.  Internet pharmacies

11   are targeted by the DEA and are frequently shut down.  When the

12   pharmacies are shut down, the balance outstanding is left

13   unpaid.  EZ-Debit assists in keeping the balances as low as

14   possible, but it will not -- but will not prevent a large loss

15   should the pharmacy be shut down by DEA.

16         "I included the article below regarding one of the recent

17   DEA initiatives to give you some background information.  FedEx

18   has experienced multimillion dollar losses in this industry.  I

19   could give you a long list of pharmacies that have been shut

20   down by the Government where FedEx was not paid."

21   **Q.**    And what ended up happening to United Care Pharmacy?

22   **A.**    United Care Pharmacy was shut down by DEA and the North

23   Carolina Board of Pharmacy in March 2006.

24   **Q.**    Did FedEx know about that?

25   **A.**    Yes.

1   **Q.**   And if you could turn to 26-54.  If you could look at the

2   email on the bottom of the page.  Is that Louis Tapper -- is

3   that the same sales representative who was involved in the

4   previous email?

5   **A.**   Yes, it was.

6   **Q.**   And what does he say to Eric Roberts?

7   **A.**   "I would like to submit United Care Pharmacy, UCP, to

8   catchall.  This was an online pharmacy operating in Wilmington,

9   North Carolina that was shut you down by the DEA in March."

10          **THE COURT:**  Wouldn't FedEx know about all these

11  closures?  If they were owed any money, wouldn't they know?  I

12  mean, they may not know immediately, but wouldn't they know

13  over time?  Isn't it the fact that if there's a closure, FedEx

14  doesn't get paid?  To the extent they have any arrangement

15  other than, I guess, a line of credit -- a bank, you know,

16  letter of credit and -- what was the other one?  I forget the

17  other one.

18          **MS. AULT:**  Security deposit.

19          **THE COURT:**  A security deposit.  But even then if they

20  have to go to the letter of credit or they had to go to the

21  security deposit, they would know that they're going there

22  because the check's not coming in, and the check's not coming

23  in because they've been closed; right?

24          So, I mean, I'm just trying to -- I don't know to what

25  extent you want -- I think in terms of volume and so forth,

```
 1   sure, you want to prove that this wasn't just one pharmacy; it
 2   was a large number of pharmacies.  Or some significant number
 3   of pharmacies and some significant losses.  But the nexus has
 4   already been proven essentially, hasn't it, that if there is a
 5   loss -- if there is a loss -- if FedEx isn't paid, there is --
 6   I don't know.  Is it a certainty that or a high degree of
 7   certainty that it was because DEA closed them down?
 8           MS. AULT:  We believe so, yes, Your Honor, but I
 9   believe that matter will be in contention.
10           THE COURT:  Okay.  So maybe for other reasons, they
11   went out of business.
12           MS. ARGUEDAS:  Right.
13           THE COURT:  Or for other reasons, they decided not to
14   pay the bill.
15           MS. ARGUEDAS:  Correct.
16           THE COURT:  Okay.  Okay.  All right.  That's an issue
17   to be discussed.
18           MS. AULT:  Yes, Your Honor.
19           THE COURT:  Thank you.  Okay.
20   BY MS. AULT:
21   Q.   Now, was EVA Global another Internet pharmacy?
22   A.   Yes, it was.
23   Q.   And if you could turn to 40-81.  And if you could read the
24   email from Scott Sutterman.
25   A.   "Several FedEx accounts in South Florida, company names
```

1    and individuals named in the article.  FYI, Bonnie, do any of

2    these accounts have any large outstanding balances?"

3    **Q.**   All right.  And the article that's attached, which is on

4    page 3, is that the article that you get to if you go to the

5    link that's on -- that's included in Mr.Sutterman's email?

6    **A.**   It would have been, yes.

7    **Q.**   And what does the article say -- so this is about EVA

8    Global; is that right?

9    **A.**   Yes, it is.

10   **Q.**   And what does the article say that EVA Global was doing

11   that was illegal?

12   **A.**   That customers who wanted to order drugs just had to fill

13   out a short questionnaire.

14   **Q.**   Okay.  And according to Bonnie Wagner -- if we can go back

15   to page 1 -- what had FedEx done with the EVA Global accounts?

16   **A.**   It says that FedEx had attempted legal action but were

17   unsuccessful in recovering the losses.

18   **Q.**   And when were the accounts closed by FedEx?

19   **A.**   July 2004.

20   **Q.**   Okay.  And so the article is about the prosecution of the

21   individuals involved in EVA Global; is that correct?

22   **A.**   Yes, is it.

23   **Q.**   Is that unusual, that it would take a certain amount of

24   time between a pharmacy being closed and then the actual

25   prosecution happening?

1  **A.**   It's not unusual.

2  **Q.**   And then what does Bonnie Wagner say that she's going to

3  do now or she thinks they should do now that they've learned

4  about this prosecution of EVA Global's owners?

5  **A.**   She says, "Any time there is a shutdown, it affects the

6  other online pharmacies that we may be doing business with.  We

7  may want to review our existing file of current online

8  pharmacies to make sure we are covered."

9  **Q.**   Now, was Waterview Pharmacy another fulfillment pharmacy

10  for which FedEx shipped packages?

11  **A.**   Yes.

12  **Q.**   And what happened to Waterview Pharmacy?

13  **A.**   Waterview Pharmacy was shut down by DEA.

14  **Q.**   And did FedEx know that that had happened?

