**Volume 3**

**Pages 423 - 530**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   VS.                             )          **NO. CR 14-00380-CRB**
                                   )
FEDEX CORPORATION, ET AL.,         )
                                   )
            Defendants,            )
_____)

San Francisco, California
Wednesday, June 15, 2016

**TRANSCRIPT OF TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                        **DAVID R. CALLAWAY**
                        United States Attorney
                        Acting Under Authority Conferred by
                        28 U.S. C. Section 515
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                 **BY:  KIRSTIN AULT**
                        **JOHN HEMANN**
                        **JENNY ELLICKSON**
                        **ASSISTANT UNITED STATES ATTORNEY**S


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2

     For Defendants:
3                              ARGUEDAS, CASSMAN & HEADLEY, LLP
                               803 Hearst Avenue
4                              Berkeley, CA  94710
                         BY:   **CRISTINA C. ARGUEDAS, ATTORNEY AT LAW**
5                              **TED W. CASSMAN, ATTORNEY AT LAW**
                               **RAPHAEL M. GOLDMAN, ATTORNEY AT LAW**
6

7                              SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
                               LLP
8                              525 University Avenue
                               Palo Alto, CA  94301
9                        BY:   **ALLEN RUBY, ATTORNEY AT LAW**

10                             FEDEX EXPRESS LITIGATION
                               3620 Hacks Cross Road
11                             Memphis, TN  38125
                         BY:   **PETER D. BLUMBERG, ATTORNEY AT LAW**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

Wednesday, June 15, 2016 - Volume 3

| <u>GOVERNMENT'S WITNESSES</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| <u>WAGNER, BONNIE</u> | | |
| (SWORN) | 427 | 3 |
| Direct Examination by Ms. Ault | 428 | 3 |
| | | |
| <u>CHIN, JASON (RECALLED)</u> | | |
| (PREVIOUSLY SWORN) | 471 | 3 |
| Cross-Examination resumed by Mr. Ruby | 471 | 3 |
| Redirect Examination by Ms. Ault | 510 | 3 |
| Recross-Examination by Mr. Ruby | 523 | 3 |
| Further Redirect Examination by Ms. Ault | 524 | 3 |

<u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 16-082 | | 432 | 3 |
| 16-084 | | 432 | 3 |
| 16-086 | | 433 | 3 |
| 16-101 | | 433 | 3 |
| 24-016 | | 433 | 3 |
| 24-017 | | 433 | 3 |
| 25-014 | | 433 | 3 |
| 26-023 | | 433 | 3 |
| 26-034 | | 433 | 3 |
| 26-056 | | 433 | 3 |
| 26-058 | | 434 | 3 |
| 26-059 | | 434 | 3 |
| 26-063 | | 434 | 3 |
| 26-066 | | 434 | 3 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 30-031 | | 432 | 3 |
| 30-052 | | 432 | 3 |
| 30-076 | | 432 | 3 |
| 30-087 | | 432 | 3 |
| 100-655 | | 490 | 3 |

1    <u>**Wednesday - June 15, 2016**</u>                    **9:06 a.m.**

2                       P R O C E E D I N G S

3                          ---oOo---

4          **THE COURT:**  Good morning.

5          **MR. RUBY:**  Good morning.

6          **MS. AULT:**  Good morning, Your Honor.

7          **THE COURT:**  Yes, Ms. Ault?  So we were in the process

8    of cross, but --

9          **MS. AULT:**  We were, Your Honor, although the parties

10   have agreed to take one witness, Bonnie Wagner, out of order.

11   She lives in Mexico and would like to --

12         **THE COURT:**  Absolutely.

13         **MS. AULT:**  And so the United States calls Bonnie

14   Wagner.

15         **THE CLERK:**  Please come forward and take the witness

16   stand.

17                       <u>**BONNIE WAGNER**</u>,

18   called as a witness for the Government, having been duly sworn,

19   testified as follows:

20         **THE CLERK:**  Please state your full name and spell your

21   last name for the record.

22         **THE WITNESS:**  Bonnie Wagner, W-A-G-N-E-R.

23      Does that sound loud?

24         **MS. AULT:**  It sounds perfect.  It's a big room and so

25   we need for you to be loud.

1                    **DIRECT EXAMINATION**

2    **BY MS. AULT:**

3    **Q.**   Good morning, Ms. Wagner.

4    **A.**   Good morning.

5    **Q.**   I understand that it is your intention to assert your

6    Fifth Amendment right not to testify on the grounds that it may

7    incriminate you?

8    **A.**   Yes.

9         **MS. AULT:**  Your Honor, we have an application for an

10   immunity order that has been approved by the appropriate

11   officials in D.C. and we would like to hand it up.

12        **THE COURT:**  And you've shown it to the defense?

13        **MS. AULT:**  I have not, Your Honor, but I'm happy to do

14   that.

15        **THE COURT:**  Is there --

16        **MS. AULT:**  There is nothing special --

17        **THE COURT:**  -- any reason I shouldn't sign it?  I know

18   of no reason why I shouldn't sign it.

19        **MR. GOLDMAN:**  No objection, Your Honor.

20        **THE COURT:**  Okay.  Then I'll sign it.  Thank you.

21   **BY MS. AULT:**

22   **Q.**   Good morning, Ms. Wagner.  What do you do for a living?

23   **A.**   I'm retired.

24        **THE COURT:**  You are going to have to pull that

25   microphone really close to you.

1              **THE WITNESS:**  I'm retired.

2              **THE COURT:**  Great.  Thank you.

3              **THE WITNESS:**  It's not moving.  Okay.

4              **THE COURT:**  I think that's better.  Thank you.

5    **BY MS. AULT:**

6    **Q.**   How long have you been retired?

7    **A.**   Six years.

8    **Q.**   Where do you currently live?

9    **A.**   Primary location is in Mexico.

10   **Q.**   Before you retired, did you work at FedEx?

11   **A.**   Yes.

12   **Q.**   And did you work in FedEx's Credit Department?

13   **A.**   Yes.

14   **Q.**   How long did you work in the Credit Department?

15   **A.**   Approximately five, six years.  I'm not sure of the dates.

16   **Q.**   How long did you work at FedEx?

17   **A.**   Thirty years.

18   **Q.**   So did you work in the Credit Department between about --

19   you said five or six years.  So was that in the 2000s, between

20   about like 2000 and 2000, maybe, 6, 7?

21   **A.**   Yes.

22   **Q.**   So I want to focus on that time.  During the time that you

23   worked in the Credit Department, who was your supervisor, who

24   was your boss?

25   **A.**   Josh Croft.

**WAGNER - DIRECT / AULT**

1  **Q.**   And who did Josh Croft report to?

2  **A.**   Kendell Black.

3  **Q.**   Who did Kendell report to?

4  **A.**   Betty Hale.

5  **Q.**   Do you know who Betty reported to?

6  **A.**   Karl Stingily.

7  **Q.**   And was Karl Stingily your vice-president?

8  **A.**   Yes.

9  **Q.**   Was the Credit Department responsible for monitoring the

10  financial and pay history for both FedEx Express and FedEx

11  Ground?

12  **A.**   Yes.

13  **Q.**   And what did it mean to extend credit to a customer?

14  **A.**   It -- it meant that they could ship packages without

15  paying in advance.

16  **Q.**   And what were the normal, the typical, credit terms for a

17  FedEx customer?

18  **A.**   Standard terms were 15 days of invoice.

19  **Q.**   Okay.  And how often were invoices sent out?

20  **A.**   Some were daily, some weekly.

21  **Q.**   But 15 days from the day they got the invoice, that was

22  when payment was due?

23  **A.**   That was standard terms.

24  **Q.**   What did it mean to cash an account?

25  **A.**   Credit privileges were revoked.

1   **Q.**   And what effect did that have on the accountholder?

2   **A.**   They could only ship if they paid up front.

3   **Q.**   And did other services also not -- I guess were other

4   services also revoked like pick up, discount, things like that?

5   **A.**   It -- that's the way the process should work, but things

6   do slip through the system.

7   **Q.**   But in the ordinary course, the customer wouldn't be able

8   to get pickups anymore so they would have to take their

9   packages to the station?

10  **A.**   Correct.  So sometimes they would take them to a drop box.

11  **Q.**   But the driver wouldn't come to them anymore?

12  **A.**   In theory, no.  They should not.

13  **Q.**   And in theory, they shouldn't get their discounts?

14  **A.**   The discounts -- once the credit privileges are revoked,

15  they no longer are eligible for those discounts.

16  **Q.**   While you were working in FedEx's Credit Department, did

17  you have experience working with online pharmacies?

18  **A.**   Yes.

19  **Q.**   And there's a stack of exhibits over there, and I suppose

20  I should just go through the process of admitting them,

21  Your Honor.

22       So I would like -- these are all FedEx documents, and so

23  I'd like to just do what I did yesterday, which is read them in

24  and have them admitted, and I think the defense has

25  requested -- since sometimes I move to admit more exhibits than

1    we actually get to with the witness, the defense has requested

2    to have 48 hours from whenever the witness testifies about them

3    to object, and we have no problem with that.

4              THE COURT:  That's fine.

5              MS. AULT:  So we would like to move in Exhibit 30-1.

6              THE COURT:  Okay. 30-1 I actually have admitted.

7              MS. AULT:  Okay.  30-31.

8              THE COURT:  Admitted.

9         (Trial Exhibit 30-031 received in evidence)

10             MS. AULT:  30-52.

11             THE COURT:  Admitted.

12        (Trial Exhibit 30-052 received in evidence)

13             MS. AULT:  30-76.

14             THE COURT:  Admitted.

15        (Trial Exhibit 30-076 received in evidence)

16             MS. AULT:  30-87.

17             THE COURT:  Admitted.

18        (Trial Exhibit 30-087 received in evidence)

19             MS. AULT:  Then I would like to go to 16-82.

20             THE COURT:  Admitted.

21        (Trial Exhibit 16-082 received in evidence)

22             MS. AULT:  16-84.

23             THE COURT:  Admitted.

24        (Trial Exhibit 16-084 received in evidence)

25             MS. AULT:  16-86.

1          **THE COURT:** Admitted.

2          (Trial Exhibit 16-086 received in evidence)

3              **MS. AULT:** 16-101.

4              **THE COURT:** Admitted.

5          (Trial Exhibit 16-101 received in evidence)

6              **MS. AULT:** And then 24-16.

7              **THE COURT:** Admitted.

8          (Trial Exhibit 24-016 received in evidence)

9              **MS. AULT:** 24-17.

10             **THE COURT:** Admitted.

11         (Trial Exhibit 24-017 received in evidence)

12             **MS. AULT:** 25-14.

13             **THE COURT:** Admitted.

14         (Trial Exhibit 25-014 received in evidence)

15             **MS. AULT:** 26-23.

16             **THE COURT:** Admitted.

17         (Trial Exhibit 26-023 received in evidence)

18             **MS. AULT:** 26-34.

19             **THE COURT:** Admitted.

20         (Trial Exhibit 26-034 received in evidence)

21             **MS. AULT:** 26-56.

22             **THE COURT:** Admitted.

23         (Trial Exhibit 26-056 received in evidence)

24             **MS. AULT:** 26-58.

25             **THE COURT:** Admitted.

**WAGNER - DIRECT / AULT**

1    (Trial Exhibit 26-058 received in evidence)

2         **MS. AULT:**  26-59.

3         **THE COURT:**  Admitted.

4    (Trial Exhibit 26-059 received in evidence)

5         **MS. AULT:**  26-63.

6         **THE COURT:**  Admitted.

7    (Court's Exhibit 26-063 received in evidence)

8         **MS. AULT:**  26-66.

9         **THE COURT:**  Admitted.

10    (Trial Exhibit 26-066 received in evidence)

11         **MS. AULT:**  Thank you, Your Honor.

12   **Q.**   So if you could turn to the exhibit that is 30-1, this is

13   an email dated March 11th, 2004, from you to Joe Singler and

14   Cindy Blankenship.  Do you remember who those people were?

15   **A.**   Yes.

16   **Q.**   What department were they in within FedEx?

17   **A.**   Collections.

18         **THE COURT:**  Are they -- is this going to be shown on

19   the screen?

20         **MS. AULT:**  Yes.

21         **THE COURT:**  Okay.  Great.

22         **MS. AULT:**  We also have a stack --

23         **THE COURT:**  Give that to Barbara, but I think I don't

24   want them right now.  I want to see if I can follow along on

25   the screen.

1   BY MS. AULT:

2   **Q.**   So Joe Singler and Cindy Blankenship were in Collections;

3   is that correct?

4   **A.**   Yes.

5   **Q.**   If we could flip to the second page.

6       Are these a number of online pharmacies that you were

7   bringing to -- this memo is to Josh Croft -- that you were

8   bringing to Mr. Croft's attention.

9   **A.**   Repeat the question, please.

10  **Q.**   Does this memo have to do with some online issues with

11  online pharmacies that you had noticed that you were bringing

12  to Mr. Croft's attention?

13  **A.**   Yes.

14  **Q.**   And this is dated March 11, 2004.  Is that about when you

15  started to notice problems with online pharmacy customers?

16  **A.**   I don't remember the date that it started.

17  **Q.**   So did the Credit Department have certain procedures for

18  dealing with high-risk customers?

19  **A.**   Yes.

20  **Q.**   Can you generally describe what those procedures were.

21  **A.**   Mainly to secure the account.

22  **Q.**   When you say *secure the account*, what do you mean?

23  **A.**   Automated debits, security deposits, bank letter of

24  credit, accelerated payment terms.

25  **Q.**   So around this time, sort of early 2004, the Credit

1    Department started getting notices or emails from the sales

2    force letting you know that there were some issues with online

3    pharmacies and that the DEA was investigating those types of

4    pharmacies; is that right?

5    **A.**    That Sales notified us?

6    **Q.**    Yes.

7    **A.**    I think the first time was not through Sales.  It was

8    through an account that we were analyzing due to the bad debt

9    loss that we had incurred.

10   **Q.**    Okay.  But generally speaking around this time in early

11   2004, did you start to get notifications from Sales that some

12   of the online pharmacy accounts were being investigated by the

13   DEA?

14   **A.**    I don't think they notified us.  If they came across a

15   media notification that an account had been closed, then they

16   would notify us.

17   **Q.**    Okay.  So what I'm asking is in 2004, did you start to get

18   notices or emails from your sales force that said that some of

19   the online pharmacy accounts -- they were having some issues

20   with the online pharmacy accounts and that DEA was shutting

21   down some of those accounts?

22   **A.**    Only if they were notified, if they received notification

23   of that account.  To just say that all of them were being

24   investigated, no, they did not tell us that.

25   **Q.**    That's not what I asked.

1    **A.**    I'm sorry.  I'm not understanding.

2    **Q.**    That's okay.

3         Around this time, did you start to get some emails or

4    other notifications from the sales force that some of the

5    accounts, the online pharmacy accounts, were -- they were

6    having problems and they were being investigated by the DEA?

7    **A.**    Yes.  The ones that they were aware of, they would let us

8    know.

9    **Q.**    And online pharmacies as an industry began to be

10   considered high risk?

11   **A.**    Not all online pharmacies were considered high risk.  Your

12   pharmacy chains like Wal-Mart, CVS, Cardinal Health, none of

13   those were considered high risk because we had credit history

14   on those accounts.

15   **Q.**    Okay.  But the accounts that you defined as online

16   pharmacies, they, as an industry, were considered to be high

17   risk?

18   **A.**    The ones that we did not have any sufficient information

19   on were considered high risk.

20   **Q.**    Okay.  So online pharmacies you considered to be high

21   risk?

22   **A.**    Yes.  And that would be not just online pharmacies, but

23   any other account that we did not have sufficient information

24   on would fall in that list.