15  **A.**   Yes.

16  **Q.**   And can you look at Exhibit 26-43.  Can you read the email

17  on the top.

18  **A.**   "Another online pharmacy bit the dust.  Herman's largest,

19  3,000 pieces per day.  On Friday, the DEA came in, broke down

20  the doors and handcuffed everyone, including the owners.

21  Herman and the AE were supposed to be there on the sales call.

22  Luckily they had rescheduled it."

23  **Q.**   Were you able to determine, based on other emails

24  surrounding this one, that this is in reference to the shutdown

25  of Waterview Pharmacy?

CHIN/ DIRECT/ AULT

1    A.    Yes.

2    Q.    And who is Herman?

3    A.    He's a district sales manager.

4    Q.    And when DEA shut down Waterview Pharmacy, what happened

5    to the orders that -- so there were a number of online

6    pharmacies that were using Waterview to fill drug orders; is

7    that correct?

8    A.    That's correct.

9    Q.    And what happened to those orders when the DEA shut down

10   Waterview?

11   A.    They were shifted to another pharmacy.

12   Q.    And did FedEx know that?

13   A.    Yes.

14   Q.    And did FedEx actually figure out where the online

15   pharmacy orders went?

16   A.    Yes, they did.

17   Q.    Did FedEx continue to ship drugs for the online pharmacies

18   that had been using Waterview after that fulfillment pharmacy

19   was shut down by the DEA?

20   A.    Yes.

21   Q.    Can you go to Exhibit 26-44.  And does this reflect which

22   pharmacy those orders moved to?

23   A.    Yes, it does.

24   Q.    Where did they move to?

25   A.    Superior Drugs.

1   Q.   And can you read Herman Robertson's email at the bottom.

2   A.   "Two of my online pharmacies that for multiple -- that for

3   multiple account numbers were recently shut down.  One of the

4   shippers say that they will now ship out of Florida.  Please

5   note the following account number that was opened today.

6   3298-29880.  There is another account at the same address,

7   2282-07705.  The account previously traded under the name CNL

8   Financial, 3104-49083.  They claim that this is the shipping

9   address.  Since they are shipping via API, it is hard to tell

10  where the shipping is actually -- is actual coming from.

11  Please let me know if you are picking up the packages from the

12  address on this account number."

13  Q.   Okay.  And did he receive information about which pharmacy

14  was shipping out the packages now?

15  A.   Yes.

16  Q.   And that was Superior Drugs?

17  A.   That's correct.

18          THE COURT:  What's API?

19          THE WITNESS:  It stands for application -- application

20  programming interface.

21  BY MS. AULT:

22  Q.   Can you explain what the API is?

23  A.   It's just -- it's a -- it allows for two programs to be

24  able to talk to each other.

25          THE COURT:  It says they are -- since they are

1   shipping via API, it is hard to tell where the shipping is

2   actually coming from.

3        In other words, they're using some mechanism or some

4   programs that you can't ascertain where the shipments are

5   coming from?  Is that it?

6            **THE WITNESS:**  Well, in terms of that answer, I -- I

7   don't know that particular answer.  But I do know that the way

8   that the online pharmacies work is they would integrate in with

9   the FedEx system.

10           **MS. ARGUEDAS:**  Do you want to know the answer from us?

11           **THE COURT:**  Sure.

12           **MS. ARGUEDAS:**  I'll get corrected if I'm wrong, but

13  API is a software program that connects the pharmacy to FedEx

14  so that they can print out labels.  How did I do?

15           **MR. CASSMAN:**  Pretty good.

16           **MS. AULT:**  Your Honor, we will have another witness

17  who will be able to testify about that.  That's simply not

18  Special Agent Chin's area of expertise.

19           **THE COURT:**  Very good.

20  **BY MS. AULT:**

21  **Q.**   Okay.  And what eventually happened to the owners of

22  Waterview Pharmacy?

23  **A.**   They were prosecuted.  They were convicted.

24  **Q.**   If you can turn to 26-96.  Does this email involve Herman

25  Robertson, the same Herman Robertson we've been talking about?

1   A.    Yes, it does.

2   Q.    What is this article generally about?

3   A.    It talks about the operators of Waterview, how they were

4   prosecuted for operating an illegal Internet pharmacy.

5   Q.    And what was the Internet pharmacy doing that was illegal?

6   A.    They were offering controlled substances for sale to

7   customers who only had to complete a brief online

8   questionnaire.

9   Q.    And in 2009, was FedEx still shipping packages for

10  Superior Drugs, the pharmacy where they knew that CNL's orders

11  had been moved to?

12  A.    Yes.

13  Q.    Now, is Elite Pharmacy another fulfillment pharmacy that

14  was a FedEx customer?

15  A.    Yes, it was.

16  Q.    And what happened to Elite Pharmacy?

17  A.    It was shut down by DEA.

18  Q.    And did FedEx know that?

19  A.    Yes, they did.

20  Q.    Can you turn to Exhibit 26-75 and can you read that email,

21  please.

22  A.    "I just received a message from one of my couriers that

23  the DEA just shut down Elite Pharmacy in Riverridge.  Don't

24  know exactly why, but we used to do several hundred outbound

25  with them, but recently it was decreased to about 80 outbound

**CHIN/ DIRECT/ AULT**

1  pieces per night.  Now it will be nothing."

2  Q.   And Bernard Marino, who was that?

3  A.   He's an account executive.

4  Q.   So he is receiving information from the, I guess -- do you

5  know who Johnny Griffin is?