25   **Q.**    But I'm asking specifically about online pharmacies as an

1    industry, were they considered to be high risk?

2    A.    Yes, they were.

3    Q.    And the fact that DEA was investigating the online

4    pharmacies is what made them high risk accounts?

5              THE COURT:   I'm sorry?

6    BY MS. AULT:

7    Q.    The fact that DEA was investigating these pharmacies made

8    them into high risk accounts?

9    A.    No.

10             THE COURT:   You're asking -- let me make sure I

11   understand the question.

12        Are you asking the witness to give her opinion as to why

13   this was a high risk account?

14   BY MS. AULT:

15   Q.    Let me ask it that way.

16        Why were online pharmacies considered to be high risk

17   accounts?

18   A.    They had no credit history with FedEx.  We didn't know

19   anything about them.

20   Q.    And the fact that DEA -- you learned that DEA was

21   investigating some of them, that also went into the calculation

22   of them being high risk accounts?

23   A.    Yes.  The couple of accounts that we were notified of,

24   that would increase the risk.

25   Q.    Okay.  And why would the fact that DEA was investigating

1  online pharmacies make them a high risk account?

2  **A.**   Not knowing why they were being investigated, we couldn't

3  tell which direction -- if they were going to be opened,

4  closed.  We had no information on why they were being

5  investigated.

6  **Q.**   Okay.  But if they were investigated and the DEA found a

7  reason to close them down, then you would incur a large loss?

8  **A.**   If they were not a secured account, yes, we would incur a

9  loss.

10  **Q.**   Okay.  So FedEx developed a standardized set of credit

11  procedures that applied to all online pharmacies?

12  **A.**   Not to all online pharmacies; only the ones that were

13  considered high risk.

14  **Q.**   Okay.  Do you recall coming to San Francisco in 2010?

15  **A.**   In April, yes.

16  **Q.**   Yes.  So April 27, 2010, you testified before the grand

17  jury?

18  **A.**   Yes.

19  **Q.**   And on April 27 of 2010, you were asked the question --

20  and this is on page 35, lines 6 through 7:

21      "**Q.**  So was there a policy put in place specifically to

22      deal with all online pharmacies?"

23      And you said, "Yes."

24      Is your memory different now?

25  **A.**   *Memory is not different, but I was only thinking of the*

1   high-risk accounts and not the established online pharmacy

2   accounts such as Walgreens and the CVS and those type.  So that

3   was the misunderstanding.

4   **Q.**   Okay.  So what your testimony is today is that if it was

5   an established business like a Walgreens or a CVS, then that

6   was not considered to be an online pharmacy, but if it was --

7   **A.**   They had an online presence.  They did online pharmacy

8   shipments.  But we had enough credit history that we did not

9   need to include them in the high-risk list.

10  **Q.**   Okay.

11  **A.**   So when you say all online pharmacies, it was only the

12  high-risk online pharmacies.

13  **Q.**   And the high-risk online pharmacies were defined as those

14  that were not part of a traditional brick and mortar chain like

15  Walgreens or CVS?

16  **A.**   No.  We had some brick and mortar pharmacies that had been

17  in business with FedEx for several years that had never done

18  online shipping, but their credit history did not show

19  sufficient financial support to increase their debt or to

20  increase the credit limit.

21  **Q.**   Okay.  If you could look at Exhibit 30-42.

22       This is a sales brief from June 21st, 2004.  If you can

23  find that one.

24  **A.**   I don't see it.

25  **Q.**   Did you find it?  Do you recognize this document?

1    **A.**    The sales brief, yes.

2    **Q.**    Okay.  If you could turn to the page marked BW5, which

3    would be the electronic page 4, and you see those "take note

4    Internet pharmacy account procedures"?

5    **A.**    Yes.

6    **Q.**    Okay.  Did you help to draft these?

7    **A.**    Yes.

8    **Q.**    Who did you draft them with?

9    **A.**    It was a team of analysts from Credit and Sales.

10   **Q.**    Okay.  So you got Sales -- Sales' assistance in helping to

11   come up with this?

12   **A.**    Yes.

13   **Q.**    And is this how the procedures were communicated to the

14   sales force through this sales brief?

15   **A.**    Yes.

16   **Q.**    Did you have to get approval and do a lot of red tape to

17   get in this sales brief?

18   **A.**    Yes.

19   **Q.**    Now, if you can look at the second paragraph, on the

20   bottom there is a sentence that says, "This doesn't include

21   established pharmaceutical corporations or drugstore chains

22   that happen to have an online presence."

23        Is that what you were talking about when you said not all

24   online pharmacies were subject to the credit policy?

25   **A.**    Well, they're subject to credit policies, but if they're

1  not a high risk, then there was no need to put them on the

2  high-risk list.

3  **Q.**   Okay.  But other than established pharmaceutical companies

4  or drugstore chains that happen to have an online presence, all

5  other online pharmacies were subject to the Internet pharmacy

6  account procedures?

7  **A.**   Yes.  Even the ones that have been with FedEx for a few

8  years.

9  **Q.**   Okay.

10     And was part of this policy that online pharmacies had to

11  go to the Credit Department first before the account could be

12  set up so that you could secure the account before it started

13  shipping?

14  **A.**   Yes.  We wanted to do the credit analysis first before

15  account establishment.

16  **Q.**   And were there any other industries that had to go to

17  Credit first before the account could be set up?

18  **A.**   Occasionally.

19  **Q.**   And which industries were those?

20  **A.**   Oh, industries?  The seasonal-type industries where they

21  do only a large amount of shipping during like a holiday season

22  or something similar to that.

23  **Q.**   And all of those had to go to credit first before they

24  could get set up?

25  **A.**   All that we could identify.

1    **Q.**   Okay.  So when you testified before the grand jury on

2    April 27th of 2010 -- and this is at page 35, lines 18 through

3    21 -- when you were asked, "Were there any other industries

4    that had to go to Credit first before the account could be set

5    up," you said that you didn't recall of any.

6        What has made you now recall that seasonal accounts were

7    subject to the same procedures?

8    **A.**   All right.  I'm getting confused here.

9    **Q.**   Okay.

10   **A.**   I do apologize.

11   **Q.**   There is no need to apologize.

12   **A.**   This happened years ago.

13   **Q.**   It's been a long time.

14   **A.**   And my memory's not that great.

15       Again, if it was a customer that did not have history with

16   FedEx and it was a seasonal-type business, then we would like

17   to view those beforehand because usually seasonal shippers can

18   incur a large debt.

19   **Q.**   Okay.  But were there procedures like these for the

20   Internet pharmacies that were established that were published

21   in a sales brief, communicated to the sales force, applied

22   company-wide that said all seasonal shippers have to go through

23   Credit first?

24   **A.**   No.  Because you didn't have a great number of seasonal

25   shippers.

1   **Q.**   Okay.  And so you needed to do this for the online

2   pharmacies because there were a lot of them?

3   **A.**   There was -- they were starting to increase in number.

4   **Q.**   On this sales brief, in the very last sentence -- so it

5   will be on the next page -- it says, "Sales assistance is

6   needed to help identify existing online pharmacy accounts."

7       And then, "Please email any known online pharmacy account

8   numbers, along with any information you may have."

9       Is that one of the ways that you identified online

10  pharmacies that needed to be secured under the credit

11  procedures?

12  **A.**   Yes.  Any help from Sales was appreciated.

13  **Q.**   And how else did you identify online pharmacies to get

14  them secured?

15  **A.**   Any account -- we would do a data search with accounts

16  that had pharmacy or -- or X in their business name to try to

17  see if they were connected with -- as an online pharmacy.

18  **Q.**   Anything else that you did to try to figure out which

19  accounts were online pharmacies?

20  **A.**   On the existing ones that we did have on the list, we

21  would do a data search on an airbill level to see if there were

22  any others that they might be using as partnerships that we

23  could identify.

24  **Q.**   So you could search FedEx's records on airbills for known

25  online pharmacies and then figure out if there were other

1   accounts that were related that were also online pharmacies?

2   **A.**   Correct.  Because you might have a fulfillment center and

3   you could look at their airbills and if they had -- were

4   shipping for different pharmacies, then we could be able to

5   identify that.

6   **Q.**   And you mentioned a list.  Did you maintain a list in the

7   Credit Department of FedEx's online pharmacy accounts?

8   **A.**   Yes, we did.

9   **Q.**   When you learned of a new online pharmacy account, did you

10  go to that list as a reference to see if it was already secure?

11  **A.**   Yes.

12  **Q.**   And if it wasn't, then you went through the procedures to

13  try to get it secured?

14  **A.**   Correct.

15  **Q.**   When you were notified of a new online pharmacy account,

16  is there anything else that you would do besides go to the

17  list, see that it was secured, and make sure that it was

18  secured?

19  **A.**   No.  If it was not secured, then I would start the process

20  of securing the account.

21  **Q.**   Okay.  And you didn't do anything else other than secure

22  the account?

23  **A.**   I secured the account.

24  **Q.**   So you were not required to notify Security?

25  **A.**   No.

1   **Q.**   Notify law enforcement?

2   **A.**   No.

3   **Q.**   You would just look on the list and see if it was secured?

4   **A.**   Yes.

5   **Q.**   If you could look at the sales brief again and go to the

6   first -- I guess where it says BW5, "take note, Internet

7   pharmacy account procedures."

8        It says in that first paragraph that, "Online pharmacy

9   accounts are a growing concern to FedEx.  Government

10  regulations haven't been formulated for these companies.  As a

11  result, several cases of fraud, illegal selling, and shipping

12  of controlled substances have occurred."

13       Did you write that language?

14  **A.**   Yes.  It was put in the sales brief.

15  **Q.**   Did you put it in the sales brief or was it another

16  member --

17  **A.**   It was a team -- it was the team that was working

18  together.

19  **Q.**   Why was that information put in here?

20  **A.**   Because we had already received a large bad debt loss on

21  accounts that had frauded FedEx by not paying.

22  **Q.**   And did you determine that that was -- that that bad debt

23  was a result of the online pharmacies committing fraud,

24  illegally selling, and shipping controlled substances?

25  **A.**   The fraud was against -- where they would set up the

1    account and not pay us.

2    **Q.**    Okay.

3    **A.**    The other part of it is information that we got from the

4    field information where they would have seen something on their

5    local news and so we wanted to stress that that had occurred in

6    some areas.

7    **Q.**    Okay.  So that you thought was important to let the sales

8    force know that that was one of the reasons for the bad debt?

9    **A.**    Yes.  And this information was provided from the field

10   reps.

11   **Q.**    So you knew that there was some percentage of FedEx's

12   online pharmacy customers that were illegally selling or

13   shipping controlled substances?

14   **A.**    Did I know of the online pharmacies that did that?

15   **Q.**    No.  You knew that there was some certain percentage,

16   however small or however large, that were?

17   **A.**    I knew of two.

18   **Q.**    So when these online pharmacy procedures were published in

19   the sales brief, did that mean that they applied company-wide?

20   **A.**    A company-wide --

21   **Q.**    Yes.

22   **A.**    Or are you talking about worldwide?  Because what happens

23   over in international I wasn't a part of.

24   **Q.**    Okay.  So at least throughout the United States?

25   **A.**    Through the U.S., I would -- those policies/procedures

1  would apply to the U.S. accounts.

2  **Q.**   So I just wanted to go back to the illegal selling and

3  shipping of controlled substances.   So having only two accounts

4  was concerning enough to you that you felt like you needed to

5  include that information in the sales brief that went out to

6  all the salespeople in the United States?

7  **A.**   Yes.  Because the debt incurred by those companies shut

8  down was significant.

9  **Q.**   Okay.  So in addition to getting information from Sales

10  about which FedEx accounts were online pharmacies, did you also

11  get information about collections?  Did they tell you sometimes

12  when there was an online pharmacy account they had discovered?

13  **A.**   Yes.  If an account showed up in their area for collection

14  and they -- if it had the Rx or pharmacy and it was not on the

15  list, then they would notify us.

16  **Q.**   And was there somebody in collections that you dealt with

17  most often on the online pharmacy accounts?

18  **A.**   Yes.

19  **Q.**   And who was that?

20  **A.**   Cindy Blankenship and her manager, Joe Singler.

21  **Q.**   And was Cindy the collector who was specifically tasked

22  with dealing with online pharmacies?

23  **A.**   I believe, but I'm not -- I'm not sure if she was the only

24  one or not, but she was probably my main contact.

25  **Q.**   And she was your main contact on the online pharmacy

1    issue?

2    **A.**   Uh-huh.  I'm sorry, yes.

3    **Q.**   So if you could look at Exhibit 30-40.  And if we could

4    put up pages 1 and 2 and -- did you find it up there?

5        So if you could look at the bottom of the first page, it

6    says, "Cindy Blankenship wrote."  Do you see that?

7    **A.**   Yes.

8    **Q.**   And then go to the second page.

9        Was Ms. Blankenship -- is this a situation where she was

10   informing of you a possible Internet pharmacy?

11   **A.**   Yes.

12   **Q.**   Did you do some additional research to determine if that

13   account, Caroline's Street Clinic, was in fact an Internet

14   pharmacy?

15   **A.**   Yes.

16   **Q.**   Did you go to Caroline's Street Clinic's website -- is

17   that one of the things that you did?

18   **A.**   Occasionally.  It's not something -- something I would do

19   all the time, no.

20   **Q.**   But sometimes that's what you would do?

21   **A.**   Yes.

22   **Q.**   And you did that in this case?

23   **A.**   Yes.

24   **Q.**   If you could -- and you could tell, if you went to the

25   website, whether they were an online pharmacy or not?

**WAGNER - DIRECT / AULT**

1    **A.**    For the most part, yes.

2    **Q.**    So we can get rid of the second page.

3          And if you just will look at the first page, if you could

4    read in the middle of the page, there's something that says

5    "how it works and what we do for you."  Do you see that?

6    **A.**    Yes.  Are you talking about what they had on their

7    website, correct?

8    **Q.**    Yes.  Could you just read what they say, how they say it

9    works and what they do for you?  You can just read that

10    paragraph.

11    **A.**    Where it starts with "you now have a friend"?

12    **Q.**    Do you see in the middle of the page, it says "how it

13    works and what we do for you," and then it are starts under

14    that, "you can conveniently and comfortably"?

15    **A.**    "You can conveniently and comfortably talk with our

16    doctors, our pharmacies using the Internet."

17          So that would indicate they're an online pharmacy.

18    **Q.**    And can you read the next sentence, please.

19    **A.**    "You'll have your prescription written and your

20    medications prescribed quickly and easily from the comfort of

21    your computer.  You'll save valuable time because you won't

22    have to wait in a doctor's office to be seen."

23    **Q.**    Did you understand from reading this that for the Caroline

24    Street Clinic, you didn't have to see a doctor in order to get

25    your prescription; it would be done online?

**WAGNER - DIRECT / AULT**

1  **A.**    You don't have to see a doctor face to face, but you still

2  had to talk to a doctor there.

3  **Q.**    Did you understand that would be done online?

4  **A.**    Yes.

5  **Q.**    And what did you do when you received this information

6  about Caroline's Street Clinic?

7  **A.**    We tried to secure the account because it was an online

8  pharmacy.

9  **Q.**    Were you ever instructed by anyone at FedEx that if you

10  learned that -- this kind of information about an online

11  pharmacy, that you could get a prescription just based on a --

12  on a, I guess -- an Internet interaction with a doctor, that

13  you didn't have to see a doctor, that you were supposed to do

14  anything differently?

15  **A.**    No.

16  **Q.**    Were you ever instructed that if you saw an online

17  pharmacy that operated that way, you were supposed to report it

18  to Security, for example?