6  A.   I believe he's a station manager.

7  Q.   He's on the operations side?  He is moving the packages?

8  A.   Yes.

9  Q.   And was PMS-MMS an Internet pharmacy that was also a FedEx

10  customer?

11  A.   Yes.

12  Q.   And was PMS-MMS using Elite to fill its drug orders?

13  A.   Yes.

14  Q.   And can you turn to Exhibit 26.76.  Did FedEx know that

15  Elite was filling orders for PMS-MMS?

16  A.   Yes, they did.

17  Q.   And what did PMS-MMS do when DEA shut down Elite Pharmacy?

18  A.   They transferred their shipping to another pharmacy out of

19  state.

20  Q.   And did FedEx know that?

21  A.   Yes.

22  Q.   And what did FedEx do when they learned that PMS-MMS had

23  just switched to a different pharmacy?  Did they keep shipping

24  packages for them?

25  A.   Yes.

1    **Q.**    And what happened to PMS-MMS?

2    **A.**    That was shut down by DEA.

3    **Q.**    And did FedEx know that?

4    **A.**    Yes.

5    **Q.**    Can you turn to Exhibit 40-96.  Can you put up pages 2 and

6    3.  Can you blow those up.

7        Okay.  And so what does this spreed sheet show happened to

8    Elite Pharmacy and PMS-MMS?

9    **A.**    It states that DEA closed the business.

10   **Q.**    Can we go back to page 1, please.

11       And who sent that spreadsheet?

12   **A.**    Bernard Marino.

13   **Q.**    And, again, who was Mr. Marino?

14   **A.**    He was an account executive.

15   **Q.**    It says, "Attached is my top 5 Express decliners for Dave

16   Brown's info."  Who was Dave Brown?

17   **A.**    He was a sales director.

18       **THE COURT:**  Are you in the position to have an opinion

19   as to whether once a pharmacy was closed down, but there were

20   still outstanding orders, these orders were transferred to

21   pharmacies within the same state or outside the state?

22       **THE WITNESS:**  Well, in some of the instances I've seen

23   the orders would be transferred -- well, it was both.  It

24   occurred both --

25       **THE COURT:**  Right.  It occurred both.  Is there any,

 1   you know -- how does it break down?  Do you know?  Is it most

 2   of the time in the same state?  Is it most of the time outside

 3   the state, or you're not able to have an opinion?

 4            THE WITNESS:  I don't think I could answer that.

 5            THE COURT:  Okay.  Thanks.

 6   BY MS. AULT:

 7   Q.   And then I would just like for you to -- so there is two

 8   exhibits, 40-37 and 40-85.  I don't want to go into them.  I

 9   just want you to do some authentication.  They both have videos

10   that are attached to emails, and the videos are part of the

11   exhibits.

12        Did you confirm that the videos that are part of the

13   exhibits are the videos that you would go to if you followed

14   the links that are in the emails?

15   A.   So, yes.  Some of them we had to do some searching to find

16   that particular video.

17   Q.   Okay.  But you did confirm that for Exhibits 40-37 and

18   40-85, the videos that are part of the exhibits are the videos

19   that you would get to if you followed the links in the email?

20   Do you have 40-85?

21   A.   I don't have 40-85.

22            MS. AULT:  Barbara, do you have 40-85?

23            THE CLERK:  No.

24            MS. AULT:  We would like to move 40-85 into evidence.

25            THE COURT:  Admitted.

```
 1              (Trial Exhibit 40-85 received in evidence)

 2              THE WITNESS:  The answer for 40-85, yes.

 3    BY MS. AULT:

 4    Q.   And for 40-87?

 5    A.   Yes.

 6              MS. AULT:  If I could have one moment, Your Honor.

 7              THE COURT:  So 40-37, that's already in evidence.

 8              MS. AULT:  Yes, Your Honor.  I just wanted him, when

 9    we play the videos later for witnesses -- I just wanted him to

10    authenticate that those were the actual videos.

11              THE COURT:  But 40-85 is in evidence.

12              MS. AULT:  Those are all the questions I have for

13    Special Agent Chin at this time.  And, Your Honor, I would just

14    state that because of the Court's directive on the order of

15    proof, we understand that we will be able to put on Special

16    Agent Chin later.

17              THE COURT:  Yes.  You will be able to put him on

18    later.  No problem.

19              THE WITNESS:  Ms. Ault, is it possible I could clarify

20    something?

21    BY MS. AULT:

22    Q.   Yes, of course.

23    A.   So I'm talking about Exhibit 40-081, and there was a

24    question about the link on this particular email or about going

25    to a particular website.
```

1        So this particular link was not working.  So what I had to

2   do is I had to go to the *Miami Herald* website and search the

3   archives for this article, and I did that by using the story

4   information in this email.

5            **MS. AULT:**  Okay.  Thank you.

6            **THE COURT:**  Go ahead.

7                          <u>**CROSS-EXAMINATION**</u>

8   **BY MR. RUBY:**

9   **Q.**   Agent Chin, my name is Allen Ruby.  I'm one of the lawyers

10  for FedEx.

11       Could we have, please, Todd, this drawing.

12       Now, did DEA provide registrations or not for the entities

13  that are shown on this schematic as *Internet pharmacy*?

14  **A.**   Are you talking about the specific Internet pharmacy

15  entity like in the middle of the chart?

16  **Q.**   Yes.

17  **A.**   DEA did not provide registrations to those Internet

18  pharmacies.