19  **A.**    No.  I didn't see any reason to because --

20  **Q.**    I'm just asking if anybody in FedEx ever instructed you

21  that if you saw a pharmacy that was operating like this, you

22  were supposed to do anything different than the normal just

23  secure them under the credit policy?

24  **A.**    All I did was secure the account.

25  **Q.**    Okay.  And so no one ever told you if you see an online

WAGNER - DIRECT / AULT

1    pharmacy operating where the patient doesn't have to meet with

2    the doctor but can do it all online and get a prescription,

3    that you need to report that to Security?

4    **A.**   No.

5    **Q.**   Or you need to report that to law enforcement?

6    **A.**   No.

7    **Q.**   Or you need to report it to your manager, anybody?

8    **A.**   No.

9    **Q.**   And I believe that you say in here at the top that once

10   you enter the website, you can get a listing of all the

11   medications that they sell.  You don't happen to remember what

12   they sold, do you?

13   **A.**   I do not recall -- remember.

14   **Q.**   That's fine.  It was a long time ago.

15         All right.  So if you could turn to Exhibit 30-66 now.

16   This is an email from Josh Croft dated June 2nd of 2005.

17         Is this also about the online pharmacy credit procedures

18   that we've been talking about?

19   **A.**   Yes.

20   **Q.**   Did you help draft this email?

21   **A.**   I don't remember having a part in drafting this email.

22   Usually an email is drafted from the person that's sending it.

23   **Q.**   Okay.  And in this email, he says now -- at the end of the

24   first paragraph that you have taken many steps to reduce the

25   exposure and now it's time to take another step to further

1   reduce the exposure.  And he talks about adding security

2   deposits and bank letters of credit in addition to the

3   procedures you were already taking.

4       Do you remember doing that, that there was an additional

5   step that you took to secure the online pharmacy accounts?

6   **A.**   I just remember we secured accounts.

7   **Q.**   All right.  And he also says that these procedures will be

8   applied to all online pharmacies.

9       So is that correct, that all online pharmacies were

10  secured under these procedures?

11  **A.**   Any online pharmacy that was considered a high risk would

12  have been secured under these procedures.

13  **Q.**   And did you ever have an online pharmacy that you

14  determined was not high risk?

15  **A.**   The others that we've already talked about.

16  **Q.**   So the established pharmaceuticals?

17  **A.**   Established pharmacies.

18  **Q.**   But other than established pharmaceutical chains like CVS

19  or Walgreens, was there ever another online pharmacy that you

20  determined was not high risk?

21  **A.**   I don't remember.

22  **Q.**   And Mr. Croft also said, "There are as many as 300 known

23  pharmacy accounts at this point."

24      Was that the pharmacy accounts that you had on the credit

25  list that you were maintaining?

1    **A.**    I don't remember how many accounts were on the list.

2    **Q.**    But the ones that you knew about, they were all on that

3    list?

4    **A.**    Yes.

5    **Q.**    If you could look at Exhibit 30-76.

6    **A.**    What was that?

7    **Q.**    30-76.  Hopefully it's the next one in your stack.  I

8    tried to put them in order and make it easy for you.

9         This is an email from you to Kimberly Abreu and David

10   Brown dated June 21st, 2005.  In this email, are you talking

11   about securing pharmacies under the credit policy we've been

12   talking about?

13   **A.**    Correct.  It's regarding the two listed in the subject.

14   **Q.**    And then in addition on the bottom, you say, "The attached

15   is the current listing of pharmacies that are known by the

16   Credit Department," and you ask him if he or his employees know

17   of any others that are not on the list, that you would like to

18   be notified.

19   **A.**    Yes.

20   **Q.**    So that's one of the ways that you learned about online

21   pharmacies?

22   **A.**    Yes.

23   **Q.**    And you sent -- and is this, what's attached -- is that

24   the list of online pharmacies that we've been talking about as

25   it existed at that time?

**WAGNER - DIRECT / AULT**

1    **A.**    That we have known about.

2    **Q.**    So you sent this to Dave Brown in Sales.  Do you recall

3    sending it to anyone else, like was there anybody outside of

4    Credit or Collections that you circulated the list to?

5    **A.**    I don't -- I don't remember, but I mainly dealt with Sales

6    and Collections.  I'm not saying that we didn't, but I just

7    don't remember.

8    **Q.**    Did you ever send the list to anyone in Security?

9    **A.**    Not that I can recall.

10   **Q.**    Did anybody in Security ever ask you for the list?

11   **A.**    Not that I can recall.

12   **Q.**    If you could look at 30-87.  And if you could flip to the

13   second page, there is an email from Herman Robertson to David

14   Waycaster, Cindy Blankenship, and you.

15        Was David Waycaster another employee in the Credit

16   Department?

17   **A.**    Yes.

18   **Q.**    And is this an example of one of the salespeople -- was

19   Herman a salesperson?

20   **A.**    Yes.

21   **Q.**    Was this an example of one of the salespeople informing

22   you of an online pharmacy or two online pharmacies that had

23   been closed in his district?

24   **A.**    Yes, but I don't see a reference to those names in this

25   email.

1    **Q.**    Okay.  But that's generally the subject of this email?

2    **A.**    Yes.

3    **Q.**    So in the last paragraph, he says he recently contacted

4    you to tell you that the pharmacy in his district had been shut

5    down by the DEA.  That was something that the salespeople did?

6    **A.**    Yes.

7    **Q.**    And why did they contact you when an online pharmacy was

8    shut down by the DEA?

9    **A.**    To make sure that the credit privileges and the account

10   was closed.

11   **Q.**    And why did you cash or close accounts that were shut down

12   by the DEA?

13   **A.**    If they were shut down, they were not going to be able to

14   pay their debt to FedEx and we did not want to incur more debt.

15   **Q.**    So he says in here that the websites were then moving

16   their shipping to a new location that he said is compliant, but

17   when someone went to check out the new shipping address, they

18   couldn't find anyone at that address.

19        What did you do when you received that information?  It's

20   all in that same paragraph where he says that he talked to you.

21   **A.**    I don't see what you're talking about.

22   **Q.**    He says, "I am now receiving calls from the websites

23   saying they are moving their shipping to pharmacies in other

24   locations that are compliant with DEA and even giving me their

25   DEA license number."

1      Do you see that part?

2  **A.**   Yes, I see that.

3  **Q.**   And then he says that he called Pam Chaplain to make her

4  aware that websites had shifted to her district.  She

5  investigated and found no one at that address.

6      So what did you do when you received this information?

7  **A.**   Without an account number, I wouldn't have been able to do

8  anything.

9  **Q.**   So when you received that type of information, you didn't

10  do anything other than secure the account?

11  **A.**   Without an account number or account name, I didn't have

12  anywhere to research.

13  **Q.**   At the beginning of this email, Mr. Robertson says he

14  feels like they don't -- "my sense is that we still don't have

15  a good understanding of how they operate."

16      Did you agree with that?  Did you feel like you still

17  didn't have a good understanding of how they operated?

18  **A.**   I didn't know much about the online pharmacies.  All I did

19  was secure the accounts.

20  **Q.**   Did you ever receive any training from anyone at FedEx

21  about how to identify a legitimate online pharmacy versus an

22  illegitimate one?

23  **A.**   How do you know?

24  **Q.**   So that's my question, is did you ever receive any

25  training from anyone at FedEx about how you would tell the

1   difference?

2   **A.**   No.

3   **Q.**   And did you ever receive any instructions on what to do if

4   you suspected that an online pharmacy was not operating

5   legitimately?

6   **A.**   Repeat, please.

7   **Q.**   Did you ever receive any instructions on what to do if you

8   had suspicions that an online pharmacy was not operating

9   legally?

10  **A.**   I don't think they would contact the Credit Department

11  regarding that.

12  **Q.**   I'm just asking if you ever received any instructions on

13  what to do?

14  **A.**   I don't recall.

15          **MR. GOLDMAN:**   Objection.   This has been asked and

16  answered several times.

17  **BY MS. AULT:**

18  **Q.**   Did anyone provide you with any information about what the

19  DEA said made an online pharmacy legal versus illegal?

20  **A.**   Did anyone contact me?   Not that I can recall.

21  **Q.**   And were you aware of any meetings --

22          **THE COURT:**   Let me ask you this.   Did anybody from the

23  DEA or FedEx tell you, look, legal pharmacies require a

24  face-to-face examination.   And if there's not a face-to-face

25  examination, it's an illegal operation.   Did anybody tell you

WAGNER - DIRECT / AULT

1   that?

2            THE WITNESS:  No.

3            THE COURT:  Are you -- you're not a doctor; right?

4            THE WITNESS:  No.

5            THE COURT:  Have you received any medical training?

6            THE WITNESS:  No.

7            THE COURT:  Are you familiar with the standards of

8   professional responsibility for doctors?

9            THE WITNESS:  No.

10           THE COURT:  Did anybody at FedEx tell you, *Here are*

11  *the standards of professional responsibility for physicians.*

12  *You're in the Credit Department.  We'd like to educate you on*

13  *the standards of professional responsibility for doctors*?

14  Anybody tell you that?

15           THE WITNESS:  No.

16           THE COURT:  Well, did the DEA come by, as an example,

17  and say, you know, *We've got this serious problem in America*

18  *and so we would like to educate you, credit manager, on what's*

19  *legal and what's not legal?*  The DEA, did they come by and tell

20  you that?

21           THE WITNESS:  No.

22           THE COURT:  Okay.  So I just wonder how long we're

23  going to go through this because I'm very familiar with the

24  process, and if what your point is gee, nobody from -- nobody

25  at FedEx told her what was legal and what wasn't legal, that's

1    correct.  I understand that.  I understand that.

2         And these memos -- what these memos demonstrate is, as I

3    understand it -- is that if -- that online pharmacies, other

4    than established brick and mortar, Walgreens, with a presence,

5    an online presence, but the rest of them presented a credit

6    risk over time, and part of that credit risk was that they be

7    closed, and if they were closed, nobody was going to get paid.

8         So I really do know that, and these memos demonstrate

9    that.  They demonstrate a few more things, too, by the way, but

10   at least as to that point, I think that really is well

11   established.

12        **MS. AULT:**  Thank you, Your Honor.

13   **Q.**  If you could turn to Exhibit 30-103.  At the bottom of

14   that first page, this is an email that is sent out from you; is

15   that correct?

16   **A.**  Yes.

17   **Q.**  If you could flip to the second page, is this another

18   communication of the sales procedures that we've been talking

19   about?

20   **A.**  Yes.

21   **Q.**  And did you help draft these?

22   **A.**  I do not remember being part of this draft, no.

23   **Q.**  Just one question.  If we could go to the third page.  It

24   says at the top, "Many of these companies operate outside

25   federal and state regulations over the sale of controlled drugs

1    which require diagnosis and prescription by a licensed

2    physician."

3         Did you understand that those were the regulations that

4    they were operating outside of, the regulations that applied to

5    diagnosis and license by a registered physician?

6    **A.**   I don't even know if I even read this.  My part in this

7    was just I had the connections to get it in the sales brief.

8    My understanding of the state law and regulations, I don't know

9    what the state law regulations were.

10   **Q.**   Okay.  Could you turn to Exhibit 26-34.  If you can look

11   at the bottom of page where it says, "Bonnie Wagner wrote" and

12   then there is a, "privileged and confidential, do not forward

13   to the customer."  Do you see that?

14   **A.**   Yes.

15   **Q.**   Is that the standard email that you would send out when

16   you wanted to get an account secured under the online pharmacy

17   credit procedures?

18   **A.**   Yes.

19   **Q.**   And then if you look at the next email up where it says

20   "Bonnie, this customer was closed down the following week after

21   opening" --

22   **A.**   Yes.

23   **Q.**   -- "by the DEA in December."  Okay.

24        So is that another salesperson informing you that the DEA

25   had shut down this account, Medical Foundations?

**WAGNER - DIRECT / AULT**

1   **A.**   Yes.  Sales stated that, yes.

2   **Q.**   And then it says, "He has since moved back to Florida and

3   is now operating under Saveon Rx."  Do you see that part?

4   **A.**   Yes.

5   **Q.**   And then you respond, "We need to move fast on Saveon Rx."

6   What did you mean by that?

7   **A.**   The account was already established, but it was not

8   secure.

9   **Q.**   So you meant *we needed to get it secured quickly?*

10  **A.**   Correct.

11  **Q.**   Why did you need to get it secured quickly?

12  **A.**   Because it was not secured.

13  **Q.**   Did you need to get it secured quickly because he had

14  already been shut down by the DEA and you were concerned that

15  he was going to be shut down again?

16  **A.**   No.  That's not the reason I was trying to get it secured.

17  He's a high-risk customer.

18  **Q.**   But is that why you said you needed to move fast?

19  **A.**   We needed to move fast because the account was not

20  secured.  And if you'll notice, that account number never

21  shipped, the one that was closed.  They had never shipped with

22  FedEx.

23  **Q.**   Okay.  So did you then go make sure that Saveon Rx was

24  secured under the credit policy?

25  **A.**   I did attempt to secure the account, yes.

**WAGNER - DIRECT / AULT**

1  **Q.**   And did FedEx keep shipping for Saveon Rx?

2  **A.**   If they were secured, then, yes.

3  **Q.**   And you were aware at that time that Florida had pharmacy

4  regulations in place that regulated online pharmacies?

5  **A.**   I was aware that Florida had state regulations?

6  **Q.**   Yes.

7  **A.**   If I was notified, yes, I would know.

8  **Q.**   Well, I'm asking you, did you know?

9  **A.**   Did I know?

10  **Q.**   Uh-huh.

11  **A.**   I don't recall.

12  **Q.**   All right.  If you could go to Exhibit 30-52.  And if you

13  could flip to the second page.  And you'll see at the top of

14  that page that there's an email from you to Cindy Blankenship.

15  **A.**   I'm sorry.  I'm still looking for it.  It's hard to --

16  **Q.**   Well, let's do it this way.  Can you read it on the

17  screen?

18  **A.**   Yes, I can.

19  **Q.**   All right.  And then there is, in the -- kind of the

20  middle of that paragraph, there is a sentence that starts,

21  "Healthcare Marketing is an account we are all familiar with,"

22  and then it says, "Since Florida is enforcing their new

23  pharmacy regulations, a lot of these online pharmacies are

24  going to other states to do business."

25       So did you know that Florida had regulations that were

1  causing the online pharmacies to move to other states?

2  **A.**   I don't recall the email.  I would have probably gotten

3  that information from the local salespeople in that area.

4  **Q.**   Do you know if FedEx did anything differently with online

5  pharmacies that were located in Florida or shipping into

6  Florida after learning that there were Florida pharmacy

7  regulations in place?

8  **A.**   I'm not sure I quite understand.  Was I -- what did we --

9  did we do anything different once the regulations were in

10  place?

11  **Q.**   Yes.

12  **A.**   We still -- the Credit Department -- I would still secure

13  accounts, even with regulations in place.

14  **Q.**   All right.  And you still had accounts that were in

15  Florida?

16  **A.**   I don't -- I don't know where the accounts were located.

17  I can't remember.

18  **Q.**   Okay.  Well, when you got the information that Saveon Rx

19  was opening up in Florida, you didn't have to do anything

20  differently because he was in Florida?

21  **A.**   Correct.  He was an online account, so I secured the

22  account.

23  **Q.**   Okay.  And then if you could go to 26-45.  Actually, I'm

24  sorry.  If you could go to 26-57.  And this is an email from

25  you, again to Cindy Blankenship, regarding Kenwood Pharmacy.

**WAGNER - DIRECT / AULT**

1    Is that what you have in front of you?

2    **A.**    Yes.

3    **Q.**    And Claude is the owner of the Saveon Rx account that we

4    were just talking about?