19  **Q.**   Okay.  Did DEA provide registrations for the affiliates?

20  **A.**   No.

21  **Q.**   Did DEA provide registrations for the fulfillment

22  pharmacies?

23  **A.**   DEA did provide registrations for the fulfillment

24  pharmacy.

25  **Q.**   And in the language that you've been using and the

1    descriptions -- the explanations you've been giving, the

2    fulfillment pharmacy is the place where the packages are picked

3    up; is that right?

4    A.    The drug packages, yes.

5    Q.    Now, in your investigation that began in 2008, what did

6    you learn about where the so-called Internet pharmacies were

7    getting their drugs from?

8    A.    I think the 2008 date -- I think you mean 2005?

9    Q.    Is that when your investigation started?

10   A.    Well, the online pharmacy investigations would have

11   started in 2005.

12   Q.    You started investigating FedEx in 2008; is that right?

13   A.    Yes.

14   Q.    All right.  What did you learn about where fulfillment

15   pharmacies were getting their drugs from in 2005?

16   A.    From distributors, drug distributors.

17   Q.    Who were also registered?

18   A.    Yes.

19   Q.    And forgive me if the Court already knows this, the way

20   the system is set up, the fulfillment pharmacies, whether

21   somebody thinks they're operating inside or outside the law,

22   need to be registered before they can buy product to ship out;

23   is that true?

24   A.    In the legitimate channels, yes.

25   Q.    I mean, maybe somebody buys stolen drugs somewhere and

1    maybe somebody buys it offshore, but in the fulfillment

2    pharmacies we're talking about in this case, they bought their

3    drugs from reputable distributors; right?

4    **A.**   Well, in one particular instance, they did not.  And that

5    was for the online pharmacy operator known as Robert Smoley,

6    and that was a situation in which myself and another DEA agent

7    posed as an undercover agent where we were selling controlled

8    substances to Robert Smoley.

9    **Q.**   Leaving aside that one instance, in all of the

10   transactions involving fulfillment pharmacies in this case, as

11   far as you know, the fulfillment pharmacy purchased its

12   product, its drugs, from reputable registered distributors;

13   right?

14   **A.**   Yes.

15   **Q.**   All right.  And, in fact, the fulfillment pharmacies need

16   to be registered or they go out of business right away.  They

17   can't get product; right?

18   **A.**   Well, they wouldn't be able to get the product from the

19   wholesale distributor.

20   **Q.**   These fulfillment pharmacies often sold very large volumes

21   of product; isn't that true?

22   **A.**   Yes.

23   **Q.**   Millions of units of phentermine and other chemicals; is

24   that so?

25   **A.**   Thousands of orders a day for these drugs.

1    **Q.**   And with all the fulfillment pharmacies that we're talking

2    about in this case, with the exception of the one undercover

3    enterprise that you told us about, the pharmacies and their

4    operators were registered with the DEA so that they could buy

5    their product to resell; is that so?

6    **A.**   Yes.

7    **Q.**   All right.  Now, isn't it true that as far back as 2005,

8    the DEA was publishing to the public and to the carriers and to

9    others in the pharmaceutical industry lists of tips or

10   suggestions or clues as to how people could figure out if a

11   particular Internet pharmacy was operating inside or outside

12   the law?

13   **A.**   DEA was putting information out like that.

14   **Q.**   All right.  Do you still have the exhibits up there that

15   Ms. Ault was asking you about?

16   **A.**   I have some of them.

17   **Q.**   Could you look, please, and see if you have 60-017.

18           **MS. AULT:**  Are you going to be using a number of them?

19           **MR. RUBY:**  But for the clock, I would.

20           **THE COURT:**  Well, yeah, we have to end at 10 after

21   4:00.

22           **MR. RUBY:**  I'll use as many as I have time for today.

23           **THE COURT:**  Do you think I might ask a question here,

24   because I'm just afraid I'm going to forget it?

25           **MR. RUBY:**  Sure.

1      **THE COURT:**  And Mr. Ruby actually has raised an issue

2  that I hadn't thought about, but let's talk about suppliers for

3  a minute.  A supplier that would come to my find is Pfizer.

4  Have you heard of Pfizer?

5      **THE WITNESS:**  I believe Pfizer is a drug manufacturing

6  company.

7      **THE COURT:**  Yeah.  Well, are they a supplier of drugs?

8  I don't mean direct supplier.  Maybe it's indirect, but does

9  Pfizer make -- don't they make Ambien?  I don't know who makes

10  Ambien.  Anyway, they make controlled substances; right?  I

11  don't care.  Dow Chemical.  There is some -- there are

12  legitimate famous drug companies making drugs; right?  And

13  they're the ones who give the drugs, sell the drugs.  They

14  don't give them.  They sell the drugs to pharmacies, don't

15  they?

16      **THE WITNESS:**  They manufacture the drugs, yes.

17      **THE COURT:**  They manufacture and either they directly

18  sell or they have agents or entities or, I don't know, three

19  levels down the road or something -- somebody -- when we talk

20  about Superior Pharmacy or Smoley, whoever they are, they don't

21  manufacture the drugs.  They get the drugs from somebody;

22  right?

23      **THE WITNESS:**  Yes.

24      **THE COURT:**  And they get the drugs from somebody who

25  has been licensed; right?

1       **THE WITNESS:**  That's correct.