5    **A.**    I didn't remember who the owner was until I talked with

6    you Sunday.

7    **Q.**    All right.  Well, if you look at 26-45 -- can you flip to

8    the other exhibit, 26-45.  If you look at the first paragraph

9    where it says, "We are processing a large refund for Saveon Rx.

10   You will recall this is Claude, aka Cosmo."

11        Does that refresh your memory that Claude was Saveon Rx?

12   **A.**    No.  I didn't -- as I explained, when you're securing

13   accounts, the names, who they own, it all becomes just one.  It

14   just flows one after the other.

15   **Q.**    But in this other second email talking about Kenwood

16   Pharmacy, the person who is Claude, is that the same Claude who

17   is referenced here, the Claude who owns Saveon Rx?

18   **A.**    Yes.

19   **Q.**    And so if you look at 26-57, this said that Mary called

20   you and told you that DEA was investigating Claude so now he's

21   contracting with other pharmacies so he can continue to stay in

22   business.

23        What did you do when you learned that information?

24   **A.**    We would have reviewed the accounts to make sure they were

25   secured.

**WAGNER - DIRECT / AULT**

1   **Q.**   The other accounts that he's using?

2   **A.**   He's not really using them.   They are individual -- other

3   pharmacies that he was using as -- to ship packages.

4   **Q.**   Okay.

5   **A.**   But he would not have been responsible.   The person that

6   shipped the package is responsible.

7   **Q.**   Okay.   And so you went and made sure -- she sent you a

8   list of who those people were and you went and made sure they

9   were secured?

10  **A.**   Yes.

11  **Q.**   And you then also say in there, "More than likely, he will

12  be closing his location in Florida."

13       What did you mean by that?

14  **A.**   That would have been information that I would have gotten

15  from our field people.

16  **Q.**   Okay.

17  **A.**   Because they're out there.   I'm not.   I'm just behind a

18  phone.

19  **Q.**   But you thought that he would be closing his location in

20  Florida because he was being investigated by the DEA?

21  **A.**   Yes.   We did not know why he was being investigated,

22  but . . .

23  **Q.**   But that was your experience, that usually if you learned

24  that someone was being investigated -- an online pharmacy was

25  being investigated by the DEA, that usually they were then shut

WAGNER - DIRECT / AULT

1    down?

2    **A.**   Not necessarily.

3    **Q.**   But from your experience, that's what you knew?

4    **A.**   From the ones that actually got shut down, then we would

5    know.  But if they were being investigated and got shut down, I

6    did not -- I did not know any of those.

7    **Q.**   Okay.  When you testified before the grand jury on

8    April 27th of 2010, at page 47, lines 14 through 17, you were

9    asked:

10        "**Q.**  If somebody is investigated by the DEA, usually

11        they're shut down?"

12       And you responded:

13       "**A.**  From the ones that we received, yes."

14       If you could go to Exhibit 16-82.  Did you find that one?

15   **A.**   I see 16-86.  Let me look through this stack.

16   **Q.**   Maybe if you could just look at the screen.

17       And if you could blow up the top.

18       Is this another instance in which you were informed by a

19   salesperson that an online pharmacy had been shut down?

20   **A.**   Yes.

21   **Q.**   All right.  And you say that you secured the account, and

22   at the end you say, "It is interesting that Gaston told me he

23   was not an Internet pharmacy; that he shipped diabetic

24   supplies.  I guess the DEA believed that story about the same

25   as I did."

1      So did you not believe Gaston when he told you that he was

2   shipping diabetic supplies?

3   **A.**   I don't even remember who Gaston was.  But I can tell you

4   what is said in emails that you think are privileged, you joke

5   around a lot.

6   **Q.**   Okay.  But you didn't believe him when he told you?

7   **A.**   I don't remember him.

8   **Q.**   Okay.  In Exhibit 30-103 -- and she'll just bring it up on

9   the screen.  That will probably be easier.

10      If you could go to page 2.

11          **MR. GOLDMAN:**  I'm sorry, Kirstin.  What Exhibit?

12          **MS. AULT:**  30-103.

13   **Q.**   Where it says an online pharmacy -- what is an online

14   pharmacy in the middle.

15   **A.**   Uh-huh, yes.

16   **Q.**   There is a reference to diabetic medications.  Is the

17   reason why that's there because sometimes people would tell you

18   that they're shipping diabetic medications, but in fact they're

19   not?

20   **A.**   They would not tell me what they were shipping.  My

21   conversations with the account was strictly on securing the

22   account.

23   **Q.**   Now if you could go to Exhibit 40-81.  If you could look

24   at the email in the middle of the page.  Was this another

25   situation where you learned from Sales that an online

**WAGNER - DIRECT / AULT**

1   pharmacy -- I guess in this case the people were being

2   prosecuted?

3   **A.**   Is this a notification from Sales to the Credit

4   Department?  Yes.  I was no longer in the Credit Department at

5   that time.

6   **Q.**   All right.  But you respond to this notification from

7   Sales; is that correct?

8   **A.**   No.  I sent it to the Credit Department to let them

9   respond to Sales.

10  **Q.**   Here from Bonnie Wagner, you are responding to Scott

11  Sutterman.  Is he someone in Sales?

12  **A.**   Yes.

13  **Q.**   You say at the end of the second paragraph, "Any time

14  there is a shutdown, it affects the other online pharmacies

15  that we may be doing business with.  We may want to review our

16  existing file of current online pharmacies to make sure we are

17  covered."

18       Why did you think that you should do that?

19  **A.**   Because if one location is shut down or closed for any

20  reason, then that means that volume is going to go to --

21  supposedly to other pharmacies, which would increase the risk

22  of a larger debt.

23  **Q.**   Okay.  And does it increase the risk that the other

24  accounts are also going to get shut down?

25  **A.**   I would not have a clue.

1  **Q.**   All right.  Because when the DEA shuts down one, don't

2  they usually start looking at their associates and then go and

3  take action against them?

4  **A.**   I wouldn't know.

5  **Q.**   When you testified before the grand jury on April 27th in

6  2010 you were asked:

7       "**Q.**   You're saying there any time there is a shutdown, it

8       affects the other online pharmacies that we may be doing

9       business with.  What did you mean by that?"

10  And you responded:

11       "**A.**   Because usually when they shut down one, they start

12       looking at who they were doing business with, and then

13       that would cause another investigation, more than likely.

14       I'm not for certain, but that's, you know, pretty normal

15       for them to start looking at their associates of who they

16       were doing business with."

17  **A.**   That was just an opinion at that time.  I don't know how

18  the DEA operates.  Me personally, if I was in that business, I

19  would want to look at associates.

20       **MS. AULT:**  We don't have any further questions,

21  Your Honor.

22       **THE COURT:**  Okay.  Let's take a recess.  We will be in

23  recess until 10:30.

24            (Recess taken at 10:14 a.m.)

25            (Proceedings resumed at 10:33 a.m.)

1          THE CLERK:  Please be seated.

2          MR. GOLDMAN:  Good morning, Your Honor.  The Defense

3    has no questions.

4          THE COURT:  Oh, okay.  Thank you.  You're excused.

5          THE WITNESS:  Thank you.

6                    (Witness excused.)

7          THE COURT:  So now we resume; is that right?

8          MR. RUBY:  Your Honor, I'm ready to resume my

9    cross-examination of Agent Chin, if the Court please.

10          THE COURT:  Sure.

11                    <u>JASON CHIN</u>,

12   called as a witness for the Government, having been previously

13   duly sworn, testified further as follows:

14          THE COURT:  Please be seated.  You're still under

15   oath.

16      Okay.  You may go.

17          MR. RUBY:  Thank you.

18              <u>CROSS-EXAMINATION</u>   (resumed)

19   BY MR. RUBY:

20   Q.   Agent Chin, we didn't learn very much about your

21   background yesterday because we didn't ask.  Tell us a little

22   bit about your education and your prior experience before you

23   joined DEA, please.

24   A.   Sure.  I attended the University of Houston, and I have a

25   business degree in finance.  And after that, I worked briefly

1    with an oil and gas company working on mapping software.  And

2    then shortly after that, I worked for Shell Trading Gas & Power

3    as a credit analyst, and then I was hired by DEA.

4    **Q.**   All right.  DEA is your first position in law enforcement,

5    was it?

6    **A.**   Yes, it is.

7    **Q.**   Now, yesterday in your testimony, you used the phrase a

8    number of times, and I'm not criticizing, but you referred to

9    "shutting down" or "we shut down an entity" or "this entity was

10   shut down."  Do you recall that generally?

11   **A.**   That term, yes.

12   **Q.**   What does that mean?  As DEA agents talk about a shutting

13   down a pharmacy, what were you describing?

14   **A.**   That would incorporate serving a search warrant on a

15   pharmacy or revoking or suspending a registration, or it could

16   include arresting individuals who were involved in an online

17   pharmacy.

18   **Q.**   Okay.  Now -- and, again, I'm not arguing, but are you

19   saying that just as you use the term within DEA, serving a

20   search warrant is a shutdown of a pharmacy?

21   **A.**   It could -- it could -- yes, it could include a shutdown

22   of a pharmacy because there are times where a search warrant

23   was served, and then the pharmacy wouldn't -- wouldn't operate

24   anymore.

25   **Q.**   Well, aside from the immediate turmoil and interruption of

1   a search warrant being served on any business, is it your

2   experience in DEA that when a search warrant is served, the

3   next day the company can't reopen its doors and resume business

4   as it was doing before it got the search warrant?

5   **A.**   I mean, that is -- that is possible that businesses can do

6   that, can reopen again after a search warrant.

7   **Q.**   All right.  So if the -- do I have it right that the

8   service of a search warrant does not in and of itself, unless

9   some other process is going on, require a pharmacy to

10  discontinue business either temporarily or permanently?

11  **A.**   The service of a search warrant itself doesn't necessarily

12  do that.  It would be up to the business operator to decide to

13  stop.

14  **Q.**   Okay.  And then it's been part of your experience, I take

15  it, that you have arrested people sometimes in pharmacies; is

16  that right?

17  **A.**   That's -- in online pharmacies that I have been present on

18  search warrants?

19  **Q.**   Yes.

20  **A.**   The people were not arrested at the time.

21  **Q.**   Okay.  Well, is there any part of the DEA's work which

22  involves doing something in respect to a pharmacy that actually

23  shuts it -- or can shut it down in the sense of lock the doors,

24  turn out the lights, no more customers, period?

25  **A.**   A situation in which a search warrant may be served in

1    conjunction with a suspension order, for example, where a

2    registration is -- a DEA registration is suspended, or there

3    could be times where a search warrant could happen in

4    conjunction with a state action and the license taken away

5    or --

6    **Q.**   Let me ask you -- I'm sorry.

7    **A.**   Or suspended.

8    **Q.**   I apologize for interrupting you.  I'll try not to do

9    that, and you be sure and finish your answers.  Okay?

10        Maybe I should be asking you specifically about, then,

11   suspension orders.  Is there such a thing in the DEA universe

12   called a suspension order?

13   **A.**   Yes.

14   **Q.**   All right.  And what is that?

15   **A.**   That's where a DEA registration is suspended.

16   **Q.**   All right.  And are there suspension orders that always --

17   strike that.

18        Do suspension orders always last for a particular period

19   of time, or are there, for example, 10-day suspension orders or

20   60-day suspension orders or indefinite suspension orders?

21   **A.**   I'm not familiar with time frames attached to a suspension

22   order.  I'm just familiar with a suspension order suspending a

23   registration.

24   **Q.**   All right.  And have you served suspension orders on

25   pharmacies?

**CHIN - CROSS / RUBY**

1  **A.**   I personally have not.

2  **Q.**   All right.  Have you worked on the preparation of

3  paperwork for suspension orders?

4  **A.**   I've never worked on a situation where I've requested a

5  suspension order.

6  **Q.**   Who signs suspension orders or issues them?

7  **A.**   It would be the -- the suspension order would be the

8  administrator or deputy administrator of the DEA.

9  **Q.**   All right.  So in your understanding -- I'm not asking for

10  a legal opinion, but in your understanding, a suspension order

11  is something that is not signed by a judge in a courtroom like

12  the one we're in now; is that right?

13  **A.**   It's -- right.  It's signed by someone within DEA.

14  **Q.**   All right.  And, again, I'm not asking you for a legal

15  opinion, but what is your understanding of the process by which

16  a suspension order gets submitted to the administrator who then

17  either signs it or not?

18  **A.**   I am -- because I don't work on the diversion side, I am

19  not -- I don't know all the details about the process itself.

20  **Q.**   Well, are you trained in the kinds of facts that are

21  pertinent to the decision to issue or not to issue a suspension

22  order?

23  **A.**   Again, I'm not familiar with that particular process of a

24  suspension order because I don't -- I don't work on those.

25  **Q.**   Well, you're an investigator; is that right?

1   **A.**   Yes.

2   **Q.**   All right.  And you write reports of your investigations?

3   Yes?

4   **A.**   That's correct.

5   **Q.**   As far as you know, do your reports of investigations ever

6   get into the process by which a suspension order is being

7   processed?

8   **A.**   I would believe that some of the information I've gathered

9   as part of an investigation could be incorporated in a request.

10  **Q.**   Well, yesterday when you told us about pharmacies, online

11  pharmacies, that had been shut down, were any of those

12  shutdowns associated with suspension orders?

13  **A.**   For the fulfillment pharmacies, some of them were, yes.

14  **Q.**   All right.  And do you have any information at all -- if

15  you don't, I'll move on -- but do you have any information at

16  all as to how it came to be that certain online pharmacies were

17  served with suspension orders and many online pharmacies were

18  not?

19  **A.**   Can you ask that -- I'm sorry.  Can you ask that question

20  again?

21  **Q.**   Sure.  Can you help us to understand the process by which

22  certain online pharmacies were served with suspension orders

23  but other online pharmacies continued to operate in the absence

24  of suspension orders?

25  **A.**   I wouldn't -- I don't believe I'd be able to answer that.

1  **Q.**  Again, without asking you for a legal opinion, can you

2  tell us generally what the grounds or bases are for a

3  suspension order when the DEA administrator decides to sign

4  one?

5  **A.**  Again, I do not work on the suspension orders, so I don't

6  know what criteria is involved.  I'm not part of that process.

7  **Q.**  Does it ever happen in your experience of dealing with

8  online pharmacies that a registration is not renewed and they

9  have to turn out the lights and lock the doors?

10  **A.**  There may be times where a person who owns a pharmacy may

11  decide not to do business anymore.

12  **Q.**  Okay.  And, indeed, any business owner has the right to

13  stop doing business, generally speaking; is that right?

14  **A.**  A business owner, yes.

15  **Q.**  All right.  But leaving that aside, leaving aside a

16  situation where the proprietor of an online pharmacy decides to

17  retire or take up another line of work, has it ever happened in

18  your experience that the registration for an online pharmacy

19  was not renewed and, therefore, the business ceased at that

20  pharmacy?

21  **A.**  I don't deal -- again, I don't deal with the registration

22  and renewing of the licenses, so I -- I wouldn't be able to

23  speak to that.

24  **Q.**  Well, you've worked on many investigations over your

25  career; is that right?

CHIN - CROSS / RUBY

1   **A.**   I've worked on several of the online pharmacy

2   investigations, yes.

3   **Q.**   All right.  Well, how many?

4   **A.**   Well, there was SafeScripts.  There's United Mill

5   Pharmacy.  There's Pitcairn.  I worked on the True Value Pharma

6   accounts -- I'm sorry -- True Value Pharma investigation, and

7   also I've been involved in the Safetrust processing or Affpower

8   investigation.