2       **THE COURT:**  Okay.  And if you look at the drugs, can

3  you tell, as an example, who was the supplier of the drugs?  Or

4  putting it another way, can't you?  Because if they hold the

5  patent on the drug, you'd know that this drug, if it's Viagra

6  or if it's Ambien or if it's something to which there still is

7  a patent, you who know who the manufacturer; is right?

8       **THE WITNESS:**  You could determine that by looking at

9  the pill, yes.

10      **THE COURT:**  So now my question is from 2005 to 2008

11 while all this was under investigation, did you go to any of

12 these suppliers and say to the suppliers, you know, *You're*

13 *selling these drugs to this online pharmacy that people are*

14 *dying from and so stop selling the drugs to these people?*  Did

15 you ever tell them that?

16      **MS. AULT:**  May I object to the Court's question?

17      **THE COURT:**  Sure.  Objection.  Overruled.

18   Did you ever tell them that?

19      **MS. AULT:**  Do you mean this witness personally --

20      **THE COURT:**  No.  He's a DEA person.  Did the DEA ever

21 go to -- I want to find out -- this is about the DEA.  It's not

22 about you.  Nothing's personal in this case.  It's not you.  I

23 want to know about the DEA.

24   Did the DEA -- we were talking about Congress.  Nothing

25 can get less personal than that.

1    Did the DEA go to the drug manufacturer or their many

2    subsidiaries and say, *Look, you're giving -- these drugs are*

3    *going to this pharmacy over here.  Thousands of units a day.*

4    *And they're poisoning thousands of people.*

5    Did you ever do that?

6              **THE WITNESS:**  DEA did go talk to the drug wholesalers.

7              **THE COURT:**  And they stopped furnishing the drugs;

8    right?

9              **THE WITNESS:**  Yes.  That's what partially created some

10   of the supply problems for the fulfillment pharmacies because

11   these wholesalers --

12             **THE COURT:**  So how do you explain how did this process

13   then continue if they stopped giving the drugs to them?  How

14   did this go on for years if they stopped it?

15             **THE WITNESS:**  The pharmacies were still able to get

16   drugs, but DEA was going out and educating the wholesale --

17   wholesalers about this particular problem.

18             **THE COURT:**  And any wholesaler that you told, was that

19   wholesaler compliant, *Oh, thank you for telling us; we won't*

20   *ship to this company again?*  Did they comply right across the

21   board?  Because I'm trying to figure out why they weren't

22   prosecuted, you see.  I'm sitting here trying to figure out why

23   they weren't prosecuted because they were right in the chain of

24   this series of events, and you've objected.

25             **MS. AULT:**  I am not objecting.  I just don't -- I can

 1   answer the Court's question, but --

 2           **THE COURT:**  Sure.  Go right ahead.

 3           **MS. AULT:**  So Cardinal and AmerisourceBergen, who are

 4   two of the largest wholesale distributors, they entered into

 5   non-prosecution agreements and --

 6           **THE COURT:**  I'm not talking about what ultimately

 7   happened.  But did -- I'm interested -- well, that's rather

 8   interesting anyway.  Non-prosecution agreements.

 9           **MR. RUBY:**  They didn't stop.

10           **THE COURT:**  They didn't stop then.

11           **MS. AULT:**  Your Honor, I think we may be getting out

12   of the witness -- what the witness knows about this area, but

13   there were --

14           **THE COURT:**  Why don't --

15           **MS. AULT:**  There were --

16           **THE COURT:**  Why don't you, in the next couple days,

17   tell me about the effort --

18           **MS. AULT:**  There were efforts taken against the

19   wholesalers.

20           **THE COURT:**  Pardon?

21           **MS. AULT:**  There were actions taken against the

22   wholesalers.

23           **THE COURT:**  I'm interested in this chain of events,

24   when actions were taken, when it was done, and why it didn't

25   stop and so forth and so on.  I understand this witness may not

1    have that answer.

2         Okay.  Well, sorry that I interrupted your cross.  Sorry.

3    Go right ahead.

4    **BY MR. RUBY:**

5    **Q.**   Can we agree, Agent Chin, that between around 2005 and

6    around 2008, there was growth in this, what you've been

7    calling, the online pharmacy industry?

8    **A.**   Yes, there was.

9    **Q.**   It was a growing set of enterprises; right?

10   **A.**   Yes, they were.  Yes.  The volumes were increasing.

11   **Q.**   And when you say the volumes were increasing, it meant,

12   among other things, that these fulfillment of pharmacies needed

13   more product; right?

14   **A.**   That's correct.

15   **Q.**   And they were buying that product from reputable -- in

16   some instances, very large distributors who, in turn, got their

17   inventory, got their product, from very, even larger pharma;

18   companies; right?

19   **A.**   I would say they were getting them from drug wholesalers.

20   **Q.**   A drug wholesaler would be a company like, to take a

21   San Francisco, native McKesson; is that right?

22   **A.**   Yes.

23   **Q.**   Big drug wholesaler; right?

24   **A.**   Yes.

25   **Q.**   They stopped selling to fulfillment pharmacies?

1  **A.**   That -- I don't know the answer to that.

2  **Q.**   All right.  Fair enough.

3       Cardinal, another very big drug wholesaler; right?  Did

4  they stop?

5  **A.**   Well, I wouldn't know the answer specifically to that.

6  **Q.**   Well, can you give us the name, please, of any drug

7  wholesalers whom you can identify who around 2005, '6, '7, '8,

8  stopped selling pharmaceuticals, chemicals, call them what you

9  will, to fulfillment pharmacies?