9   **Q.**   All right.  And as to these investigations that you've

10   just mentioned in answer to my question, did some or all of

11   them involve organizations which operated through more than one

12   pharmacy?

13   **A.**   You mean that these online pharmacy organizations utilize

14   different fulfillment pharmacies?

15   **Q.**   Yes.

16   **A.**   Yes, that did occur.

17   **Q.**   Has it ever happened in the course of any of your

18   investigations into online pharmacies that in the course of

19   your investigation you were advised, "Oops.  Their license was

20   not renewed and, you know, you don't need to go to that

21   location anymore because the lights are turned off"?

22   **A.**   I think I've seen some situations involving, for example,

23   United Mill Pharmacy Service.  I've seen some instances where a

24   diversion investigator may go by the business and see it

25   doesn't appear to be operating anymore.

1    **Q.**   All right.  And --

2               **THE COURT:**  That's actually not the question, as I

3    understand the question.  The question is:  Are you aware of a

4    case in any of the ones you've investigated -- I don't know,

5    10, whatever that number is -- in which the license -- that the

6    licensee applied for a renewal of his or her license and that

7    renewal was denied by the DEA?  Are you aware of any such case?

8          So I'm not asking whether it went out of business.  I'm

9    not asking whether people were arrested.  I'm not asking any of

10   that.  I'm just asking this type of case.  Do you understand

11   the type of case I'm asking?

12              **THE WITNESS:**  Yes.  Yes, sir.

13              **THE COURT:**  Okay.  Are you aware of any?

14              **THE WITNESS:**  I'm not aware of any.

15              **THE COURT:**  Okay.

16   **BY MR. RUBY:**

17   **Q.**   Well, Agent Chin, isn't it true that for a number of years

18   that you've been working as an investigator for the DEA, the

19   DEA made public statements that there are a large number of

20   Internet pharmacies operating outside the law?

21   **A.**   Just a general statement?

22   **Q.**   Just a general statement, yes, from DEA there are

23   thousands of online pharmacies out there and many of them --

24   most of them are operating outside the law.

25   **A.**   I recall statements of -- like publications, for example,

1  like educational publications, just warning about the dangers

2  of online pharmacies and that they would be operating outside

3  the law.

4  **Q.**   To your knowledge during your employment with DEA, did DEA

5  ever undertake any systematic effort to nonrenew or revoke or

6  suspend the licenses which allowed these unscrupulous operators

7  to continue to sell drugs to the population?

8  **A.**   Systematic?

9  **Q.**   Systematic, yes.  A program.  A policy.  Resources.  A

10  plan.  Yes, systematic.

11  **A.**   I just am aware of, through investigations of online

12  pharmacies, those type of actions in terms of suspensions.

13  **Q.**   Okay.  Now --

14      **THE COURT:**  Well, I think the question -- and maybe

15  you've answered it, and maybe the answer is no, but I want to

16  make sure that is your answer.

17      Is your answer no; that is, you are not aware of any

18  systematic program of the DEA to take these online pharmacies

19  out of business by means of a suspension or nonrenewal of their

20  license?

21      **THE WITNESS:**  In terms of a stated course?

22      **THE COURT:**  Yeah.  Right.  "This is what we're going

23  to do.  Look at these people.  There are hundreds or thousands

24  of online pharmacies.  You know what we're going to do?  We're

25  not going to renew their license.  That's one way to put them

1   out of business."

2        Now, did DEA -- was there such a program to do that to

3   your knowledge?

4        THE WITNESS:  I'm not aware of a specific program in

5   that sense.

6        THE COURT:  Well, you're aware of a lot of programs

7   that DEA has; right?  You're aware that DEA has said there are

8   a thousand or a large number of online pharmacies out there

9   that are engaged in illegal activity?  Are you aware of that?

10        THE WITNESS:  I'm aware that DEA has put out notices,

11   yes.

12        THE COURT:  And you're aware that every day you went

13   to work, you went to work on -- for how many years with DEA?

14        THE WITNESS:  I've been with DEA for 11 years.

15        THE COURT:  Eleven years.  Every day you went to work,

16   at least up to some particular point in time, investigating and

17   enforcing the law as DEA saw it with respect to these online

18   pharmacies.  So you're aware of what the tools were; right?

19        THE WITNESS:  I'm aware of what the tools were, yes.

20        THE COURT:  And, as a matter of fact, you're aware of

21   a tool that on occasion you saw work, which is serving a notice

22   of suspension?

23        THE WITNESS:  Yes.

24        THE COURT:  So you're aware that that's one of the

25   things.

1          THE WITNESS:  Yes.

2          THE COURT:  So my question is:  Are you aware that

3     this was a program -- that DEA embarked upon a program saying,

4     "The way to approach this problem is to have -- is to suspend

5     licenses for all of these illegal operations"?  Are you aware

6     of such a program?

7          THE WITNESS:  I would say that suspending licenses was

8     a tool that was available; but whether or not it was

9     necessarily a specific program, I wouldn't be -- I'm not aware

10    of that.

11         THE COURT:  Well, when you say you wouldn't be, I'm a

12    little -- I don't know what that means.  I mean, I don't

13    know -- are you saying you -- there could have been a program

14    and you as the agent conducting these investigations just

15    wouldn't know about it?  You're not saying that, are you?

16         THE WITNESS:  Well, what I'm saying is there was an

17    online pharmacy problem.

18         THE COURT:  Yeah.

19         THE WITNESS:  And one of the priorities, at the time

20    that I was working on this, by DEA was to do some sort of

21    action against these online pharmacies.

22         THE COURT:  Okay.  And did they say, "Look, this is

23    our plan.  This is our plan.  Let's -- there are a thousand of

24    them out there.  Let's issue a thousand suspensions or 500

25    suspensions or 800 suspensions"?  Are you aware that that's an

1    approach that they took?

2            **THE WITNESS:**  I'm aware of one of the options that we

3    could use -- one of the tools we could use to deal with this

4    problem was to suspend.

5            **THE COURT:**  And believe me, the Defense agrees with

6    that.

7            **MR. RUBY:**  Indeed.

8            **THE COURT:**  That's right.  So we're all in agreement,

9    you could have done it.

10           Now the question is:  Were you aware of a program to do

11   it?  And I don't mean just on an occasion do it.  I mean a

12   systematic program.

13           **THE WITNESS:**  I'm not aware of a systematic program

14   for that.

15           **THE COURT:**  Okay.

16   **BY MR. RUBY:**

17   **Q.**   Mr. Chin -- or Agent Chin -- excuse me -- I'm going to

18   show you a couple of exhibits that I'm going to display on the

19   screens, and I hope you'll be able to follow along.  We can dig

20   up a paper copy as needed, but for now would you try to follow?

21   I can move more quickly if we're all using the screen.

22           So could we please put up 60-017?  This was -- and just to

23   orient you, this was the testimony of Mr. Rannazzisi, a high

24   officer of the Drug Enforcement Administration.

25           And, Todd, could you go, please, to Bates page 139.  And

1    would you go, please -- can you magnify the paragraph that

2    begins "Pharmaceuticals can be purchased legitimately"?

3         All right.  Now, Mr. Rannazzisi reports in his testimony

4    that pharmaceuticals can be purchased legitimately over the

5    Internet, and he makes reference to 12 DEA-registered

6    pharmacies that are included on something called the VIPPS,

7    V-I-P-P-S, list.  Do you see that?

8    A.   Yes, I do.

9    Q.   And VIPPS came up yesterday in some testimony.  You recall

10   that generally?

11   A.   Yes.

12   Q.   All right.  And so what he's saying here is that there are

13   12 DEA-registered pharmacies that are included on this list,

14   and they're okay.  They're appropriately licensed.  They're

15   legitimately operating.  They're all good, these 12 pharmacies.

16        And then he goes on to say that:  (reading)

17             "Most other Internet pharmaceutical sales in the

18        United States are legally suspect and potentially very

19        dangerous."

20        Do you see that?

21   A.   Yes, I do.

22   Q.   So he's telling Congress and the industry that other than

23   12 -- excuse me, I'll keep my voice down -- that other than 12

24   pharmacies in the United States, other Internet pharmacy sales

25   are legally suspect and potentially very dangerous.  Is that

1    how you read that?  That's what he's saying; right?

2    **A.**    Just there, yes.

3    **Q.**    And we know, don't we, that these Internet pharmaceutical

4    sales, we know from your testimony yesterday, that most of

5    these sales are coming from chemicals that are sold by licensed

6    distributors and manufacturers; right?

7    **A.**    Yes, the drugs are coming from distributors.

8    **Q.**    All right.  And they're coming from distributors and then

9    they're going to actual pharmacies, which are also registered

10   by the DEA; right?

11   **A.**    That's correct, but I interpret this to say that

12   Mr. Rannazzisi is saying that if you need something to check to

13   verify that the online pharmacies are legitimate, you can use

14   this VIPPS list.

15   **Q.**    Well, okay.  But the VIPPS list has 12 pharmacies on it,

16   and this is a big country.

17         I'm sorry.  May I withdraw that, Your Honor?  That's not a

18   question.

19         Agent Chin, do you read this to point out that, yes, you

20   can look at a list and you'll find 12 pharmacies in the

21   United States which have gotten the blessing of this NABP;

22   right?

23   **A.**    I read this to mean that here's a source you can go to to

24   identify a safe and legitimate online pharmacy.

25   **Q.**    And at least it was Mr. Rannazzisi's conclusion that most

1    other Internet pharmaceutical sales in the United States are

2    legally suspect and potentially very dangerous?  At least

3    that's what he's saying; is that right?

4    **A.**   Yes.

5    **Q.**   All right.  And we know, don't we, that these

6    pharmaceutical sales, the potentially very dangerous ones that

7    he's referring to, are coming from pharmacies that are dealing

8    in licensed products, and they're selling them pursuant to

9    registrations that are issued and renewed by the DEA; right?

10   **A.**   They are coming from pharmacies, yes.

11   **Q.**   Licensed pharmacies?

12   **A.**   Yes.

13   **Q.**   All right.  And in your experience -- this was in 2005,

14   which I think is around the time you went to work for DEA --

15   did DEA, to your knowledge, try to address this problem by

16   scrutinizing, examining, if necessary suspending or revoking or

17   declining to issue or renew the licenses of this large cohort

18   of businesses that are jeopardizing the health of the country?

19   **A.**   I'm aware that DEA was trying to address the problem, and

20   that one of the tools that DEA could use would be to suspend

21   the registrations of these pharmacies.

22   **Q.**   Okay.  Now, how many times, to your knowledge, if you

23   know, in the last 11 years has DEA issued an immediate

24   suspension order?

25   **A.**   How many times?

1    **Q.**   How many times?

2    **A.**   I wouldn't -- I don't know the exact number of times.

3    **Q.**   I won't -- no one will be displeased if you don't know the

4    exact number; but can you give us, without guessing, an

5    approximate number of times that DEA has issued an immediate

6    suspension order?

7    **A.**   I don't know how many.  I don't think I could even

8    approximate a number because I don't -- I don't know how many.

9    **Q.**   Could it be zero?

10            **MS. AULT:**  Objection, Your Honor.  Vague.  Is he

11   asking how many in the investigations he worked on or how many

12   nationally?

13            **THE COURT:**  I think he'll take anything.

14            **MR. RUBY:**  Yeah.  It's a very -- yeah, it's a very

15   broad question.

16   **Q.**   Without guessing, can you estimate how many times over the

17   last 10 or 11 years, approximately, DEA has actually issued an

18   immediate suspension order which was then delivered to a

19   pharmacy so that pharmacy had to stop what they were doing?

20   **A.**   I can think of the Superior Drugs immediate suspension.

21   And then other times an immediate suspension wasn't necessarily

22   needed because when an inspection was done on some of these

23   fulfillment pharmacies, the owners would voluntarily give up

24   the registration.  So an immediate suspension wouldn't be

25   needed.

1   **Q.**   All right.  So the answer to my question -- and I'll give

2   you a chance to expand on this.  We'll talk some more about

3   it -- but the answer to my question is you know of one instance

4   where an immediate suspension order was issued and served and

5   used to require a pharmacy to discontinue?  Yes?  Superior?

6   **A.**   Yes, Superior.

7   **Q.**   All right.  And that's the one you know about; fair

8   enough?

9   **A.**   Yes.

10  **Q.**   When was the immediate suspension order served on

11  Superior?

12  **A.**   It was in May 2010.

13  **Q.**   May of 2010, okay.

14      Now, I'd like to show you, please, an exhibit that's been

15  marked as 100-655.

16          **MR. RUBY:**  May I approach the witness, Your Honor?

17          **THE COURT:**  Go ahead.

18          **THE WITNESS:**  (Witness examines document.)

19  BY MR. RUBY:

20  **Q.**   Agent Chin, you've seen this before, haven't you?  This is

21  what we discussed yesterday, the 2006 request for an immediate

22  suspension order from Agent Williams?

23  **A.**   Yes, I've seen this before.

24          **MR. RUBY:**  I'd move this in evidence, Your Honor.

25          **THE COURT:**  It's admitted.

CHIN - CROSS / RUBY

1          **MS. AULT:**  Objection, Your Honor.  This is pure

2     hearsay.  It's a report by an agent who is not here, is not

3     testifying.  It's --

4          **THE COURT:**  It's not a record, is that right, not a

5     business record of the Government?

6          **MS. AULT:**  It's not a business record.

7          **THE COURT:**  Really?  What does the Government do?

8     What do you call this?

9          **MS. AULT:**  Your Honor, this is a -- this is a report

10    written by an agent.  The agent is not testifying.  There's

11    no --

12         **THE COURT:**  Well, why don't you bring in the agent,

13    and then your agent can explain it?

14       Are you saying this isn't -- what are you saying this is?

15         **MS. AULT:**  I'm saying this is hearsay, Your Honor.

16         **THE COURT:**  It's hearsay?

17    **MS. AULT:**  Yes.

18         **THE COURT:**  It's hearsay.  Let's see, and it's not an

19    exception to the hearsay rule?

20         **MS. AULT:**  No, Your Honor.

21         **THE COURT:**  Because the business records of the DEA

22    are not exceptions to the --

23         **MS. AULT:**  It is not a business record of the DEA.

24         **THE COURT:**  It's not?  Oh, I'm sorry.  What does it

25    say on top?  Maybe I misread it.  That part (indicating).

1        **MS. AULT:**  It is not a report of a regularly conducted

2   activity of the DEA.  It is not a --

3        **THE COURT:**  They don't report investigations?

4        **MS. AULT:**  Your Honor, it's a report of a specific

5   instance.  It's not a report of regularly conducted activity.

6   It is not a business record.

7        **THE COURT:**  I see.  Okay.

8        **MS. AULT:**  If it was a business record, then -- it is

9   not.

10       **THE COURT:**  Well, all right.  So I'm going to reserve

11  a ruling on its admissibility, but proceed.

12       **MR. RUBY:**  Thank you.

13       **THE COURT:**  I think I'll just treat it as -- it's

14  admitted subject to a motion to strike.  If you want to make a

15  motion to strike and have authority that this doesn't come into

16  evidence, I'll consider the authority; and if you're right,

17  I'll strike it.

18       (Trial Exhibit 100-655 received in evidence)

19  **BY MR. RUBY:**

20  **Q.**   For the record, Agent Chin, is this the recommendation of

21  Agent Williams that you were asked about a little bit yesterday

22  when you testified?

23  **A.**   Yes, it is.

24  **Q.**   All right.  Now, this is dated December of 2006?  Yes?

25  **A.**   That's correct.

**CHIN - CROSS / RUBY**

1   **Q.**   Now, let me ask you this:  In December of 2006, as far as

2   you knew, did DEA have a policy that it was not going to seek

3   out immediate suspension orders against licensees even under

4   the most egregious and extreme circumstances?