10  **A.**   I don't know of any specific names, but I do know that the

11  wholesalers would have to file excessive purchase reports about

12  this type of activity.

13  **Q.**   I'll get to that.  I promise.  But right now, I'm trying

14  to follow through.

15       You had said, I thought -- and maybe I misunderstood --

16  that there were sizeable material distributors who stopped, and

17  I'm trying to find out who they were.  If you don't know or if

18  I misunderstood your testimony, I'll move on.  But I want to

19  get an answer to that.  Who were they who stopped?

20  **A.**   I don't have a specific name for a wholesaler.

21  **Q.**   Did the DEA publish in a positive way at the time the

22  fact, if it was a fact, that good citizen distributor -- I'm

23  going to make up a name -- ABC Company has contributed to the

24  public welfare by withdrawing from sales of pharmaceuticals to

25  these unscrupulous sellers over the Internet.  It seems like

1  something the DEA might want the public to know.  Do you recall

2  reading anything like that?

3  **A.**   I don't recall anything specifically about that.

4  **Q.**   Do you recall within the ranks of the DEA, in trainings or

5  meetings of staff or meetings with supervisors, being told

6  well, good news, the supply of pharmaceuticals has been reduced

7  to these unscrupulous sellers because such and such distributor

8  and thus and so distributor have decided that they're going to

9  be good citizens and stop?  Do you remember anything like that?

10 **A.**   I don't recall any specific conversations about that.

11 **Q.**   And finally on this point for now, can you think of anyone

12 presently employed by the DEA whom you think would know for

13 sure, as part of his or her work history and work

14 responsibilities, whether or not any of these sizeable

15 distributors decided to listen to the urgings of the DEA and

16 stop selling to unscrupulous Internet pharmacies?

17 **A.**   What I would know is individuals from DEA who would have

18 participated in, like, an industry-wide presentation or meeting

19 with the wholesalers.

20 **Q.**   And may I have a name of one of those people, please.

21 **A.**   Sure.  I'm aware of Charlie Trant who participated in

22 that.

23 **Q.**   Is he still with DEA?

24 **A.**   He's retired.

25 **Q.**   And what part of the country is he in, if you know?

1   **A.**   I think he's -- he's somewhere in the East Coast.   I

2   forget exactly which state.   It might be the D.C. area.

3   **Q.**   Anyone else come to mind who would know?

4   **A.**   Jim Byrom.

5   **Q.**   Okay.  Fair enough.

6        Now, I started to ask you about Exhibit 60-017.  This is

7   the transcript of testimony of Mr. Rannazzisi to a

8   congressional committee.  Do you recall that generally?

9   **A.**   Yes.

10  **Q.**   And this testimony was in 2005.  Is that what it looks

11  like to you on the front page?

12  **A.**   Yes.

13  **Q.**   And could we go, please, to the Bates page, Todd, if that

14  works, Bates page 139.  Can you magnify that at the top of the

15  page, please.

16       And, Agent Chin, are these the teachings of Mr. Rannazzisi

17  about the characteristics which are frequently shared by

18  illegal or rogue Internet pharmacies?

19  **A.**   Yes.

20  **Q.**   And was it -- was this the kind of advice that DEA was

21  giving to the public and the industry about how you might spot

22  a company that was using the Internet in a way that the DEA did

23  not approve?

24  **A.**   These would have been generally, yes, some of the same red

25  flags.

1   **Q.**   All right.  Now, in 2005 and 2006, 2007, did DEA itself

2   have a program of trying to use these signals, these red flags,

3   to determine which fulfillment pharmacies were operating

4   outside of the law?  In other words, I'm just trying to ask,

5   did the DEA take its own advice and take a look at particular

6   fulfillment pharmacies and see whether they were partnered up

7   with someone who advertised that no prescription was necessary,

8   didn't participate in insurance plans, etc.?

9   **A.**   I'm sorry.  Could you reask that?

10  **Q.**   I'm going to start completely over.

11      Did, in 2005 or 2006, DEA have a systematic program of

12  investigating or looking at fulfillment pharmacies using red

13  flags, as you called them, like this to determine whether these

14  enterprises were operating inside or outside the law?

15  **A.**   I still don't completely --

16          **THE COURT:**  Well, it's simple.  This is not -- I mean,

17  I think there is three answers:  *Yes, no*, or *I don't know*.

18      I mean, here in 2005, there's testimony that here are five

19  indicia of illegality.  Okay.  In summary.  I can't ask the

20  question any better, but I'm going to ask the question anyway

21  because I think it deserves an answer if you don't understand

22  it.  So here they all are.

23      There are six.  Okay.  Six little signs here.  Mr. Ruby

24  wants to know whether DEA had a program utilizing one or more

25  of these six criteria or flags in place in 2005, 2006, 2007?

1   Did they have that?  And you -- either *yes, they did*; *no, they*

2   *didn't*; or *I just don't know*.

3          THE WITNESS:  I wouldn't know -- I can't think of any

4   particular program.  So --

5          THE COURT:  So to the best of your knowledge, they

6   didn't; is what you're saying?

7          THE WITNESS:  I can't think of anything, so . . .

8          THE COURT:  Okay.  So I think to the best of your

9   knowledge at this time, you can't think of one.  Okay.

10  **BY MR. RUBY:**

11  **Q.**   Well, and to be fair to you, in 2005, you were just

12  starting with DEA?

13  **A.**   Yes.