5   **A.**   A policy?

6   **Q.**   Yes, a policy.

7   **A.**   Not that I'm aware of.

8   **Q.**   Did in 2006 DEA have a procedure or a practice of not

9   using the tool, not using this resource of immediate suspension

10  orders even in very extreme cases?

11  **A.**   Not that I'm aware of.

12  **Q.**   All right.  Now, is it true that in this document

13  Agent Williams describes some controlled buys?

14  **A.**   Yes, she does.

15  **Q.**   Tell us what a controlled buy is, please.

16  **A.**   Well, it's what I refer to as an undercover purchase, and

17  it's just a situation where an agent who will assume an

18  undercover identity will go to an online pharmacy website and

19  make a purchase for controlled substances.

20  **Q.**   Okay.  And did you note that -- strike that.

21      In 2006, did DEA have a practice that it followed

22  occasionally of asking licensees who were violating the law to

23  voluntarily give up their license?

24  **A.**   Yes.

25  **Q.**   Tell us about that.  How were you trained to know about

**CHIN - CROSS / RUBY**

1  DEA asking people voluntarily to give up their licenses?

2  **A.**    Well, I wasn't trained on that, but I've seen instances in

3  investigations where a diversion investigator will talk to a

4  pharmacy owner about voluntarily giving up the registration.

5  **Q.**    And when a diversion investigator had a conversation like

6  that -- that is, asking a licensee about, "Hey, why don't you

7  discontinue?" -- did the investigator need authority from some

8  supervisory personnel, like the kind of people who could sign

9  suspension orders?

10 **A.**    I wouldn't be able to answer that.

11 **Q.**    And in your understanding, what kinds of licensees would

12 be asked voluntarily to give up their licenses?

13 **A.**    In this instance?

14 **Q.**    Let's say in this instance, sure.

15 **A.**    In this instance, it was where DEA was investigating an

16 online pharmacy, fulfillment pharmacy, and they were asking the

17 pharmacist to give up the registration.

18 **Q.**    Why would they do that?

19 **A.**    Because the -- this particular person was distributing

20 controlled substances from an online pharmacy that would be

21 just based on an online questionnaire.

22 **Q.**    All right.  There wasn't really any doubt within DEA, was

23 there, back in 2006 that Superior was doing just as you said

24 and, in the view of the DEA, was clearly and repeatedly

25 violating the laws that govern the sale of controlled

1    substances; right?

2    **A.**    In this report?

3    **Q.**    Yeah.

4    **A.**    Yes, this report appears in the document.

5    **Q.**    All right.  And if you could go, please, to Bates page,

6    Todd, 2523, and sort of move it up a little if you can,

7    paragraph 25.

8         And the investigator explained that DEA would request the

9    voluntary surrender of Superior Drugs registration, and the

10   registrant said that he and his attorney would get back to

11   Investigator Williams; is that true?

12   **A.**    That's what it says.

13   **Q.**    All right.  And then if we could go to paragraph 26, and

14   it appeared that Mr. White and his attorney forgot to get back

15   to DEA about their request that he voluntarily surrender his

16   license.  Is that how you read this?

17   **A.**    Well, it just says, "No response regarding this matter."

18   **Q.**    You're right.  He could have forgotten.  He could have

19   been meaning to say no.  Or there could have been a variety of

20   reasons; right?

21   **A.**    It just says, "No response," so...

22   **Q.**    Okay.  Fair enough.

23        And then what DEA did was to permit Superior and Mr. White

24   to continue to operate as a registrant for years after this

25   report was prepared; is that right?

**CHIN - CROSS / RUBY**

1    **A.**   Well, I wouldn't necessarily say it in those words, but

2    Superior Drugs continued to have a registration.

3    **Q.**   Well, were they allowed to continue to sell drugs to the

4    public pursuant to the registration which was given to them by

5    the DEA?

6    **A.**   They had a registration and they were continuing to

7    operate, but Superior Drugs was under investigation.

8    **Q.**   And during the period of that investigation, Superior

9    continued to sell drugs to the public; right?

10   **A.**   Superior was continuing to operate, yes.

11   **Q.**   Why was Superior allowed to continue to operate after this

12   report was submitted to management at DEA?

13           **MS. AULT:**  Objection.  Lack of foundation.

14           **MR. RUBY:**  May I withdraw the question?

15   **Q.**   Do you know why Superior was allowed to continue to

16   operate in the years after this report was submitted to

17   management at DEA?

18   **A.**   In terms of this specific instance, I wouldn't know the

19   details of necessarily what was discussed regarding this

20   request.

21   **Q.**   Well, I'm trying to ask a little different question.  Do

22   you know why it was that the DEA allowed Superior to continue

23   to operate as a registrant in the years following this report

24   being submitted to management?

25   **A.**   Generally, from what I am aware of is that Superior was

**CHIN - CROSS / RUBY**

1    under investigation and that Superior was tied to other online

2    pharmacy investigations.  So that would -- was a reason why

3    Superior was still in operation, so that other offices could

4    continue to operate -- I mean, could continue to investigate

5    the online pharmacies tied to Superior.

6         THE COURT:  So, in other words, your understanding was

7    it was a part of an ongoing investigation?

8         THE WITNESS:  Yes.

9         THE COURT:  And had the pharmacy been stopped in 2006,

10   that would have compromised the investigation?

11        THE WITNESS:  That is a consideration that's taking

12   place.

13        THE COURT:  All right.  So from the DEA's point of

14   view, they certainly want that investigation to go forward.

15   They do not want this pharmacy to be stopped until their

16   investigation has advanced to the point where they choose to

17   stop it, which they actually did five years later and thousands

18   of pills later, hundreds of thousands of pills.

19        By the way, isn't Superior Drugs one of the -- isn't it an

20   alleged co-conspirator in this case?

21        MS. ARGUEDAS:  Yes.

22        MR. RUBY:  It is, Your Honor.

23        THE COURT:  Okay.  So it is entirely relevant.

24        Anyway, Ms. Ault, I'm satisfied you will bring in the

25   person who can explain why DEA waited five years to conduct --

1    to close this facility down.  It's highly relevant.

2              MS. AULT:  That was our --

3              THE COURT:  And so it's not unclear to the Government,

4    while this case is about what did FedEx know and what did FedEx

5    do, it is also very much about what did the Government know and

6    what did the Government do because your whole thesis has been

7    that the Government did X and FedEx should have done Y.

8         And so, of course, we want to know what is it that

9    FedEx -- what is it that the Government did and what did they

10   know, and I'm certain we'll get to that at some point.  But I

11   don't want you to be surprised that the Court is extremely

12   interested in finding that out.

13             MS. AULT:  It was always our plan to call

14   Ms. Williams.

15             THE COURT:  Good.  Oh, well, there we are.  Perfect.

16   So we'll leave the document in.

17             MS. AULT:  No, Your Honor.  It is still hearsay, and

18   we do still object.

19             THE COURT:  Well, when does the document come in?

20   When she testifies?

21             MS. AULT:  Your Honor, we don't believe the document

22   ever comes in.  We don't believe --

23             THE COURT:  Never?

24             MS. AULT:  We don't believe police reports or DEA-6s

25   are ever admissible evidence.

1        **THE COURT:**  Well, then she'll be asked about all this.

2        **MS. AULT:**  She may be asked about it --

3        **THE COURT:**  And as long as it's consistent with

4   everything she said, we don't need to see the report.

5        **MS. AULT:**  Exactly.

6        **THE COURT:**  Okay.  All right.  Fair enough.

7        **MR. RUBY:**  All right.

8   **Q.**   Then before I leave this or recess this discussion,

9   Agent Chin, I'm going to show you page -- and this is Bates

10  page 142 of the Rannazzisi testimony.  Bates page 142.

11       **MR. FRANK:**  Which exhibit?

12       **MR. RUBY:**  60-017.  Sorry.

13       **MR. FRANK:**  I'm sorry.  What was the Bates page?

14       **MR. RUBY:**  Bates page 142, please.

15       And then if you could bring up kind of lower on the page.

16  It's the second paragraph from the bottom.  "In addition," do

17  you see that?

18  **Q.**   And it's true, isn't it, Agent Chin, that in 2005 DEA was

19  explaining to Congress and to the public that there exists no

20  statutory definition specifically outlining what constitutes a

21  valid doctor-patient relationship?  Do you see that?

22  **A.**   I see where -- I see where he says that.

23  **Q.**   All right.  And he was saying that was DEA's position at

24  that time, that there was no statutory definition which defined

25  this kind of relationship; right?

1    **A.**    That is what Mr. Rannazzisi was saying.

2    **Q.**    And then, Todd, on the same page if you could go up,

3    please, to the paragraph that begins "During the CYBERx

4    investigation."

5         And just to get a sense of the size -- the scale of this

6    set of issues, do you see Mr. Rannazzisi explained that just

7    the CYBERx pharmacies in nine months of 2005 had purchased --

8    lawfully purchased over 60 million dosage units of controlled

9    substances?  Is that what that looks like to you?

10   **A.**    That's what he says.

11   **Q.**    All right.  And is it true that Mr. Rannazzisi pointed out

12   that these 60 million dosage units had been purchased from

13   licensed registrants who supplied them to licensed pharmacies

14   who then provided them to the public?  Right?

15   **A.**    (Witness examines document.)  Yes, it says that.

16   **Q.**    All right.  Thank you.

17        Now, let me change the subject at this point.  I think you

18   told us, Agent Chin, that you are in the financial crimes or

19   financial something unit of the DEA?  Yes?

20   **A.**    Financial Investigations Team.

21   **Q.**    Financial Investigations.  And you yourself have a

22   background in finance; is that right?

23   **A.**    I have a degree in finance.

24   **Q.**    All right.  Did you ever attempt, as part of your

25   investigation in this matter, to take a look at how much money

**CHIN - CROSS / RUBY**

1  passed from the alleged co-conspirators Chhabra-Smoley and

2  Superior to FedEx?

3          **MS. AULT:**  Your Honor, I'm going to object because we

4  were specifically told to put on evidence of knowledge.  We

5  will put on evidence of finances later, and that will be the

6  appropriate time for these questions.

7          **THE COURT:**  I'll allow that.

8          **MR. RUBY:**  Should I wait?

9          **THE COURT:**  Sustained.

10          **MR. RUBY:**  That's fine.

11      I wonder if I could cover, then, one qualitative question

12  that doesn't get into the exact numbers.

13          **THE COURT:**  Sure.

14  **BY MR. RUBY:**

15  **Q.**  You looked at the issue of monies that passed from

16  Superior and the so-called Chhabra-Smoley Organization to

17  FedEx; is that true?

18  **A.**  Yes.

19  **Q.**  Now, FedEx was paid for delivering packages; true?

20  **A.**  Yes.

21  **Q.**  FedEx is what is called a common carrier?  Yes?

22  **A.**  Yes.

23  **Q.**  All right.  You testified yesterday that you thought that

24  illicit pharmacies marked up their products, I think you said,

25  two or three times before reselling them to the public; is that

1  right?

2  A.   That's correct.

3  Q.   And sometimes the markups in the Internet pharmacy world

4  could be even greater.   They could be four times or six times?

5  Would you agree with me about that?

6  A.   Yes.

7  Q.   Did you find any indication that FedEx marked up its

8  common carrier delivery charges to its pharmacy customers for

9  delivering their packages?

10  A.   I didn't find an instance of a markup, but because of the

11  volume, they would get discounts.

12  Q.   Sure.   I was getting to that.   There was no markup.   They

13  didn't charge anything extra to what they charged other

14  customers; true?

15  A.   Not that I've seen.

16  Q.   All right.   But, in fact, FedEx provided quantity

17  discounts to its pharmacy customers; is that right?

18  A.   That's what I've seen.

19  Q.   And FedEx routinely offered quantity discounts to its

20  other customers, nonpharmacy customers; isn't that true?

21  A.   From what I understand.

22  Q.   And, in fact, the quantity discounts that you looked at

23  that FedEx provided to its pharmacy customers were pursuant to

24  written call them term sheets or call them written terms of

25  service; is that right?

**CHIN - CROSS / RUBY**

1    **A.**    The agreements?

2    **Q.**    Yes.

3    **A.**    Yes.

4    **Q.**    Okay.  You testified yesterday that, I think, that the

5    investigation by DEA of FedEx began around July of 2008.  Yes?

6    **A.**    In 2008.  Well, around April 2008 is when we started

7    looking at that, and the first subpoena was served in

8    June 2008.

9    **Q.**    Fair enough.  Was there an event, as far as you know,

10   which caused this investigation of FedEx to begin within DEA?

11   **A.**    It was information that would have been acquired through

12   the Internet pharmacy investigations.

13   **Q.**    Then the answer to my question is, no, there was no single

14   event which triggered this investigation, am I right?

15   **A.**    Like some sort of single, like, to a particular day, no.

16   **Q.**    I mean, sometimes a construction crane will fall over, and

17   then there will be an investigation of how that came to be.

18   That's what I'm thinking of as an event.  That wasn't what

19   happened here, was it?

20   **A.**    No.

21   **Q.**    Now, did you, in the course of your investigation, review

22   documents which were agreements between FedEx and online

23   pharmacies?

24   **A.**    Yes.

25   **Q.**    And in particular, did you review documents which were

1   agreements to ship packages between FedEx and Superior?

2   **A.**   Yes.

3   **Q.**   And did you review agreements to ship packages between

4   FedEx and the Chhabra -- what's called the Chhabra-Smoley

5   Organization?

6   **A.**   Yes, I've seen those.

7   **Q.**   All right.  Did you find evidence of any other agreements

8   between FedEx and Superior?

9   **A.**   I know that Mr. White was on EZ Debit, so there was -- oh,

10  there was a -- I recall seeing an agreement with a company

11  called True Value Pharma, and that was an online pharmacy that

12  was utilizing FedEx and utilizing Superior to ship, and

13  agreements for EZ Debit for that particular account.

14  **Q.**   All right.  EZ Debit was part of the billing and

15  collection and credit policies of FedEx as we've heard for the

16  last day or two?  Yes?

17  **A.**   Yes.

18  **Q.**   All right.  So let me make sure my question is clear.

19  Other than documents you saw which pertained to the terms of

20  service and the shipping of packages, pick up of packages and

21  the payment for shipping packages, and the credit terms, if

22  any, that applied to the delivery of packages, did you see any

23  other agreements between FedEx and Superior?

24  **A.**   No.

25  **Q.**   And same question as to the Chhabra-Smoley entity

1    so-called.  Did you see evidence of any other agreements

2    between FedEx on the one hand and this organization on the

3    other, other than shipping of packages, collecting packages,

4    credit, payment, and so forth?

5    **A.**    No.

6    **Q.**    And then, finally, could we put, please, Exhibit 001-001

7    back up on the screen.

8         Agent Chin, do you remember this from yesterday?

9    **A.**    Yes, I do.

10   **Q.**    All right.  And this, let's call it a diagram, shows a

11   FedEx truck down at the bottom, as I think you pointed out in

12   your testimony yesterday; is that so?

13   **A.**    Yes.

14   **Q.**    Was this a fair depiction of a diagram of what you believe

15   is a typical or a characteristic transaction of the ordering

16   and payment and creation of a prescription that was delivered

17   by FedEx?

18   **A.**    In terms of online pharmacy --

19   **Q.**    Yes.

20   **A.**    -- yes.

21   **Q.**    All right.  So do we agree that in the typical

22   characteristic FedEx transaction, there was always a

23   prescription?

24   **A.**    There was one that was invalid.

25   **Q.**    But I'm asking you, as you know, a different question.

1   Was there always a prescription?

2   **A.**   There was a document that would have been purported to be

3   a prescription.