14  **Q.**   All right.  Did you have basically the same job then that

15  you have now, except you've been promoted over the last 11

16  years?

17  **A.**   Well, I'm still an agent, yes.  In terms of -- I moved

18  groups since I started.

19  **Q.**   All right.  But in terms of your investigative

20  responsibilities, making allowance for the fact that you're

21  more senior now, did you have about the same job then that you

22  have now?

23  **A.**   Yes.

24  **Q.**   All right.  Another question.  In 2005/2006, that time

25  period, did the DEA have a system of gathering information

1   about fulfillment pharmacies that could be consulted, the

2   information could be looked at, when it came time for the

3   pharmacy to renew its registration?

4   **A.**   There's a database that has registrant information in it.

5   **Q.**   All right.  And it is true, isn't it, that registrations

6   need to be renewed periodically?

7   **A.**   Yes.

8   **Q.**   What is the period?  Do you recall?

9   **A.**   I don't know the exact period.

10  **Q.**   Two or three years?

11  **A.**   That sounds about right.

12  **Q.**   All right.  So there was a -- I think you just told me

13  there was a database, and was it your understanding that when

14  it came time for a registrant -- it wouldn't have to be just a

15  fulfillment pharmacy.  It would be any registrant.

16      When the registrant was seeking to renew their

17  registration, there was a database that the DEA could look at

18  and see if there was information which might be helpful in

19  deciding whether or not to renew the registration for this

20  individual or enterprise?  Fair enough?

21  **A.**   Yes.

22  **Q.**   So, for example, if a fulfillment pharmacy had been shut

23  down and it came time for them to renew their registration, in

24  your understanding, was there a database that someone could

25  look at and see, *Ah, they've been shut down.  Well, maybe we'll*

1    *renew them; maybe we won't?*

2    **A.**    There -- within that database, it should capture that

3    information.

4    **Q.**    Did the database contain information which was not

5    available to the public?

6    **A.**    Yes.

7    **Q.**    And what kind of information?  What kind of nonpublic

8    information did you understand might be in the database?

9    **A.**    Probably information that dealt with investigation.

10   **Q.**    If someone were under -- if an operator or a pharmacy were

11   under investigation, that would not necessarily be public.  In

12   fact, in many circumstances, it would not, at least until there

13   were an arrest or something.  Is that a fair statement?

14   **A.**    Yes.  But I would say that I'm not an expert in that

15   database.  I mean, I just generally kind of know a little bit

16   of information about it.

17   **Q.**    These are general questions.

18        Now, in 2005/2006 -- let me call it the time period that

19   I'm asking about -- was there within DEA a real concern that

20   these Internet pharmacies were operating -- some of them were

21   operating outside of the law?

22   **A.**    Yes.

23   **Q.**    And was it the case in this time period I'm asking you

24   about that the DEA did not want to renew registrations for any

25   fulfillment pharmacy that was operating outside the law?

1   **A.**   That I don't know what kind of discussion there would have

2   been about that.

3   **Q.**   Well, do you know whether or not in the period 2005, 2006,

4   2007, DEA knowingly, that is with knowledge of some illegal

5   operations, actually renewed registrations for fulfillment

6   pharmacies?

7   **A.**   I don't work on the registration side, so I don't know all

8   of the particulars about that.

9   **Q.**   Well, given the knowledge that you do have about the DEA's

10  operations and their standards and their objectives -- I can

11  only ask you about things that you know -- can you assure us

12  that the DEA never knowingly renewed the registration of a

13  fulfillment pharmacy that was selling controlled substances

14  without valid prescriptions, for example?

15  **A.**   Again, I don't work on the regulatory side and so I don't

16  deal with DEA registrations and the issuance and renewals of

17  those.

18  **Q.**   Well, it is a fact, is it not, that the Superior entity

19  was a registrant of the DEA until at least, what was it, 2010?

20  **A.**   Yes.  Superior was a registrant.

21  **Q.**   Continuously from 2002, let's say, through when?

22  **A.**   Through 2010.

23  **Q.**   Okay.  And 2010, they lost their registration?

24  **A.**   Yes.  Because the DEA shut them down.

25  **Q.**   Okay.  So let's focus on the period 2002 through 2010.  Is

1    it the case that when Superior's registration came up for

2    renewal during that time period, if DEA had said *we're not*

3    *renewing you*, the ability of Superior to buy pharmaceuticals

4    and to stock the shelves of its fulfillment pharmacy or

5    pharmacies would have been, if not completely eliminated, very

6    seriously cut back?

7    **A.**    If Superior didn't have a DEA registration, yes.

8    **Q.**    And we know that -- strike that.

9          Is it true that for the period 2002 through 2010, Superior

10   was continuously investigated for a variety of complaints or

11   suspicions or concerns about whether or not they were operating

12   within the law?

13   **A.**    I'm aware of, yes, multiple instances like that where

14   there was some sort of action.

15   **Q.**    And if the database that you told us about earlier was

16   being used in the way that you think it's used, information

17   about those investigations or suspicions or -- would have --

18   would have been reflected in some way in the database; is that

19   a fair statement?

20   **A.**    Again, I don't know what's entered into the database

21   because I don't do the entry of that.

22   **Q.**    Was it your understanding as a DEA agent that if a

23   registrant were being investigated for serious violations, that

24   there was an entity, at least in the database, that would

25   notify the reader to look at such and such file or to be aware

1    that a search warrant had been served or otherwise inform him

2    or her that this should be looked at?