4   **Q.**   Okay.  And you testified yesterday that the medication,

5   the pills, whatever it was, came in a labeled container of some

6   kind; is that right?

7   **A.**   What do you --

8   **Q.**   Did the fulfillment pharmacy put a label on the little

9   container of pills?

10   **A.**   Yes.

11   **Q.**   All right.  And on the label, what information was there?

12   **A.**   It would be the customer who ordered the drug, the

13   quantity, strength, and directions.

14   **Q.**   Was the name of the prescribing physician usually on the

15   label?

16   **A.**   That would be on the label.

17   **Q.**   Did the fulfillment pharmacy have a requirement that it

18   retain copies of the prescriptions which were referred to on

19   the pill bottles?

20   **A.**   The fulfillment pharmacy, yes, had a recordkeeping

21   requirement.

22   **Q.**   What part of this entire transaction did FedEx, as the

23   delivery company, have any visibility into at all?  FedEx

24   wasn't part of the call from the consumer to the affiliate; is

25   that right?

**CHIN - CROSS / RUBY**

1    **A.**    FedEx was not part of that.

2    **Q.**    FedEx was not a part of any interaction between the

3    affiliate and what's labeled here as the Internet pharmacy; is

4    that true?

5    **A.**    That's correct.

6    **Q.**    FedEx was not part of any transaction between the Internet

7    pharmacy and the credit card processor; is that true?

8    **A.**    That's correct.

9    **Q.**    FedEx was not part of any transaction between the doctor

10   and the Internet pharmacy, the writing of the prescription, the

11   payment of the doctor?  FedEx had nothing to do with that; is

12   that right?

13   **A.**    That's correct.

14   **Q.**    FedEx was not part of the arrangements between the

15   Internet pharmacy and the fulfillment pharmacy; is that true?

16   **A.**    That's correct.

17   **Q.**    FedEx was not part of the filling of the prescription, the

18   putting it into the pill bottle, and the putting a label onto

19   it; is that true?

20   **A.**    Well, for that particular step, FedEx would have had

21   visibility in terms of the sales associates visiting these

22   fulfillment pharmacies and talking to the business owners or

23   the FedEx customers, and you'd also have the drivers who would

24   be going in and picking up all these large volumes of packages

25   from these particular pharmacies.

1            And then on the other end, on the delivery side to the

2     customer, FedEx would have visibility in that some of these

3     customers would exhibit signs of being addicted to these drugs

4     or abusing these drugs.

5     Q.   One step at a time.  I asked you whether FedEx had any

6     visibility into the process by which this typical or

7     characteristic prescription was filled at the fulfillment

8     pharmacy.  Yes or no?

9     A.   FedEx could have had visibility in that to the extent that

10    a sales executive would have visited with that customer and had

11    been shown the process.

12            THE COURT:  Well, I see, could have.  So how many

13    cases are you aware of when that particular thing happened?

14            THE WITNESS:  I recall that there was a district sales

15    manager who told us that she had seen or had been shown how the

16    business operated at Superior.

17            THE COURT:  Okay.

18    BY MR. RUBY:

19    Q.   And are you prepared to identify any particular

20    prescriptions that FedEx had visibility into?

21    A.   I wouldn't be able to identify a particular prescription.

22    Q.   Would you be able to identify any particular prescriptions

23    where FedEx had any visibility into the process by which the

24    prescription was filled or the pill bottle was loaded or the

25    label was affixed to it?

1    **A.**    Not a specific prescription.

2    **Q.**    Okay.

3              **MR. RUBY:**   May I have a moment, please, Your Honor.

4                        (Pause in proceedings.)

5    **BY MR. RUBY:**

6    **Q.**   And, actually, this is my last question -- or last series

7    of questions.

8         Yesterday you told us about a pharmacy called EVA Global;

9    is that right?

10   **A.**    Yes.

11   **Q.**    All right.  And was EVA -- did you tell us that EVA Global

12   was shut down?

13   **A.**    Well, there was the article discussing the prosecution of

14   those individuals.

15   **Q.**   And in the prosecution of the individuals associated with

16   EVA Global, how many of those prosecutions ended in an

17   adjudication or a conviction of guilt as opposed to the charges

18   being dismissed?

19   **A.**    I don't know the number.  I'm not aware of the number.

20   **Q.**    Were there any convictions?

21   **A.**    Particular -- specifically to EVA Global?

22   **Q.**    That's what I'm asking you.

23   **A.**    I don't think there were with EVA Global.

24   **Q.**   So were you meaning to testify yesterday the view of the

25   DEA that if the people associated with EVA Global were arrested

**CHIN - CROSS / RUBY**

1   and the charges were all dismissed, that FedEx should have

2   stopped doing business with them anyway?

3   **A.**   I think it would be a red flag for FedEx, and that they

4   would look at the customer more closely after having seen that

5   or experienced that.

6           **THE COURT:**  So, in other words, an acquittal of a

7   defendant in a criminal prosecution would require anybody

8   dealing with that defendant who had been acquitted under our

9   law with greater care and caution as to -- that's your view; is

10  that right?

11          **MS. AULT:**  That assumes facts not in evidence,

12  Your Honor.  I don't believe there was testimony that it was an

13  acquittal.

14          **THE COURT:**  I'm sorry.  What was it?  Was it a

15  conviction?

16          **MS. AULT:**  Your Honor, there was a -- there was a

17  mistrial declared, and then there was a decision not to retry

18  the case.

19          **THE COURT:**  There was a dismissal.  Okay.  So let's

20  state it.

21      If the charges are dismissed -- by the way, I take that

22  doesn't help your argument, does it?

23      If the Government chooses to dismiss the charges, it's

24  your view that as to anybody whose charges were dismissed by

25  the United States Government after filing charges to prosecute

1  that person should be treated by FedEx with greater care and

2  caution?  Is that your view?  I'm just trying to understand

3  what you just said.

4                    (Pause in proceedings.)

5        THE WITNESS:  Oh, sorry.

6        THE COURT:  Yeah, I'm asking you.  Is it your view

7  that people -- if the Government dismisses the charges against

8  somebody after filing criminal charges, that that's a red flag

9  to anybody dealing with that person that they ought to deal

10 with them with greater care and caution as a result of the

11 dismissal of the charges?

12       THE WITNESS:  Well, I believe that the reason why the

13 individuals got in trouble in the first place is because they

14 were doing something --

15       THE COURT:  Wrong.

16       THE WITNESS:  -- illegal.

17       THE COURT:  Right.  That's right.  I understand that

18 view.  That view is held by a number of people.  I'm surprised

19 to hear that it's held by the Government.

20       MR. RUBY:  I have no other questions at this time,

21 Your Honor.

22       THE COURT:  Ms. Ault?

23       MS. AULT:  Thank you, Your Honor.

24    Could we have Exhibit 1-1, please.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**REDIRECT EXAMINATION**</u>

**BY MS. AULT:**

**Q.**   Actually, just to go back to the last question about

EVA Global, is it your view that given the environment, what

was going on with online pharmacies at this time around 2007,

and everything that you've seen that FedEx's employees were

aware of, that when they learned that an online pharmacy was

operating based on an online questionnaire model with no

contact between a face -- no face-to-face contact between a

doctor and a patient, that FedEx had an obligation to inquire

further about how that pharmacy was operating?

**A.**   Yes.

**Q.**   Okay.  So there were some questions about FedEx's

visibility into the various different parts, and I believe that

Mr. Ruby asked you a question about whether FedEx had any

visibility into the relationship between the Internet pharmacy

and the fulfillment pharmacy.

     Did FedEx have visibility into that relationship based on

payments to FedEx?  In other words, would FedEx be able to know

that certain online pharmacies were paying the bills for drugs

picked up at a particular fulfillment pharmacy?

**A.**   Yes.

**Q.**   So FedEx would have visibility into the relationship

between the Internet pharmacy and the fulfillment pharmacy

based on where they were picking up the drugs and who was

1    paying for the shipments?

2    **A.**    Yes.

3    **Q.**    In addition, did you run across examples where FedEx

4    employees would set up computer systems inside the fulfillment

5    pharmacies?

6    **A.**    Yes.

7    **Q.**    And would also integrate those computer systems with the

8    pharmacies' actually computer systems?

9    **A.**    Yes.

10   **Q.**    And was one of those pharmacies Superior Drugs?

11   **A.**    It was.

12   **Q.**    And you also discussed a situation where a district sales

13   manager told you that she had learned how Superior Drugs was

14   getting their orders.  And was that Faith Wilson?

15   **A.**    Yes.

16   **Q.**    And did she tell you that she knew that Superior was

17   getting its orders based on an online questionnaire model where

18   there was no contact -- well, she didn't know if there was a

19   doctor involved or not?

20   **A.**    Right.

21   **Q.**    But that the patients weren't seeing a doctor?

22   **A.**    I believe that it was based upon just an Internet

23   communication.

24   **Q.**    And then Mr. Ruby asked you a large number of questions

25   about diversion.  So to go back, are there two sides of DEA?

CHIN - REDIRECT / AULT

1    **A.**    There are.

2    **Q.**    What are the two sides of DEA?

3    **A.**    There's the criminal side and then there's the regulatory

4    side, which is diversion.

5    **Q.**    And which side are you on?

6    **A.**    I'm on the criminal side of DEA.

7    **Q.**    Okay.  So the only contact that you have with the

8    diversion side is when a diversion -- something about diversion

9    intersects with one of the criminal cases that you're doing?

10   **A.**    Yes.

11   **Q.**    All right.  So the questions that he was asking you about

12   whether there are any programs about, you know, systematically

13   doing away with registrations, based on your position in the

14   criminal side of DEA, is that something that you would have --

15   you would know -- you would know about in the course of your

16   job?

17   **A.**    Right.

18   **Q.**    You would or you would not?

19   **A.**    I wouldn't be subject to that on a daily basis.

20   **Q.**    Okay.  So those programs could exist, you just wouldn't

21   know about them because you're not on that side of the house?

22   **A.**    Right.

23   **Q.**    And then I think another thing that was unclear perhaps,

24   is that DEA, prior to the passage of the Ryan Haight Act in

25   2009 -- prior to -- I guess prior to the Ryan Haight Act going

1   into effect in April of 2009, DEA did not register Internet

2   pharmacies; correct?

3   **A.**   That's correct.

4   **Q.**   They only registered fulfillment pharmacies?

5   **A.**   That's correct.

6   **Q.**   All right.  And I'm now going to do what I -- I'm going to

7   ask you a question you may not know the answer to.  Are you

8   aware of any mechanism by which DEA can shut down legally

9   suspect online pharmacies en masse, or do they have to do it

10   one by one on a case-by-case basis?

11   **A.**   It has to be a case-by-case.

12   **Q.**   And if we could look at Exhibit 60-17 and go to page 6.

13       Mr. Ruby was talking to you about Mr. Rannazzisi's

14   testimony, and if we could look at this here (indicating).

15       He pointed you to a part of Mr. Rannazzisi's testimony

16   where Mr. Rannazzisi said that -- I think he was talking about

17   strengthening laws and that there was no statutory definition

18   specifically outlining what constituted a valid doctor-patient

19   relationship.

20       But in Mr. Rannazzisi's testimony, does he have two

21   paragraphs discussing how the online questionnaire model is not

22   a legal way to get drugs?

23   **A.**   Yes.

24                (Pause in proceedings.)

25         **MS. AULT:**  That's all I have, Your Honor.  Thank you.

1          **MR. RUBY:**  No other questions, Your Honor.

2          **THE COURT:**  Well, I have a couple.

3     Diversion -- I want to understand your understanding of

4     these two sides of DEA.  There's something called diversion and

5     there's something called enforcement?

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  Okay.  Now, "diversion" means what?  What

8     does it mean?

9          **THE WITNESS:**  It means to -- instances where

10    controlled substances are taken out of the regulatory channel.

11    So, for example, a situation in which controlled substances are

12    sold on the street, for example, could be a diversion; or if

13    there's a pharmacist that's selling controlled substances out

14    the backdoor; or in some cases with the online pharmacies as

15    well would constitute diversion.

16         **THE COURT:**  So diversion involves violation, in your

17    view, violation of the law; is that correct?

18         **THE WITNESS:**  Yes.

19         **THE COURT:**  So while it's a separate part, it's part

20    of the enforcement process of DEA?  While it's not, quote,

21    "enforcement," are you saying that it's not part of the entire

22    enforcement process of DEA?

23         **THE WITNESS:**  It's one of the things that DEA does,

24    yes, to enforce the laws.

25         **THE COURT:**  To ensure -- to investigate violations of

CHIN - REDIRECT / AULT

1    the law?

2              THE WITNESS:  Yes.

3              THE COURT:  And that's what diversion does?

4              THE WITNESS:  Yes.

5              THE COURT:  And enforcement does it too?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  So I understand that.

8         Now, can we put up 1-1 a minute, that diagram, or that

9    picture?  Whatever it is.  We all looked at it.

10             MS. ARGUEDAS:  They have it.

11             MR. HEMANN:  We're putting it up.

12             THE COURT:  Okay.  There it is.  Okay.  Very good.

13        You better put it on my screen, because I'm -- you're

14   asking a lot for me to look at it over there.  Is there a way

15   to get it on --

16             UNIDENTIFIED SPEAKER:  No.

17             THE COURT:  No?  Oh, there it is.  We all see it.

18        Do you see it in front of you?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Okay.  Now, in response to, I think,

21   Ms. Ault's question about registration, you said that the

22   fulfillment pharmacy is registered by the DEA.

23             THE WITNESS:  That's correct.

24             THE COURT:  Okay.  But the Internet pharmacy is not.

25             THE WITNESS:  That's correct.

1      **THE COURT:**  Okay.  So let me ask some questions about

2  the Internet pharmacy.  Let's take the case of

3  Superior Drugs -- okay? -- which you investigated for a number

4  of years.

5      **THE WITNESS:**  Okay.

6      **THE COURT:**  Right?

7      **THE WITNESS:**  Yes.

8      **THE COURT:**  Okay.  During the course of your

9  investigation, were you able to identify the Internet pharmacy

10  that was used in connection with Superior Drugs?

11      **THE WITNESS:**  Yes.

12      **THE COURT:**  And did it have a name?

13      **THE WITNESS:**  There were several Internet pharmacy

14  organizations that utilized Superior, and I'm aware of some of

15  the names.

16      **THE COURT:**  Okay.  And when did you become aware of

17  these names?

18      **THE WITNESS:**  It would have been when I first started

19  working with these investigations.

20      **THE COURT:**  Okay.  Okay.  So 2006, 2007, 2005 perhaps,

21  looking at the Internet pharmacy, you could look at it and say,

22  "That's the X," or, "That's the Jones Internet pharmacy or the

23  Smith Internet pharmacy."  We know about them?

24      **THE WITNESS:**  Yes.

25      **THE COURT:**  Okay.  And they're right at the center;

1   right?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  And they are the big -- they're the

4   hub.  Everything goes through them?

5              THE WITNESS:  Correct.

6              THE COURT:  Right.  And they dispense cash, money?

7              THE WITNESS:  Yes.

8              THE COURT:  Right.  And they get money?

9              THE WITNESS:  Yes.

10             THE COURT:  And they get the money, according to this

11  chart, from the credit card processor; right?

12             THE WITNESS:  Correct.

13             THE COURT:  And let's take -- let's call somebody

14  Visa.  They were a credit card processor.

15             THE WITNESS:  Correct.

16             THE COURT:  Okay.  So Visa -- oh, and in order for

17  Visa to process and participate in this -- call it "scheme" --

18  in this scheme, they have an agreement with the Internet

19  pharmacy; right?

20             THE WITNESS:  That's correct.

21             THE COURT:  Okay.  These are commercial agreements

22  that are established that Visa has with every customer; right?