3    **A.**    From instances where I've actually seen a record in that

4    database, there has been information like that.

5    **Q.**    Okay.  In fact, it's true, isn't it, Agent Chin, that

6    between 2002 and 2010, the Drug Enforcement Administration used

7    a variety of investigative tools that are not available to

8    civilians in its investigation of this entity; is that right?

9    Superior?

10   **A.**    Yes.  We did utilize some investigative tools.

11   **Q.**    You used search warrants, for example; is that true?

12   **A.**    Yes.

13   **Q.**    You used controlled buys; is that right?

14   **A.**    Yes.

15   **Q.**    These are things that those of us who are not law

16   enforcers are not allowed to use.  Do we agree on that?

17   **A.**    Yes.

18   **Q.**    So why was it, if you know, that the Drug Enforcement

19   Administration repeatedly decided to renew the registration of

20   Superior in this period of 2002 through 2010?

21   **A.**    I wouldn't have the answer to that question.  All I could

22   talk about are actions that I was involved in in terms of the

23   multiple online pharmacy investigations that I conducted and

24   the closures of the online pharmacies that I conducted,

25   including SafeScriptsOnline, Kwic Fill, United Care Pharmacy,

**CHIN/ CROSS / RUBY**

 1    Pitcairn Group, Grupo Call Centers, and United Mill Pharmacy

 2    Services.

 3    **Q.**    Do you know whether or not in 2006, at least one of your

 4    investigative colleagues at DEA wrote a long written request to

 5    management to take away the registration of Superior and put

 6    them out of business?  2006.  Do you know anything about that?

 7    **A.**    I've seen that.

 8    **Q.**    And how did you come to see that?

 9    **A.**    I've seen the report itself.

10    **Q.**    And who was the author of that report?

11    **A.**    Diane Williams.

12    **Q.**    And who is she?

13    **A.**    She was a diversion investigator.

14    **Q.**    Under what circumstances did you see her report?

15    **A.**    It was in the process of gathering evidence and reports in

16    this investigation.

17    **Q.**    The investigation of FedEx?

18    **A.**    Yes.

19    **Q.**    And did I understand it correctly that Agent Williams

20    wrote a report with considerable detail advocating, urging,

21    suggesting that Superior be -- their registration be withdrawn?

22    **A.**    Yes.  That's what was in the report.

23    **Q.**    2006, wasn't it?

24    **A.**    I believe, yes, that's correct.

25    **Q.**    Did it happen?

**CHIN/ CROSS / RUBY**

1   **A.**   Not that I'm aware of, no.

2   **Q.**   Why not?

3   **A.**   I don't know the exact reason why.

4   **Q.**   You didn't make that decision, did you?

5   **A.**   I did not.

6   **Q.**   Who did?

7   **A.**   You'd have to talk to the people -- I don't know.

8   **Q.**   Okay.  Do you know whether or not the management personnel

9   who considered Agent Williams' recommendation felt that there

10  just wasn't enough real evidence to shut down Superior in 2006

11  or indeed until 2010?

12  **A.**   I don't -- I don't know the ultimate reason why.

13  **Q.**   Did you work on the Superior investigation or

14  investigations before 2010?

15  **A.**   I had -- yes.  I had contacted Diane and spoken with her

16  about Superior.

17  **Q.**   Other than contacting her and finding out the work that

18  she had done, did you do some other independent investigation

19  as part of your duties?

20  **A.**   I was doing some investigating as it related to the online

21  pharmacies that we were focused on.  So in the course of

22  gathering evidence for the online pharmacies that we were

23  investigating, we identified some fulfillment pharmacies, yes.

24  There was some investigating that I had done like requesting

25  bank records.

1    **Q.**  In the period 2005, '6, '7, the period I'm asking you

2    about, did the DEA publish, either for public consumption or

3    internally, any estimates of how many rogue Internet pharmacies

4    the agency thought would be -- were operating in the

5    United States?  I'm not asking for your opinion.  I'm just

6    asking did the agency publish something that you saw?

7    **A.**  I can't recall anything specific.

8    **Q.**  I'm not -- strike that.

9        Did the agency make you aware of any document or estimate

10   that the institution had made as the number of Internet

11   pharmacies has grown from five hundred to a thousand over such

12   and such period?  Do you recall anything like that?

13   **A.**  I can't think of anything off the top of my head.

14         **MR. RUBY:**  Your Honor, I see it's 10 after.

15         **THE COURT:**  I appreciate that.  Okay.  So we will

16   resume tomorrow at 9:00.  9:00.  And we'll go to noon or 12:30

17   or something like that.  Then I have my calendar in the

18   afternoon.

19         **MR. RUBY:**  Thank you.

20         **THE COURT:**  Thank you very much.

21         **MS. ARGUEDAS:**  Your Honor, can we just confirm

22   tomorrow's witnesses are the remaining Chin, Wagner, Brashier,

23   Newkirk?

24         **MS. AULT:**  We were going to talk to you about that.

25         **THE COURT:**  Just have a conference.  Thank you.

1

2          (Proceedings adjourned at 4:11 p.m.)

3                CERTIFICATE OF REPORTER

4      I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Tuesday, June 14,2016

8

9

10

11  _____

12      Jo Ann Bryce, CSR No. 3321, RMR, CRR
           U.S. Court Reporter

13

14

15

16  _____
       Pamela Batalo, CSR No. 3593, FCRR

17          U.S. Court Reporter

18

19

20

21

22

23

24

25