23             THE WITNESS:  Yes.

24             THE COURT:  And absent that agreement, this financing

25  mechanism wouldn't work, would it?

1          THE WITNESS:  That's correct.

2          THE COURT:  Okay.  So tell me, if you recall, what

3     efforts you made to go to Visa and tell them to stop doing

4     business with the Internet pharmacy.

5          THE WITNESS:  I'm aware that DEA, as part of the

6     industry meetings, did meet with the credit card processing

7     companies, and that companies such as Mastercard were actively

8     taking efforts to stop the online pharmacies.  They were

9     enforcing their rules.

10         THE COURT:  Well, I'm trying to figure out that if you

11    went to Visa in 2005 and told them to stop doing business with

12    Internet, how it continued.  How do you think it continued?  Do

13    you have an idea?  Why did it continue?  You go to -- DEA goes

14    to Visa, a legitimate company, and says to Visa, "Look, you're

15    financing -- you're facilitating the financing of this horrible

16    enterprise.  You must stop it."  Did they stop it?

17         THE WITNESS:  Well, there are other ways that these

18    online pharmacies receive money.

19         THE COURT:  I just want to talk about Visa.  I'm

20    looking at your diagram.  It's not mine.  Your diagram, did

21    Visa stop after you told them this horrible thing that they

22    were doing?  And I watched.  The president of Visa or one of

23    the high people in Visa, they were part of this hearing,

24    weren't they?

25         THE WITNESS:  Yes.

1              THE COURT:  They were sitting there with FedEx and

2       Google and everybody, and even Mr. Rannazzisi probably was

3       there.  A big thing, "Visa, you've got a job to do.  Don't

4       finance this illegal operation."  But they continued, didn't

5       they, after 2005; or did they stop in 2005?

6              THE WITNESS:  Visa International did continue.

7              THE COURT:  Fine.  Well, what efforts did you make to

8       prosecute Visa International for continuing to exercise the

9       financing of this operation?  Any?  Did you investigate them?

10             THE WITNESS:  I did not investigate Visa.

11             THE COURT:  Are you aware of an investigation of Visa

12      which led to, I guess, a no prosecution agreement?

13             THE WITNESS:  One thing that we did in our

14      investigation with the online pharmacies was to go after a

15      payment processor who was helping to facilitate these illegal

16      online pharmacies.

17             THE COURT:  A payment processor.  Visa?

18             THE WITNESS:  It was a separate organization that was

19      authorized to sell credit card processing services, including

20      Visa.

21             THE COURT:  Well, tell me about Visa.  Did they

22      contribute to a substantial financing of this operation over

23      time from 2005 to 2009 -- or 2008?  Were they a contributor to

24      it?

25             THE WITNESS:  Visa doesn't actually provide payment.

CHIN - REDIRECT / AULT

1          **THE COURT:**  Did they participate in the process of

2     processing these -- I'm not making up Visa.  You've got it

3     right there.  I just want to know.  Did they continue with this

4     operation?

5               **THE WITNESS:**  Visa was part of this, yes.

6               **THE COURT:**  And they continued?

7               **THE WITNESS:**  Yes.

8               **THE COURT:**  I see.  Thank you.

9          **MS. AULT:**  Your Honor, may I clarify a few things with

10    the witness?

11              **THE COURT:**  Sure.

12    **BY MS. AULT:**

13    **Q.**   So in the course of your investigations, the Internet

14    pharmacies that you investigated used Visa and Mastercard

15    originally?

16    **A.**   Yes.

17    **Q.**   All right.  At some point in time did they stop using

18    Mastercard?

19    **A.**   Yes.

20    **Q.**   Why?

21    **A.**   Because Mastercard --

22              **THE COURT:**  Can you tell me when?  Give me the date.

23    **BY MS. AULT:**

24    **Q.**   Approximately, do you remember?

25    **A.**   I recall --

1        **THE COURT:**  You can tell him.  You can tell him.

2        **MS. AULT:**  I don't remember.

3   **Q.**   It was sometime in 2004 or '5?

4   **A.**   Yes.  I recall around that time period.

5   **Q.**   Okay.  It was before -- it was while the SafeScriptsOnline

6   online pharmacy was operating; correct?

7   **A.**   Yes.

8   **Q.**   So it was before the end of 2006?

9   **A.**   Yes.

10  **Q.**   Likely sometime in 2005?

11  **A.**   Yes.

12  **Q.**   What did Mastercard do?

13  **A.**   Mastercard stopped processing for -- or made efforts to

14  stop processing for the online pharmacies.

15  **Q.**   Okay.  And so did they actually send out letters to all of

16  the online pharmacies telling them, "If you are not VIPPS

17  certified, we cannot process for you"?

18  **A.**   I know Mastercard was sending out -- if they detected some

19  fraudulent activity, they would send a notice to the acquiring

20  banks alerting the acquiring banks that this type of activity

21  was going on, the online pharmacy activity was going on.

22  **Q.**   Okay.  And so did Mastercard take some significant efforts

23  to stop online pharmacies from using its services?

24  **A.**   Yes.

25  **Q.**   And were those for the most part successful?

CHIN - REDIRECT / AULT

1  **A.**   For Mastercard, yes.

2  **Q.**   Okay.  Now, Visa, how is -- how is Visa structured?  Is

3  there a Visa U.S. and a Visa International?

4  **A.**   From my investigation, yes.

5  **Q.**   Did Visa U.S. take some substantial steps to stop

6  prosecuting -- or stop processing orders for Internet

7  pharmacies?

8  **A.**   From what I understand, yes, Visa U.S. had more

9  flexibility to do that.

10  **Q.**   Okay.  And so in your experience with your investigations,

11  were the online pharmacies not able to get processing with

12  Visa U.S.?

13  **A.**   Yes.

14  **Q.**   So how did they then get processing with Visa?

15  **A.**   So they would have to seek offshore companies to set up

16  their merchant accounts so that they could process with

17  Visa International.

18  **Q.**   All right.  And did you, in the course of your

19  investigations, run across individuals who specialize in

20  helping Internet pharmacies to establish the offshore accounts

21  that they needed and the ways that they needed to hide what

22  their business was so that they could get credit card

23  processing with Visa International?

24  **A.**   Yes.

25  **Q.**   And did you also learn that there were one or two offshore

1  credit card processors located in I believe St. Kitts and

2  Cyprus who were one further step by which the online pharmacies

3  could disguise their business from Visa International?

4  A.   Yes.  It was Israel.

5  Q.   And the individuals who were helping the online pharmacies

6  to hide their business model from Visa, were some of those

7  people prosecuted?

8  A.   Yes.

9        MS. AULT:  Does that help the Court?

10       THE COURT:  Yeah.  Thank you.

11       MR. RUBY:  May I, Your Honor, briefly?

12       THE COURT:  Sure.

13                    **RECROSS-EXAMINATION**

14  BY MR. RUBY:

15  Q.   Agent Chin, it was, I don't know, ten minutes ago that I

16  asked you whether this drawing here was typical or

17  characteristic of the transactions which led to FedEx

18  delivering packages; right?

19  A.   Yes, that's correct.

20  Q.   You understood that question, didn't you?

21  A.   Yes.

22  Q.   And you answered yes?

23  A.   Yes.

24  Q.   Do you now want to say that this is misleading?

25  A.   No.  This is how a typical online pharmacy generally

**PROCEEDINGS**

1    operated.

2    **Q.**    All right.  So with the Visa logo appearing in a couple of

3    places in the transaction, you stand behind that?  That's how

4    these things worked; right?

5    **A.**    Yes.

6              **MR. RUBY:**  I have no more questions.

7                     **FURTHER REDIRECT EXAMINATION**

8    **BY MS. AULT:**

9    **Q.**    Just, sorry, one last thing that I forgot, which was, as

10   even Visa International began to crack down on more of the

11   online pharmacies, did you find in your investigations that

12   they switched to another payment model?

13   **A.**    Yes.

14   **Q.**    And what was that payment model?

15   **A.**    CODs.

16   **Q.**    Okay.  Thank you.

17             Including CODs by FedEx?

18   **A.**    That were transported by FedEx, yes.

19             **MR. RUBY:**  I have no other questions, Your Honor.

20             **THE COURT:**  Thank you.  You may step down.

21                     (Witness excused.)

22             **THE COURT:**  So why don't we recess until a quarter of

23   1:00, is that -- oh, no, no.  I forgot it's criminal calendar,

24   so why don't we recess.

25             Now, we're not meeting tomorrow; is that right?

**PROCEEDINGS**

1          MS. AULT:  Correct, Your Honor.

2          THE COURT:  And we resume on Friday?

3          MS. AULT:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. HEMANN:  Your Honor, we'll have two witnesses,

6    just two witnesses, on Friday.

7          THE COURT:  Two witnesses on Friday, that's all.

8          MR. HEMANN:  Well, we believe two witnesses,

9    Mr. Murphy and Ms. Willis; and we are attempting to identify

10   others who were at this series of meetings and arrange to have

11   them here.  If we're able to do that, we'll let the Defense

12   know by the end of the day today at the very latest.

13         MS. ARGUEDAS:  Great.  But otherwise we'll push

14   forward with other law enforcement witnesses; right?  In other

15   words, we're going to work the whole day; correct?

16         MR. HEMANN:  That was not our understanding,

17   Your Honor; but based on --

18         MS. ARGUEDAS:  Am I saying something that's wrong

19   here?

20         MR. HEMANN:  No.  And maybe it was just a

21   miscommunication, Your Honor.  Our understanding was that we

22   were going to at this point in time focus on that series of

23   meetings and have these two witnesses in particular, and then

24   resume with -- to the extent we can't get others here by

25   Friday, resume on Monday with the other -- any other witnesses

1   that the United States has -- Mr. Byrom, Mr. Trant,

2   Ms. Becker -- who were at the meetings as well.

3           **MS. ARGUEDAS:**  I understood Willis Murphy, Friday

4   morning; Trant, Becker, Byrom next week; but Friday afternoon

5   we should be in session with witnesses that the Prosecution is

6   putting on.

7           **THE COURT:**  Well, okay.  Let me ask them.  Would you

8   have somebody available?

9           **MS. ARGUEDAS:**  They have all these agents that are

10  here.

11          **MS. AULT:**  If we could confer for a moment,

12  Your Honor.

13          **THE COURT:**  Yeah.  Sure.

14                  (Government counsel conferring.)

15          **MR. HEMANN:**  So I have -- if -- I have to think,

16  Your Honor.  We have one witness who is here who could probably

17  stay -- possibly stay -- I don't know what his personal

18  situation is -- until Friday and move forward, a law

19  enforcement person.

20       I'll tell you, to be completely candid, Your Honor, what I

21  desperately do not want to do is put on a bunch of witnesses

22  that the Court -- like Ms. Wagner this morning, I mean, you

23  know, I don't think that that is helpful.

24       We have been asked by FedEx and FedEx lawyers if we're

25  able to cut their witnesses loose for the next of the week and

PROCEEDINGS

1    not have them sitting around.  They were the ones that were

2    scheduled for the most part.  And we did that understanding

3    what the Court is interested in hearing and not wanting to

4    waste the Court's time.

5         We may be able to scramble to put some law enforcement

6    witnesses on.  I do not believe that the Court wants to hear

7    those witnesses at this point at this time, and I think that we

8    will test the Court's patience by putting them on.  I am loath

9    to do that.

10         **THE COURT:**  Yes, I don't blame you for not wanting to

11    test the Court's patience.

12         **MR. HEMANN:**  So --

13         **MS. ARGUEDAS:**  May I be heard, though?

14         **THE COURT:**  By the way, that assumes a fact not in

15    evidence.

16                        (Laughter)

17         **MS. ARGUEDAS:**  First of all, Bonnie Wagner is

18    definitely part of the Prosecution's evidence, supposedly, of

19    FedEx's knowledge.  Her e-mails were discussed by Mr. Hemann in

20    their opening statement.  The fact that she was not a very

21    effective witness is another matter.

22         **THE COURT:**  They may not --

23         **MS. ARGUEDAS:**  The --

24         **THE COURT:**  They may not agree with that.  Okay.

25         **MS. ARGUEDAS:**  The Government has had a whole lot of

1   FedEx employees here in town waiting to go on, inconvenienced

2   them tremendously.

3        My only point is this, Judge:  FedEx's position always is

4   we want trial all day, every day, no delays.  We want to get to

5   the end of this thing.  So we want somebody here on Friday

6   afternoon, and they have lots of choices of who that could be

7   that would not test the Court's patience and would be on the

8   subject they think of knowledge and intent.

9        **THE COURT:**  Well, I think it would be knowledge.  In

10  other words, if you do have somebody that is available and you

11  can put on, put that person on, if you will.  You know --

12       **MS. AULT:**  I believe that -- some of the issue that

13  we're having, Your Honor, is that, you know, we had a plan, and

14  then the Court said that the Court wanted a certain order of

15  proof, and I think that we have been struggling to figure out

16  what the Court means by that.  And so we are -- as we figure

17  out what the Court means by that, we are restructuring our

18  witnesses, but that makes it logistically difficult.

19       So we will make every effort to have more witnesses here

20  on Friday.  We just -- we can't guarantee it.

21       **THE COURT:**  Well, if you have a witness who can

22  testify as to knowledge --

23       **MR. HEMANN:**  I believe that we understand right now

24  today what the Court wants to hear in terms of knowledge

25  evidence.  On Friday we will have two such witnesses available.

**PROCEEDINGS**

1   We will have other witnesses that we can put on that testify as

2   to -- under the broad umbrella of knowledge but not the

3   particular areas that the Court is interested in hearing.

4       I do not believe that given the trajectory that we are on

5   that calling witnesses and having the Court sit and listen to

6   witnesses -- the witnesses that we would otherwise put on, is

7   going to advance the end of this trial.  I believe that the

8   best course for advancing the end of the trial and getting to a

9   decision point is to put the witnesses on that the Court wants

10  to put on, have the Court hear them, and then have a

11  discussion.

12          **THE COURT:**  Okay.  Well, I'll accept that.  All right.

13  I think on the one hand I can't ask you to do something and

14  then start to micromanage it.

15      I appreciate FedEx's position.  It has been your position

16  from day one.  I understand that.  Then I perhaps threw -- I

17  intervened in the well-ordered process by restructuring the

18  order of proof.

19      Be that as it may, the Government has agreed to focus on

20  that, and I have to leave it to their discretion.  But when the

21  day comes that the Government says, "Look, this is all our

22  evidence about knowledge," I want to be in a position to hear

23  some argument on that issue before going to Dr. X or Patient Y

24  or somebody else.

25      So --

1          MR. HEMANN:  We understand and anticipate that,

2     Your Honor.

3          THE COURT:  So I have no reason to believe you

4     wouldn't -- I have no reason to believe you're not operating in

5     good faith.  And when you tell me that I don't want to hear

6     somebody right now, my guess is you're right because when you

7     tell me I do want to hear somebody right now, I'm not sure

8     you're right in that regard; but I'm going to -- you deal with

9     it, think about it and deal with it.  If you decide that you

10    can put a third witness on, please advise FedEx by the end of

11    today; and if you decide not to, that's fine.

12         MR. HEMANN:  We'll tell them either way.

13         THE COURT:  Great.

14         MR. HEMANN:  Thank you very much, Your Honor.

15         MS. AULT:  Thank you, Your Honor.

16         THE COURT:  Thank you.  Okay.  We're in recess.

17              (Proceedings adjourned at 12:02 p.m.)

18                          ---oOo---

1

2

3                    **CERTIFICATE OF REPORTERS**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, June 15, 2016

8

9

10

11    _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15    _____

16          Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

17

18

19

20

21

22

23

24

25